# E-filing

PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name ___Jimenez,___ ___Jose L.___ _____
      (Last)       (First)     (Initial)

Prisoner Number ___E-49850___

Institutional Address ___P.O. Box 689, Soledad, CA  93960___

___Correctional Training Facility - Central___

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

JOSE LUIS JIMENEZ,
(Enter the full name of plaintiff in this action.)

vs.

B. CURRY, Warden, et al.,

_____

_____

_____
(Enter the full name of respondent(s) or jailor in this action)

)
)
)
)
)
)
)
)
)
)
)
)
)

CV 08 2551

Case No. _____
(To be provided by the clerk of court)

**PETITION FOR A WRIT MHP**
**OF HABEAS CORPUS**

**(PR)**

Read Comments Carefully Before Filing In

### When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS    - 1 -

1    Who to Name as Respondent

2         You must name the person in whose actual custody you are. This usually means the Warden or

3    jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced. These are not proper

5    respondents.

6         If you are not presently in custody pursuant to the state judgment against which you seek relief

7    but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8    custody you are now and the Attorney General of the state in which the judgment you seek to attack

9    was entered.

10   A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11       1. What sentence are you challenging in this petition?

12           (a)   Name and location of court that imposed sentence (for example; Alameda

13                County Superior Court, Oakland):

14            <u>Los Angeles County Superior Ct.</u>   <u>Los Angeles, CA 90012</u>

15              Court                    Location

16           (b)   Case number, if known    <u>A032130</u>

17           (c)   Date and terms of sentence <u>4-3-86</u>  , <u>15-years-to-Life</u>

18           (d)   Are you now in custody serving this term? (Custody means being in jail, on

19                parole or probation, etc.)        Yes <u>XXX</u>    No _____

20                Where?

21               Name of Institution: <u>Correctional Training Facility</u>

22               Address: <u>P.O. Box 686, Soledad, CA 93960-0686</u>

23       2. For what crime were you given this sentence? (If your petition challenges a sentence for

24   more than one crime, list each crime separately using Penal Code numbers if known. If you are

25   challenging more than one sentence, you should file a different petition for each sentence.)

26      <u>Homicide of the second degree</u>

27   _____

28     <u>§  187</u>

PET. FOR WRIT OF HAB. CORPUS    - 2 -

3.  Did you have any of the following?

    Arraignment:                         Yes __XX__    No _____

    Preliminary Hearing:              Yes __XX__    No _____

    Motion to Suppress:             Yes _____    No __XX__

4.  How did you plead?

    Guilty _____    Not Guilty __XX__    Nolo Contendere _____

    Any other plea (specify) _____

5.  If you went to trial, what kind of trial did you have?

    Jury __XX__    Judge alone_____    Judge alone on a transcript _____

6.  Did you testify at your trial?           Yes __XX__    No _____

7.  Did you have an attorney at the following proceedings:

    (a)    Arraignment           Yes __X__    No _____

    (b)    Preliminary hearing      Yes __X__    No _____

    (c)    Time of plea           Yes __X__    No _____

    (d)    Trial                     Yes __X__    No _____

    (e)    Sentencing            Yes __X__    No _____

    (f)    Appeal                 Yes __X__    No _____

    (g)    Other post-conviction proceeding    Yes _____    No __XX__

8.  Did you appeal your conviction?         Yes __X__    No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal           Yes __X__    No _____

        Year: _____    Result:_____N/A_____

        Supreme Court of California    Yes __X__    No _____

        Year: _____    Result:_____N/A_____

        Any other court            Yes _____    No __XX__

        Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1    petition?                                    Yes ____    No XX

2         (c)    Was there an opinion?            Yes XX    No ____

3         (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                 Yes ____    No XX

5                If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?              Yes XX    No ____

10        [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16        (a)    If you sought relief in any proceeding other than an appeal, answer the following

17               questions for each proceeding. Attach extra paper if you need more space.

18               I.    Name of Court: Los Angeles County Superior Court

19                     Type of Proceeding: _____ habeas corpus petition _____

20                     Grounds raised (Be brief but specific):

21                     a. state/federal denial of due process

22                     b. state/federal denial of equal protection

23                     c. _____

24                     d. _____

25                     Result: petition denied    Date of Result: 1/9/08

26               II.   Name of Court: Second Dist. Court of Appeals/Div

27                     Type of Proceeding: _____ habeas corpus petition

28                     Grounds raised (Be brief but specific):

a. _____ (See attached) _____

b. _____

c. _____

d. _____

Result: __denied__ Date of Result: __2/15/08__

III. Name of Court: __California Supreme Court__

Type of Proceeding: __Petition for Review__

Grounds raised (Be brief but specific):

a. __(See attached copy of writ and Exhibits)__

b. _____

c. _____

d. _____

Result: __denied__ Date of Result: __4/23/08__

IV. Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____ Date of Result: _____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____    No __XXC__

Name and location of court: _____

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to

support each claim. For example, what legal right or privilege were you denied? What happened?

Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1   need more space. Answer the same questions for each claim.

2        [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One:_____

6        _____PLEASE SEE ATTACHED PAPERWORK_____

7   Supporting Facts:_____

8   _____

9   _____

10   _____

11        Claim Two:_____

12   _____

13   Supporting Facts:_____

14   _____

15   _____

16   _____

17        Claim Three:_____

18   _____

19   Supporting Facts:_____

20   _____

21   _____

22   _____

23        If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   _____ALL ISSUES ALLEGED HEREIN ARE FULLY EXHAUSTED

26   _____

27   _____

28   _____

PET. FOR WRIT OF HAB. CORPUS     - 6 -

1         List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    Martin v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038

5    Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063

6    In re Scott (2005) 133 Cal.App.4th 573

7    Do you have an attorney for this petition?                    Yes_____     No_ X_

8    If you do, give the name and address of your attorney:

9    _____

10        WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on ___May 12___ , 2008.              _Jose L. Jimenez_

14                Date                                   Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

ATTACHMENT

This petition concerns:

    ☐ A conviction             ☒ Parole

    ☐ A sentence             ☐ Credits

    ☐ Jail or prison conditions     ☐ Prison discipline

    ☒ Other *(specify):* **federal denial of due process, equal protection, sufficiency of evidence**

1. Your name: **Jose Jimenez**

2. Where are you incarcerated? **CTF-Central**

3. Why are you in custody?   ☒ Criminal Conviction   ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

    **Homicide of the second degree**

b. Penal or other code sections:   **Penal Code § 187**

c. Name and location of sentencing or committing court: **Los Angeles County Superior Court,**

    **210 W. Temple St., L.A., CA 90012**

d. Case number:   **A032130**

e. Date convicted or committed:   **March 27, 1990**

f. Date sentenced:   **April 03, 1986**

g. Length of sentence:   **fifteen (15) years to Life**

h. When do you expect to be released? **unknown; M.E.P.D. was on April 19, 1997**

i. Were you represented by counsel in the trial court?   ☒ Yes.   ☐ No. If yes, state the attorney's name and address:

    **Los Angeles County Public Defender's Office**

4. What was the LAST plea you entered? *(check one)*

  ☒ Not guilty   ☐ Guilty   ☐ Nolo Contendere   ☐ Other:

5. If you pleaded not guilty, what kind of trial did you have?

  ☒ Jury   ☐ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial

6. GROUNDS FOR RELIEF
Ground 1: State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PETITIONER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTION WERE VIOLATED BY RESPONDENTS WHEN THEY DENIED TO HIM THE INDIVIDUALIZED CONSIDERATIONS MANDATED AND REQUIRED BY STATUTORY AUTHORITIES AND ALL THE CLEARLY ESTABLISHED FEDERAL LAWS.

a. Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

On April 12, 2007, Jose L. Jimenez (Petitioner), appeared before the Board of Parole Hearings (BPH) for his 5th subsequent hearing (6th overall), during which Ms. J. Eng was Presiding Commissioner and Mr. J. Martin was Deputy Commissioner. A copy of the Hearing transcript is attached hereto as Exhibit "A", and incorporated by reference to bolster a claim of a "no parole" policy and/or practice which has been found to be patently unconstitutional by numerous state and federal courts that have ruled on the matter.

Petitioner was represented by Ms. M. Tardiff. A staff psycholo-gist, Dr. E. Hewchuck, Ph.D., testified utilizing a filed Report dated: 7-26-05, that in his opinion Petitioner is NOT a risk of CURRENT danger to the public safety. A copy of that Report and Reports of 1996, 1998 and 2002 are attached as Exhibit "B". A copy of the 2007 Counselor's
(continued on attached pages)

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

(SEE ATTACHED POINTS AND AUTHORITIES)

I

1 | **(continued from previous page)**:

2 | Report is attached as Exhibit "C" and was prepared and filed but not cited to at the Hearing.

3 | It should be noted that a current psychological evaluation was done by a forensic specialist from
4 | Sacramento but was not made available before the Hearing and HAS NOT, as of this writing, been received by
5 | petitioner as mandated by statute. Copies of the 2005, 2003 and 2001 BPT Decisions denying parole are
6 | attached hereto as Exhibit "D" and are clearly anecdotal evidence to further advance the allegation of a "no
7 | parole" policy and/or practice that has been held to be unconstitutional as well as illegal by all courts that have
8 | ruled on the subject matter and, with the Court's leave, are also incorporated by reference to this pleading as
9 | though fully set forth herein. This allegation of a "no parole" policy and/or practice is not idle nor wishful thinking
10 | but is fully documented after many months of discovery conducted in a group of cases out of Santa Clara
11 | county: In re Lewis, et al., case no. 68038, a copy of that Order is attached as Exhibit "E".

12 | Also present at the hearing was Mr. D. Eastman, d.d.a., from Los Angeles county, parole division.

13 | Parole statutes and regulations bestow on life prisoners a liberty interest in parole protected by due
14 | process. McQuillen v. Duncan (9th Cir. 2002) 306 F.3d 895, 901-903; In re Rosenkrantz[1] (2002) 29 Cal.4th 616,
15 | 661 [Rosenkrantz V]. Petitioner's liberty interest required the BPH panel to find him suitable for parole and set
16 | his prison term and a parole date because, when his MEPD lapsed, his parole was evaluated to no longer pose
17 | an unreasonable risk of danger to society or public safety. (Penal Code (PC) §3041(a); 15 California Code of
18 | Regulations (CCR) §§ 2280, 2281(a).)

19 | In some cases, a lifer who otherwise qualifies for parole may be found unsuitable for and denied parole if
20 | the commitment offense was especially egregious when compared to other instances of the same offense. Such
21 | cases, however, are *exceptions*, and not per the rule. Accordingly, the conduct of an up-to-life sentenced inmate
22 | who committed second degree murder **must** be especially violent when compared to that of other second
23 | degree murderers for parole to be denied on the basis of the offense in the case of an otherwise qualified
24 | inmate. However, the offense cannot serve as a basis for denying parole interminably. In re Ramirez (2001) 94
25 | Cal.App.4th 549, 569-570; Rosenkrantz V, 658. (cf: Biggs v. Terhune (9th Cir. 2003) 34 F.3d 910; Irons v.

---

27 | [1] There have been seven (7) "Rosenkrantz" decisions: People v. Rosenkrantz (1988) 198 Cal.App.3d 1187; In re Rosenkrantz (2000) 80
Cal.App.4th 409; Davis v. Superior Court (2-22-01, B146421 [non-pub.]; In re Rosenkrantz (2002) 95 Cal.App.4th 358; In re Rosenkrantz (2002)
28 | 29 Cal.4th 616; In re Rosenkrantz L.A. County Sup.Ct. no. BH003529, filed 6-26-2006 ;Rosenkrantz v. Marshall (2006) 444 F.Supp.2d 1036.

**I-**A

1    Warden (E.D. Cal. 2005) 358 F.Supp.2d 936; Martin v. Marshall (N.D. Cal. 2006) 431 2281(b); In re Minnis

2    (1972) 7 Cal.3d 639, 646; In re Rosenkrantz (2000) 80 Cal.App.4th 409, 424-427 (Rosenkrantz V); Rosenkrantz

3    V, 655; Ramirez, supra, 566. The "some evidence" standard is satisfied if there is F.Supp.2d 1038 (Martin I);

4    Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063 Rosenkrantz VI].)

5         Here, Petitioner did not intend that anyone would die as a result of the melee and any violent

6    consequences and he was therefore sentenced as a youth originally and cannot have committed any crime in

7    any definitive criteria which would suggest that his crime was committed in "an exceptionally cruel manner" nor

8    with an "especially callous disregard for the suffering of another" because he did not intend the logical

9    consequences of the actual perpetrator and had no specific intent to do any harm to anyone such as this wanton

10    murder of an innocent.

11         Substantive due process requires that the grounds set forth by a BPH panel for its decision must be

12    supported by at least some credible, relevant evidence in the record. The panel was required to base its findings

13    on a weighing of all relevant, reliable evidence. (15 CCR § substantial, reliable evidence in the record that could

14    support the conclusion reached. Powell v. Gomez (9th Cir. 1994) 33 F.3d 39, 40; Cato v. Rushen (9th Cir. 1987)

15    824 F.2d 703, 705. And federal due process requires substantial evidence having indicia of reliability Jancsek v.

16    Oregon Bd. Of Parole (9th Cir. 1987) 833 F.2d 1389, 1390; In re Powell (1988) 45 Cal.3d 894, 904; Rosenkrantz

17    V, 658; McQuillen, supra, 306; Biggs, supra, 915; Caswell v. Calderon (9th Cir.2004) 363 F.3d 832, 839.

18        Black's Law Dictionary 5th Ed. 1979 defines **SUBSTANTIAL EVIDENCE** as follows:
         "Such evidence that a reasonable mind might accept as adequate to support a conclusion.
19       *It is that quality of evidence necessary for a court to affirm a decision of an Administrative*
         *board.* (Black's p. 1281, citing State v. Green (1974) 544 p.2d 356, 362. emphasis added.)

20         The Due Process clause of the Fourteenth Amendment prohibits state action that deprives a

21    person of life, liberty, or property without due process of law. A person alleging a due process violation must first

22    demonstrate that he or she was deprived of a liberty or property interest protected by the Due Process Clause,

23    and then show that the procedures that led to the deprivation were constitutionally insufficient. Kentucky Dept. of

24    Corrections v. Thompson (1989) 490 U.S. 454; McQuillen, supra, 900.

25         In the parole context, a prisoner alleging a due process claim must demonstrate the existence of a

26    protected liberty interest in parole, and the denial of one or more of the procedural protections that must be

27    afforded when a prisoner has a liberty interest in parole. The Supreme Court held in 1979, and reiterated in

28

1  1987, that "a state's statutory scheme, if it uses mandatory language, creates a presumption that parole release
2  will be granted when or unless certain designated findings are made, and thereby gives rise to a constitutional
3  liberty interest." McQuillen, supra, 901 (citing Greenholtz v. Nebraska Penal Inmates (1979) 442 U.S. 1, 7 and
4  Board of Pardons v. Allen (1987) 482 U.S. 369, 373. Because no evidence supported the panel member's
5  finding that Petitioner's parole poses an "unreasonable risk of danger to society" or to "public safety," and the
6  finding was inapposite to the record, parole denial on that basis subverted due process and substantiates those
7  who contend that this state is without an excuse as to why the denial rate is what it is.

8      The reason stated by the panel for finding Petitioner unsuitable was BPH's boilerplate statement that his
9  parole "would pose an unreasonable risk of danger to society or a threat to public safety." (Exhibit "A", p. 63) the
10  sole ground set forth by the panel in support of its Decision to AGAIN, for the sixth ($6^h$) time, deny suitability and
11  dismiss his warrant of parole which is long overdue! (His M.E.P.D. was 4-19-1997.)

12      Parole denial based on the "unreasonable risk" subterfuge abandoned principles of independence and
13  abrogated due process because it is supported by **NO** reliable evidence. **All** of the competent, professionally-
14  sanctioned evidence that addresses Petitioner's current **and** future dangerousness, parole risk, etc., found it to
15  be "no greater than the average citizen," or "suitable for release," nor has it been for over a decade.
16  "Significantly, *the evidence underlying THE DECISION must be supported by '"some indicia of reliability.'"*
17  Rosenkrantz VI, supra, at p. 1083, emphasis added. (See again Exhibit "B", Exhibit "A", at p.43.)

18      Utilizing the legal precedent established as the focal criteria, all relevant, reliable evidence in Petitioner's
19  records that addresses his dangerousness and parole "risk" all assess these factors to be low. And, because not
20  a scintilla of reliable, relevant evidence supports the panel's flawed findings, the sole relevant reason for finding
21  him unsuitable for parole sensibly suggests this was an illegitimate (ongoing) basis for denial. Martin v. Marshall
22  (N.D. Cal. 2006) 431 F.Supp.2d 1039, (Martin I), Martin v. Marshall 448 F.Supp.2d 1143, (Martin II), et al.

23      In Martin II, supra, Justice Patel found NO justification for the panel's boilerplate lack of individual
24  consideration and in her July 21, 2006 Memorandum and Order she stated:

25      "In light of the Board's apparent abandonment of its independent role"—**which occurred AFTER**
26  **Governor Schwarzenegger took office---,** "*the court finds that a remand would indeed be futile.*" There can be
27  no question but that the implication here is exactly what it means: NO INDEPENDENT PAROLE DECISION BY
28  THE WILSON, DAVIS, OR SCHWARZENEGGER regimes for this Petitioner. Id. at p. 1144. (Emphasis added.)

1    In Rosenkrantz V, supra, at p. 655, the Supreme Court explained that parole release decisions "entail

2    the [BPH]'s attempt to predict by subjective analysis whether the inmate will be able to live in society without

3    committing additional antisocial acts." Such a prediction requires analysis of individualized factors on a case-by-

4    case basis and the BPH's discretion in that regard is almost unlimited. Notwithstanding that the BPH's discretion

5    is exceedingly broad, it is circumscribed by the requirements of procedural due process. (Rosenkrantz, id., Calif.

6    Const. article I, § 7(a), and statutory directives mandating a fair and unbiased Hearing.)

7    Absent substantial evidence of the presence of unsuitability factors, there must be some relevant,

8    reliable evidence that a petitioner is otherwise unsuitable for parole, such as by his having failed to meet the

9    suitability criteria under 15 CCR § 2402, subd. (d); §§ 1-4, 6-9. And, while the BPH has exceedingly broad

10    discretion in its parole decisions, the Findings must reflect "an individualized consideration of the specified

11    criteria and cannot be arbitrary or capricious." Rosenkrantz V, supra, 677; "[t]he liberty interest is created, not

12    upon the grant of a parole date, but upon the incarceration of the inmate." Biggs, supra, 914.

13    The failure to properly consider the post-incarceration factors highlights the inherent misunderstanding

14    and application of the "some evidence" standard and triggers the required scope of judicial review of the federal

15    questions presented here.

16    There are two sets of parole criteria regulations, not one. 15 CCR §§ 2402, subd. (c) [Circumstances

17    Tending To Show Unsuitability], and 2402 subd. (d) [Circumstances Tending To Show Suitability]. It appears that

18    the BPH's focused emphasis has been on, and remains on, subdivision (c), with little or no regard given to

19    subdivision (d). Petitioner asserts, as a matter of statutory construction, the "public safety" concern in PC §

20    3041(b), demands an equal (or neutral) emphasis at the outset of a panel's deliberations AND on its Findings

21    under both sets of criteria and any balanced and reasonable interpretation should compel this approach

22    throughout the entire process due any inmate and to do so would virtually assure a Finding of suitability.

23    Factors TENDING to show suitability or unsuitability must be weighed and balanced within the

24    parameters of a standard of proof. Without this critical, reliable component, the process is inherently arbitrary,

25    capricious, and defective. This standard-less analysis would vitiate the individualized consideration held

26    appropriate in Rosenkrantz V. The crux of the matter is that of a standard of proof with indicia of reliability as set

27    forth below and reinforced with significant legal precedent.

28    The "some evidence" standard is NOT the sole standard of evidence to be applied to the BPH's

1  decisions. It is only one aspect of *judicial* review employed by a habeas court. Edwards v. Balisok (1997) 520

2  U.S. 640, 647. And, if the Rosenkrantz V decision implies, as it does, that the "some evidence" standard should

3  be applied to the BPH Findings, then this is a clear and unreasonable application of well-established federal

4  Constitutional law set forth by the High Court. Nothing in Superintendent v. Hill (1985) (Hill) 472 U.S. 445, 456,

5  implies that it IS A STANDARD OF EVIDENCE to be applied by any agency, board, or executive body outside a

6  disciplinary committee within an exigent-circumstances prison setting that has no pressing need for more formal

7  evidentiary standards or anything warranting standard-less precedents

8      What IS implied by the Rosenkrantz V court, when it held that a habeas court can't reverse a decision

9  denying parole even if it determines that the evidence overwhelmingly preponderates towards a finding of

10 suitability is completely unreasonable because it prevents effective habeas relief from an arbitrary and capricious

11 decision, and worse, stymies effective judicial review. This court is not obliged nor compelled to defer to a state

12 decision misapplying federal constitutional principles. Hubbart v. Knapp (9th Cir. 2004) 379 F.3d 773, 780;

13 referencing Mullaney v. Wilbur 421 U.S. 684, 691; see also Peltier v. Wright (9th Cir. 1994) 15 F.3d 860, 862.

14     In Oxborrow v. Eikenberry (9th Cir. 1989) 877 F.2d 1395, 1399, the Circuit held that: "Our deference to

15 the [state court] is suspended only upon a finding that the court's interpretation of [state law] is untenable or

16 amounts to a subterfuge to avoid federal review of a constitutional violation." Thus, it is petitioner's contention

17 that respondents seek to avoid federal review by asserting that the "some evidence" standard 1) is applied by the

18 BPH and/or, 2) limits judicial review ONLY to the BPH's ultimate decision and not to a finding of a defective pre-

19 Decision process.

20     If Petitioner were the beneficiary of an individualized consideration utilizing real evidence with reliable,

21 articulate proof, it would have logically flowed that he is now MORE suitable than his previous hearing wherein

22 he encouraged that if he continued his positive programming and rehabilitation he would likely be found suitable.

23 (Exhibit "B".) All those laudatory words at his Hearing would have had a consistent ring of truth to them in that he

24 has progressed towards a more-suitable mien, not the reverse. This highly illegal "boilerplate" denial now rises to

25 the level of a federal due process violation. Biggs, supra, pp. 916-917; Martin I, supra, 1042.

26     Please note that the previous Decisions denying parole also gave advice; the present denial is almost a

27 carbon copy of the last panel's decision. This summary denial of suitability leading to parole now rises to the

28 level of a federal due process violation. Biggs, supra, p. 917; Martin I, supra, 1048-49.

<center>Ⅰ- E</center>

1    The High Court in Greenholtz (at p. 7) Allen (at p. 373) , supra, established that:

2    "While there is no constitutional or inherent right of a convicted person to be conditionally
     released before the expiration of a valid sentence, a state's statutory scheme, if it uses
3    mandatory language, creates a presumption that parole release will be granted when or unless
     certain designated findings are made, and thereby gives rise to a constitutional liberty interest."
4    (Citing McQuillen, supra, at 901.)

5         In the absence of any evidence in the record supporting the BPH's decision, remanding the case back to

6    be reheard is a futile act, and the appropriate remedy is release of the Petitioner. McQuillen II, supra, p. 1015-15;

7    Martin II, supra, p. 1145; Rosenkrantz VI, supra, p. 1087.

8         A petitioner is entitled to "something more than mere pro forma consideration.", e.g. meaningful

9    individual consideration. Not a sham hearing using rote words and repeating boilerplate from a pre-printed form.

10   The only mandate "normally" being followed under P.C. § 3041 (a), is a multi-year denial under § 3041 (b) to

11   "swallow" the due process required under the 14th Amendment, an ingestion violating the equal protection

12   guarantees and abridges Petitioner's civil rights under both state and federal Constitution's proscription against

13   this tactic for all similarly-situated inmates. In re Sturm (1974) 11 Cal.3d 258, 268; Ramirez, supra, at 570;

14   Rosenkrantz V, at pp. 658, 683.

15   "Judicial oversight must be extensive enough to protect the limited right of parole applicants "'to
     be free from an arbitrary parole decision ... and to something more than mere pro forma
16   consideration.'" [citation omitted] The courts may properly determine whether the [BPH]'s
     handling of parole applications is consistent with the parole policies established by the
17   Legislature. [ ] while courts must give great weight to the [BPH]'s interpretation of the parole
     statutes and regulations, final responsibility for interpreting the law rests with the courts. [ ]
18   Courts must not second-guess the [BPH]'s evidentiary findings [ ] However, it is the proper
     function of judicial review to ensure that the [BPH] has honored in a "'practical sense"' the
19   applicant's right to "'due consideration."'" [ ] Ramirez supra, at 564.

20        (Since it is clear that parole should be the rule and not the exception, a moderate or average risk cannot

21   be construed as "unreasonable." Were an average risk grounds for parole denial, then the exception would

22   "operate so as to swallow the rule that parole is 'normally' to be granted. Rosenkrantz V, at pp. 658, 683.)

23   "All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety
     ... {However] the [BPH] "'shall normally set a release date.'" [citation omitted] The [BPH]'s
24   authority to make an exception ... should not operate to swallow the rule that parole is 'normally'
     to be granted. ...Therefore, a life term offense must be *particularly egregious* to justify the denial
25   of a parole date. In order to comply with the parole policy established by the Legislature in P.C.
     § 3041, the [BPH] must weigh the inmate's criminal conduct not against ordinary social norms,
26   but against other instances of the same crime or crimes." (Ramirez, supra, at 570, disapproved
     on other grounds, emphasis added as usual in published cases.)

27

28        The applicability of this standard to the review of decisions applies and Petitioner's right to due

Σ·F

consideration does not appear to have been honored in any practical sense by the panel in this case and their Decision is facially and legally deficient. In the instant case the BPH made no effort to comply with the controlling rules and seems to have merely stated its "predetermined conclusion." (See: In re Caswell (2001) 94 Cal.App.4th 1017, 1030.)

In In re Smith (2003) (Smith II) 114 Cal.App.4th 343, 369, the Sixth District Court of Appeals found that there was not some evidence that Smith's crime was more callous than the average second degree murder. There was nothing to "distinguish th[e] crime from other second degree murders ... the record provides no reasonable grounds to reject, or even challenge, the findings and conclusions of the psychologist and counselor[s] concerning [his] dangerousness."

The Second District Court of Appeals, in the case of another life-term inmate named Smith similarly found no evidence to support a parole denial based on the commitment offense. In re Smith (2003) (Smith I) 109 Cal.App.4th 489.

Compare In re Scott (2004) 119 Cal.App.4th 871, 876-877 [Scott I], where the First District reversed the BPH's standard statement of reliance on the gravity of the crime because in truth, "the relevant evidence show[ed] no more callous disregard for human suffering than is shown by most second degree murder offenses." (Governor's rescission of Scott's parole unanimously reversed on 10-18-05, see: In re Scott 133 Cal.App.4th 538, Scott II.)

On 5-18-05, in Coleman v. BPT (E.D. Cal. No. 97-0783), Honorable Judge L. Karlton adopted the Findings and Recommendations IN FULL. There, it was found that ex-governors Davis and Wilson (and NOW Governor Schwarzenegger, too. See infra at p. 3), had/have panels with a sub rosa "no parole" policy and were/are carrying it out. Martin I , supra, pp. 1048-49; Martin II, supra, p. 1144; (see Coleman and Final Order, attached as Exhibit "F", Petition for Rehearing and Rehearing en banc filed by BOTH parties.)

It is beyond debate that neither a state agency interpreting an enabling statute nor any court of the state can construe a statute contrary to Legislative intent or the ordinary meaning of the words used in a statute. Our Court, in the entire history of the statute, has never construed it with any adequacy according to the plain meaning to create guidance and instill compliance by both the BPH panels and those who serve the governors otherwise, although it would seem enough time and toil has passed to have done so.

Instead, this lack of judicial construction has led to the many years of overwhelming denials that DO

1   *NOT* reflect in any clear way the presumptions of § 3041. Nor does it reflect instruction as to what the agency's
2   burden of proof is or the legal significance of relevant, reliable, or material evidence. This lack of judicial
3   guidance has left unfettered discretion in the hands of lay appointees to determine the legal import of evidence
4   (or lack thereof) although these persons are arguably unqualified by a dearth of professional standing to make
5   these determinations upon which a federal liberty interest depends.

6       Determining the legality and weight and of evidence requires some specific legal training in evidentiary
7   law; not by lay persons, and which lack of training is visibly evident in the incongruously inapposite findings thus
8   made. (McQuillen I, supra, 907-912; Rosenkrantz V, supra, 680; Rosenkrantz II, supra, 424-426; Smith II, supra,
9   361; Smith I, supra, 501-506.) These are only a few of the published cases but unpublished absurdities
10  exponentially abound!

11      The Sixth district held for the proposition in Smith II at 361 that "[t]he weight given the specified factors
12  relevant to parole suitability lies within the discretion of the BP[H]."; a court's determination "of whether the
13  *preponderance of the evidence* supports a finding of suitability is irrelevant." (Emphasis added.) This is the first
14  time a published decision on the BPH has even mentioned a burden of proof. This reference infers the BPH must
15  honor this evidentiary standard as faithfully to the letter as legally possible.

16      Yet there is no settled bright line rule for a court to determine if the BPH has met that standard. Just the
17  opposite, in fact, since Smith II strongly suggests that even if a reviewing court finds the agency did not meet the
18  standard, an allegation of "some evidence" is sufficient to automatically require judicial deference.

19      The Third District Court of Appeals stated the following as fact:

20      "It is without doubt that a blanket no-parole policy would be contrary to the law, which
        contemplates that persons convicted of murder without special circumstances may eventually
21      become suitable for parole and that, when eligible, they should be considered on an
        individualized basis. Thus, blanket policies have long been deemed to be improper. ¶ In Roberts
22      v. Duffy (1914) 167 Cal. 629, a decision that predates the enactment of our state's old
        indeterminate sentencing law, the Court condemned a blanket parole policy that was contrary to
23      the statutory parole scheme then in place. It appeared that the statutory law *allowed a prisoner to
        apply for parole after serving ONE YEAR* but that, **contrary to the statute, the parole authority**
24      **adopted a rule precluding application until one-half the sentence was served.**

25          The Court held that, "'while the prisoner had no right to apply to release on parole at any
        time, *he was entitled to apply* and have his application duly considered on an individualized
26      basis.'" Id. at pp. 640-641.

27                                  (Does this sound familiar? Emphasis added to original citation.)

28      "With respect to persons sentenced to indeterminate terms, the purpose of punishment is

satisfied by the requirement of service of a minimum period before eligibility for parole and, when suitable for parole, by determination of a release date **in a manner that will provide** UNIFORM TERMS for offenses of similar gravity and magnitude with respect to their threat to the public." (P.C. §§ 3041, 3041(a), 3041.5, citing In re Morrall (2002) 102 Cal.App.4[th] 280, 291-292.)

The arbitrary or capricious misapplication of statutory law violates both state and federal due process. Hill, supra, at p. 428; Gordon v. Duran (9th Cir. 1990) 895 F.2d 610, 613; In re Edsel P. (1985) 165 Cal.App.3d 763, 779. "The touchstone of due process is protection of the individual against [the] arbitrary action of government." Wolff v. McDonnell (1974) 418 U.S. 539, 558.)

These principles apply in equal force to incarcerated prisoners. (In re Jones (1962) 57 Cal.2d 860, 862; ["a convicted felon, although civilly dead, is nevertheless a 'person' entitled to protection of the 14th Amendment."]; In re Price (1979) 24 Cal.3d 448, 453 [acknowledging that P.C. § 2600 limits a prisoner's deprivation to only such rights "as is necessary in order to provide for the reasonable security of the institution in which he is confined."].)

In interpreting a prisoner's rights of substantive due process the High Court has held that a prisoner may derive a due process liberty interest from administrative regulations, as well as state law and the U.S. Constitution. Sandin v. Conner (1995) 515 U.S. 472, 484; Hewitt v. Helms 459 U.S. 460, 469, receded from on p. 484, fn. 5; Meachum v. Fano (1976) 427 U.S. 215, 226; Wolff, supra, at p. 557. In applying these standards here, the BPH violated Petitioner's right to constitutional due process but he is not challenging the BPH's right to conduct professional psychological assessments as the main focus of the parole evaluation process, but does challenge their "normal" practice of summarily dismissing and patently ignoring their own experts.

Predictions of future conduct necessarily relate to public safety concerns but Judge Karlton in Irons v. Warden (E.D. Cal. 2004) 358 F.Supp.2d 936, discussed this conundrum and noted that the propensity analysis:

> "To a point, it is true, the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after 15 or so years in the cauldron of prison life, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite recognized hardships of prison, [petitioner] does not possess these attributes, the predictive ability of the circumstances of the crime is near zero." [2]

---

[2] "It is worth noting, as has our [Calif.] Supreme Court (*People v. Murtishaw* (1981) 29 Cal.3d 733, 768, disapproved on other grounds in *People v. Boyd* (1985) 38 Cal.3d 762,, that a large number of legal and scientific authorities believe that, even where the passage of time is not a factor and the assessment is made by an expert, predictions of future dangerousness are exceedingly unreliable. (See, e.g., Monahan, *Violence Risk Assessment: Scientific Validity and Evidentiary Admissibility*, 57 Wash. & Lee L. Rev. 901 (2000); Otto, *On the Ability of Mental Health Professionals to 'Predict Dangerousness*,' 18 Law & Psychol. Rev. 43 (1994); Lidz, et al., *The Accuracy of Predictions of Violence to Others*, 269, Jour.Am.Med.Assn. 1007 (1993); Diamond, *The Psychiatric Prediction of Dangerousness*, 123 Pa.L.Rev. 439 (1974); Dershowitz, *The Law of Dangerousness: Some Fictions About Predictions* (1970) 23 J. Legal Ed. 24. According to a Task Force of the American Psychiatric Assn., "[n]either psychiatrists nor anyone else have demonstrated an ability to predict future violence or dangerousness. (Am.Psych.Assn., Task Force Rpt. 8, *Clinical Aspect of the Violent Individual* (1974) at p. 28.) As our [Calif.] Supreme Court has also noted,

1

2    (Irons, supra, at p. 947, fn. 2, this 'dicta' was also cited as Headnote #10 at p. 937; see additional discussion of

3    "need for more therapy" used as a ruse to deny suitability at p. 948.)

4    P.C. § 3041(a) governs parole suitability determination processes and does not define more than one

5    class of persons. The statute generalizes that it's focus is "any prisoner" who is serving an indeterminate term.

6    Through application, however, the agency's discrimination amongst the class serving indeterminate sentences is

7    in violation of the right to equal protection ensconced in the Fourteenth Amendment. Equal protection is "[in

8    essence] a direction that [a person] similarly situated should be treated alike." (City of Cleburne v. Cleburne

9    Living Ctr. (1985) 473 U.S. 432, 439, citing Plyler v. Doe (1982) 457 U.S. 202, 216, "To state a claim ... for

10    violation of the Equal Protection Clause of the 14th Amendment a plaintiff must show that the defendants acted

11    with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class."

Barren v. Harrington (9th Cir. 1998) 152 F.3d 1193, 1194, cert. denied 525 U.S. 1154 (1999).)

12    Strict scrutiny, alternatively, is utilized if the government distributes benefits or burdens in a manner

13    inconsistent with fundamental rights. (See Sosna v. Iowa (1975) 419 U.S. 393; Shapiro v. Thompson (1969) 394

14    U.S. 618.) The fundamental right here is the due process right to relevant, reliable evidence being considered

15    when analyzing a right to release on parole. McQuillen I, supra, at 900; McQuillen II, supra, at 1012; Martin I ,

16    supra, at 1043: ("[T]he deferential 'some evidence' standard has outer limits. [citing Coleman, supra,  with

17    approval slip op. at 9] If it is established that a particular judgment was predetermined, then a prisoner's due

18    process rights will have been violated even if there is 'some evidence' to support the decision. [See Bakalis v.

19    Golembeski (7th Cir. 1994) 35 F.3d 318, 326] (a decision-making "body that has prejudged the outcome cannot

20    render a decision that comports with due process. ... The California Supreme Court has explicitly stated that a

21    blanket no-parole policy as to a certain category of prisoners is illegal. [In re Minnis; In re Morrall] " ... Because

22    petitioner cannot change the past, denying [P]etitioner parole based only on the facts surrounding the crime itself

23    effectively changes his sentence ... into life imprisonment without the possibility of parole." Ibid. at 1046.) (cf:

24    Martin II, supra, at 1144: "In sum, the Board appears to have capitulated to the blanket no-parole policy

25

26    "the same studies which proved the inaccuracy of psychiatric predictions [of dangerousness] have demonstrated BEYOND DISPUTE the no
27    less disturbing manner in which such prophecies consistently err: they predict acts of violence which will not take place ('false positives'", thus
branding as 'dangerous' many persons who are in reality totally harmless. [citation.]" (People v. Burnick (1975) 14 Cal.3d 306, 327.) (all
emphasis in original). (See: copy of Order denying Review, dated 11/30/05, Daily Journal 12/2/05, p. 13803, attached as Exhibit "B"). Scott, II
28    supra, footnote #9.

1   described by this court in its previous [Martin I] Order, abandoning its role as an independent assessor of

2   petitioner's eligibility. This capitulation is particularly troubling in light of the Board' vigorous assertions of

3   independence during the 2003 hearing." This Honorable Court should grant the writ and Order all appropriate

4   relief including a complete discharge from custody and sanction full redress for Petitioner.

5                                            CONCLUSION

6        WHEREFORE, Petitioner respectfully submits that the writ should be granted in full and all available

7   remedies leading to his immediate release from custody be Ordered at the earliest possible moment and

8   forthwith. It is respectfully requested that an evidentiary hearing be Ordered as an alternative to the above

9   should there be consideration of the "no parole" policy and/or practice by this or previous administrations.

10  ///

11  ///

12  ///

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            **I**-K

7. Ground 2 or Ground _____ (if applicable):

PETITIONER'S FEDERAL RIGHTS TO DUE PROCESS AND EQUAL PROTECTIONS WERE

VIOLATED WHEN RESPONDENTS UTILIZED A LESSER STANDARD OF LEGAL PROOF

REQUIRING EVIDENCE WITH SOME INDICIA OF RELIABILITY TO FIND THAT PETI-

TONER IS UNSUITABLE TO PAROLE AND IS THEREFORE AN UNREASONABLE RISK

a. Supporting facts:

Nowhere is there any codification that avers petitioners must

prove his or her suitability. Only if an inmate is found unsuitable

does evidence become citable. (See Dannenberg, at 1095; Rosenkrantz

at 658, 683.) Evidence must be specific, articulable, and have "some

indicia of reliability." Respondents have the burden of proof to

demonstrate, in the Record, why an inmate is not suitable and a

denial of more than one year requires that the BPH panel state for

the Record why it isn't likely that petitioners would be found suit-

able any time sooner. There is a wholesale vitiation going on here.

Procedural safeguards require: a hearing one year prior to

the MEPD, CCR §§2268(b)[2400 et sqq.], 2270(d), (e), (f); PC §3041

(a), CDC v. Morales (1995) 115 S.Ct. 1597, 1600; service and prior

examination of all material considered; representation if desired.

The one-year lead on a MEPD imparts that the Legislature

intended that some inmates will be suitable at an initial hearing

otherwise why would such a gratuitous mandate exist? Govenor's-

level review presumes a neutral, well-defined, professional body

that will follow all the state and federal laws. Only this practice

b. Supporting cases, rules, or other authority:                    (continued on attached pages)

(SEE ATTACHED POINTS AND AUTHORITIES)

II

1  Ground 2, continued:

2  would meet the constitutional burden under the discretionary methods

3  needed to quickly resolve an uncertain matter.

4      The "some evidence" relied on to deny parole must be relevant

5  and reliable in establishing Petitioner is a <u>current</u>, unreasonable

6  threat to public safety and must not be grounded in an incomplete

7  or unreasonable assessment of the relevant factors.

8      In explaining what the "some evidence" standard meant, the

9  Court in <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616 at 677, stated

10  that "[o]nly a modicum of evidence is required." On its face, this

11  standard could thus be seen as remarkably broad--that a scintilla

12  of evidence (or the BPH's assessment of it)--would be enough to

13  completely immunize BPH decisions from judicial review. However,

14  such a reading would effectively serve to nullify the <u>Rosenkrantz</u>

15  court's holding rejecting the Executive's position that factual

16  decisions rejecting parole were immune from examination by the courts

17  and in point of fact were required.

18      A disection of the "some evidence" standard itself--both

19  conceptually and through a review of the application of the

20  <u>Rosenkrantz</u>' standard (and its progeny)--makes clear that this is

21  the meaningful standard. Properly understood, it strikes an

22  appropriate balance between judicial deference to difficult BPH

23  decisions and the protection of constitutional liberty interests.

24      The "some evidence" standard of review is laid out here:

25  "[W]e conclude that the judicial branch is authorized
   to review the factual basis of a decision of the [BPH]
26  denying parole in order to ensure that the decison comports
   with the requirements of due process of law, but that
27  in conducting such a review, the court may inquire only
   whether some evidence in the record before the [BPH] sup-
28  ports the decision to deny parole, <u>based</u> <u>upon</u> <u>the</u> <u>factors</u>

1    <u>specified by statute and regulation.</u> <u>Rosenkrantz</u>, 658.
2    "[a]s long as the [BPH] decision reflects due consideration
     of the <u>specified factors</u> as applied to the INDIVIDUAL
     PRISONER <u>in accordance with applicable legal standards</u>,
3    the court's review is limited to ascertaining whether
     there is some evidence in the record that supports the
4    [BPH] decision." <u>Id</u>. at 677. (emphasis added).

5        Thus, the inquiry into whether there is "some evidence" is

6    more complex than it might otherwise seem, as the standard MUST

7    be applied within the context of the statutory framework in which

8    it arises. This framework imposes at least 3 requirements on the

9    "some evidence" standard if it is used to deny parole.

10        First, the BPH must base their decisons only on evidence that

11    serves to establish that the inmate will or will not pose a

12    continuing, "unreasonable risk of danger to society if relesed from

13    prison." CCR, title 15, §2402(a), and PC §3041(b).

14        Second, the evidentiary basis for parole decisions must be

15    based on the factors specified in the regulations after

16    <u>individualized considerations of all of the factors.</u> <u>Rosenkrantz</u>

17    at 677 ("The precise manner in which the specified factors relevant

18    to parole suitability are considered and balanced lies within the

19    discretion of the [executive branch], but the decision must reflect

20    an individualized consideration of the specified criteria and CANNOT

21    BE ARBITRARY AND CAPRICIOUS."); see also <u>In re Stanley</u> (1976) 54

22    Cal.App.3d 1030, 1038 n.7 ("Other courts place more weight on the

23    prisoner's record of crime. We abstain from any argument over the

24    relative primacy of various parole factors. It is enough to say

25    that the Adult Authority must apply all the factors.") (citing <u>In</u>

26    <u>re Minnis</u> (1972) 7 Cal.3d 639). These factors naturally all relate

27    to whether the inmate poses <u>a continuing, unreasonable risk of danger</u>

28    <u>to society if released from prison</u>. (emphasis added).

1    Third, the evidence upon which the BPH relies must be relevant
2    and reliable. CCR §2402(b) ("All relevant, reliable information
3    available to the panel shall be considered in determining suitability
4    for parole.") (cf. CCR §§2402(d)(1-9).

5    In sum, a court examining parole decisions must determine
6    whether, after all consideration of all the factors enumerated in
7    the statute and regulations, the decison was based on: 1) some
8    evidence; 2) a reasonabe consideration of all the factors specified
9    by the statutory guidelines; 3) evidence that is both relevant and
10   reliable; and 4) factual determinations that suggest an inmate poses
11   a CURRENT, UNREASONABLE THREAT TO PUBLIC SAFETY.

12   A review of the post-Rosenkrantz legal panorama reveals that
13   California courts of appeals and federal courts have routinely
14   applied the above boundaries and checkpoints of relevance,
15   reliability and reasonableness to the "some evidence" standard.
16   The California Supreme Court has so far utterly failed to establish
17   a brightline Plimsoll mark to define the full depth of the inquiry.

18   The courts continue to assess the reasonableness of the BPH's
19   interpretation of the facts and circumstances used to legally sus-
20   tain a finding of parole suitability denial. The court in In re
21   Van Houten (2004) 116 Cal.App.4th 339, 356, assessed whether the
22   BPH was reasonably able to conclude that there was some evidence
23   of the inmate's need of continuing therapy and her dangerousnes
24   to the public. Though it found in the affirmative, the court took
25   a close look at whether the BPH "could reasonably conclude that
26   [her] defense, that Manson's influence overwhelmed [her], was
27   exaggerated such that she is fully responsible for the LaBianca
28   murders" and whether "[t]he BPH could infer with sufficient

1 reasonableness to satisfy a minimal 'some evidence' standard that

2 [she] is a danger to the public and in need of continued therapy

3 and programming." Her denial was affirmed with instructions.

4      Judicial inquiry into the stated reasons for parole denial

5 have their place and numerous state and federal courts--in a wide

6 range of contexts--have similarly held the judicial inquiry into

7 the reasonableness of BPH determinations and conclusions is

8 appropriate, even when such determinations and conclusions are

9 accorded broad deference. (See, e.g., <u>In re Farley</u> (2003) 109

10 Cal.App.4th 1356, 1361-2: "Judicial review of a CDC custody

11 determination is limited to determining whether the classification

12 decision is arbitrary, capricious, irrational, or an abuse of the

13 discretion granted those given the responsibility for operating

14 prisons. While we must uphold respondent's classification action

15 if it is supported by "some evidence" and we must afford great

16 deference to an administrative agency's expertise, <u>where the agency's</u>

17 <u>interpretation of the regulation is clearly arbitrary or capricious</u>

18 <u>or has no basis, COURTS SHOULD NOT HESITIATE TO REJECT IT</u>."

19      Federal courts likewise require parole decisions to be

20 reasonable. As an example, in a parole rescission case, a federal

21 court in this state held: "the Court of Appeals conclusory findings

22 that there was 'some evidence' to support the rescinding, the BPH's

23 decision that parole was improvidently granted to petitioner are

24 contrary to clearly established federal law and, to the extent they

25 are fact-based, represent unreasonable determinations of the facts

26 in light of the evidence presented in the state court preceedings."

27 <u>Stockton v. Hepburn</u> (N.D Cal. 2005) 2005 U.S. Dist. LEXIS 4877 at

28 43; see also <u>Irons v. Warden</u> (N.D. Cal 2004) 358 F.Supp.2d 936,

1   948 ("Clearly, a conclusion by lay BP[H] commissioners that
2   petitioner has not yet acheived required therapy for insight OR
3   OTHER REASONS is not reasonably sustainable, and a state court's
4   conclusion to the contrary is patently unreasonable.")

5   The federal liberty interest is made an adjunct to the state
6   requirements of due process by and through the 14th Amendment to
7   the U.S. Constitution and the substantial evidence of the federal
8   standard must be overcome to meet federal guarantees to its citizens
9   who, before they became entitled to state civil rights, were first
10  bestowed by operation of their federal citizenship. A state cannot
11  lawfully deny any federal right to its citizens but that is exactly
12  what respondents are demanding of their agents in the BPH, and will
13  no doubt now ask this Honorable Court to signoff on. That must not
14  be allowed if the judiciary is to be truly separated from the
15  Executive charades disguised is a legitimate exercise in freedom.

16  The goal of indeterminate sentences and the parole system is
17  not only to punish, but also to provide for reformation and
18  rehabilitation as the CDC's renaming suggests:

19      "The belief no longer prevails that every offense in
        a like legal category calls for an identical punish-
20      ment without regard to past life and habits of a parti-
        cular offender. ... Retribution is no longer the domi-
21      nant objective of the criminal law. Reformation and
        rehabilitation of offenders have become important goals
22      of criminal jurisprudence."

23  People v. Morse (1964) 60 Cal.2d 631, 643 n.8 (quoting Williams
24  v. State of New York (1949) 337 U.S. 241, 247). In a lengthy discus-
25  sion of this topic, the Supreme Court stated the following:

26      "[T]he purpose of the indeterminate sentence law, like
        other modern laws in relation to the administration
27      of criminal law, is to migitate the punishment which
        would otherwise be imposed upon the offender. These
28      laws place emphasis upon the reformation of the offender.

1      They seek to make the punishment fit the criminal rather
2   than the crime. They endeavor to put before the prisoner
    great incentive to well-doing in order that his will
3   to do well should be strengthened and confirmed by the
    habit of well-doing. [...] [The] interests of society
4   require that under prison discipline every effort should
    be made to produce a reformation of the prisoner. ...
    The legislative policy [was to provide a system whereby]
5   a hope was to be held out to prisoners that through
    good conduct in prison and a disposition shown toward
6   reformation, they might be permitted a conditional liber-
    ty upon restraint under which they might be restored
7   again to society. ... Although good conduct while in-
    carceratd and potential for reform are not the only
8   relevant factors, this court has acknowledged their
    significance. Furthermore, the Authority has declared
9   that these factors are among those of 'paramount impor-
    tance. In re Minnis, 7 Cal.3d 644-45.
10

11       The Rosenkrantz Court, at 656, citing to Minnis, reaffirmed

12   these principles: "[E]ven before factors relevant to parole de-

13   cisions had been set forth expressly by statute and regulations,

14   we concluded that '[a]ny official or board vested with discretion

15   is under an obligation to consider all relevant factors [], and

16   the [BPH] can't, consistently with its obligation, ignore post-

17   conviction factors UNLESS DIRECTED TO by the Legislature." (citing

18   Minnis at 645; emphasis added for illumination).

19       Petitioner has a Constitutional liberty interest in parole

20   decisions and "[P]arole applicants in this state have an expectation

21   that they will be granted parole unless the BPH finds, in its

22   reviewable discretion, that they are unsuitable for parole in light

23   of the circumstances specified by statute and regulation."

24   Rosenkrantz at 654 and at 659-61 this liberty interest is an

25   expectation protected by due process of law. (holding that the

26   California Constitution Art. V, §8(b) and PC §3041 "give rise to

27   a protected liberety interest" in that "a prisoner granted parole

28   by the BPH has an expectation that the Governor's decision to affirm

1  modify, or reverse the BPH's decision will be based upon the same
2  factors the BPH is required to consider," and that "this liberty
3  interest underlying a Governor's parole review decision is protected
4  by due process of law.").

5  Federal courts have also unequivocally held that California's
6  parole system gives rise to a liberty interest constitutionally
7  protected by due process. See: Allen, infra at 376-78; Greenholtz
8  v. Inmate of Neb. Penal & Corr. Complex (1979) 442 U.S. 1, 11-12
9  (holding a state's statutory parole scheme that uses mandatory
10  language may create a presumption that parole release will be
11  granted upon certain circumstances or findings, thus giving rise
12  to a constitutionally protected liberty interest); McQuillen, supra
13  at 902-3 n.1 (holding that because parole scheme uses mandatory
14  language and is largely parallel to the schemes found in Allen
15  and Greenholtz do give rise to a protected libety intrest in RELEASE
16  ON PAROLE, "California's parole scheme gives rise to a cognizable
17  liberty interest in release on parole.") Biggs v. Terhune (9th
18  Cir. 2003) 334 F.3d 910, 914-15 (same) and, ("[t]he liberty interest
19  is created, not upon the grant of a parole date, but upon the
20  incarceration of the inmate."

21  Rosenkrantz specifically rejected any position that a court
22  may not properly examine the factual basis of parole decisions
23  at 667, "[W]e conclude that the courts properly can review a
24  Governor's decisions whether to affirm, modify, or reverse a parole
25  decision by the BPH to determine whether they comply with due
26  process of law, and that such review properly can include a determi-
27  nation of whether the factual basis of such a decision is supported
28  by some evidence in the record that was before the BPH.

1    Post-<u>Rosenkrantz</u>, courts have reaffirmed the concepts of broad

2    executive deference but vigilent judicial review, by engaging care-

3    ful analysis, will ensure that the boundaries of due process are

4    respected and upheld. "[t]he exceedingly deferential nature of

5    the "some evidence" standard of judicial review set forth in

6    <u>Rosenkrantz</u> does not convert a court reviewing the denial of parole

7    into a potted plant." <u>In re Scott</u> (119 Cal.App.4th 871, 898, re-

8    cently affirmed).

9    The Court, in <u>In re Dannenberg</u> (2005) 34 Cal.4th 1061 at 1095

10   n.16 reaffirmed that effective judicial review is critical to due

11   process. Rejecting the dissent's suggestion that the opinion "per-

12   mits untethered pro forma parole denials that are insulated from

13   effective judicial review, thus contravening California life in-

14   mates' due process rights to individualized parole consideration,"

15   the majority made clear that the [BPH] must apply detailed standards

16   in evaluating individual inmates' suitability for parole on public

17   safety grounds, and that the Executive's broad discretion is subject

18   to meaningful judicial oversight.

19   There is no question that the discretion afforded to the BPH

20   with respect to parole decisions is great. However, the parole

21   system's very purpose is to provide for the reentry into society

22   of inmates who no longer pose a danger or unreasonable threat to

23   public safety, and those rights afforded thereunder are

24   constitutionally protected.

25   The BPH must abide by due process considerations, and the

26   courts are entrusted with ensuring that such considerations are

27   adequately respected and thus protected. Neither <u>Rosenkrantz</u> or

28   <u>Dannenberg</u> permits respondents to immunize themselves from re-

1   view by unreaonable and possibly unlawful assertion that certain
2   facts support a denial of parole. On the contrary, Rosenkrantz
3   and Dannenberg make clear that the courts have a vital and therefore
4   important role to play in ensuring that parole decisions are
5   actually supported by "some evidence" having a basis in fact, and
6   an indicia of reliability supported in the record.

7      Petitioner submits that there is a real danger that, improperly
8   understood, the guidelines articulated in Rosenkrantz, Dannenberg,
9   and the court of appeals will serve to provide respondents with
10  de facto immunity from judicial review, a result anathema to state
11  and federal due process protections. Properly understood, the "some
12  evidence" standard provides a fair and proper framework for review
13  of parole decisions in any venue, one that provides respondents
14  with an appropriate level of deference in making extremely difficult
15  decisions relating to inmates' liberty interests and public safety
16  concerns, while ensuring that statutory and constitutional liberty
17  interests are being adequately and lawfully safeguarded through
18  judicial review. And, when this standard is properly applied to
19  this case, there should be no doubt but that the BPH's denial of
20  suitability seems unsustainable and must be reversed, a new hearing
21  granted, and an Order with instructions issued.

22     WHEREFORE, Petitioner prays that the writ be granted in full
23  and all available relief be accorded to Petitioner to comply with
24  and comport to the state and federal Constitutions and the legal
25  adversarial process and resolution of a judicious nature in this
26  most important matter herein. Petitioner hereby incorporates by
27  reference, as though fully set forth, all papers, pleadings,
28  transcripts, exhibits and matters of record in the instant matter.

7. Ground 2 or Ground __3__ *(if applicable)*

PETITIONER HAS A FEDERALLY-COGNIZABLE LIBERTY INTEREST IN RELEASE

TO PAROLE CREATED BY RESPONDENT'S STATUTORY SCHEME AND MANDATORY

LANGUAGE OF THE ENABLING STATUTES THAT REQUIRES A SUITABILITY FINDING

UNDER STATUTORY CRITERIA AND RESPONDENTS' BURDEN IS NOT MET HEREIN

a. Supporting facts:

This petition is intended to give legitimate meaning to petition-

er's fifteen (15) years-to-Life sentence by seeking an Order in this

Court granting the writ to discharge petitioner from state prison,

or alternatively, compelling the BPH to conduct a new parole

consideration hearing and correctly weight their statutory findings

to view suitability and consequent release to parole for Petitioner.

The issues raised are of constitutional dimension, comporting

to petitioner's federal constitutional rights, and questioning the

legality of petitioner's continued confinement in the face of over-

whelming evidence of legally-sustainable proof of suitability and

unquestioned state-hired professionals and their proffered opinions

of reasonable assurance in adhering to concerns of public safety.

There is NO evidence having indicia of reliability that this

petitioner poses an unreasonable risk of danger to the public and

P.C. §3041(a) and California Code of Regulations (CCR), Title 15,

Division II §§2402(d)(1,2,3,4,6,7,8 & 9) (parole suitability criteria)

all make it clear that there IS A MANDATE, based on a legally-

sufficient standard, and that standard is subject to judicial review

b. Supporting cases, rules, or other authority:

(SEE ATTACHED POINTS AND AUTHORITIES)

III

**(continued from previous page)**:

for abuse of discretion under a federal due process and equal protection umbrella with safeguards required in a review of the "evidence" of unsuitability that is burdened upon respondents.

The California Supreme Court recognizes that prisoners have procedural due process protections in connection with parole determinations. A legitimate expectancy of release to parole is created by PC § 3041. If the statute creates the legitimate expectancy of parole, it is not legally sufficient to answer that the BPH may, in its broad discretion, deny parole suitability.

This argument, that the BPH's broad discretion swallowed Petitioners liberty interest and expectation of release was squarely rejected by the High court in Allen, supra. Additionally, the Court stated in Rosenkrantz IV: "[P]arole applicants in this state *Have an expectation that they will be granted parole* unless the BP[H] finds in its discretion, that they are unsuitable for parole **in light of the circumstances specified by statute and regulation**." Rosenkrantz IV, supra, 29 Cal.4th at p. 654. And, [O]ur past decisions make clear that the *requirement* of procedural due process embodied in [Art. I,  § 7, subd. (a)], places some limitations upon the broad discretionary authority of the BP[H]." Id. at p. 655.

Therefore, it is inherently clear that the presence of discretion held by the BPH does not, under either state or federal law, diminish nor extinguish the expectancy of release to parole and in no ways Petitioner's due process rights. It thus follows that a liberty interest has existed under PC § 3041 that is embodied in, and protected by, the Fourteenth Amendment's Due Process Clause.

Also, CCR regulations use the "shall/unless" language (§§ 2401-2402) and recognize all available rights to Petitioners. Further, these regulations AS ORIGINALLY WRITTEN, made it even clearer that parole was to normally to be granted. This remained so until political operatives, presumably with a criminal bent, manipulated the executive and legislative branches to repeal this proviso and substitute a "Willie Horton" revision that was never fully explained to the public nor openly voted upon for acceptance and would've probably failed it there had been an honest attempt to do so.

For respondents to abrogate this federal liberty interest they must provide substantial relevant, reliable evidence having some indicia of credibility that Petitioner poses a CURRENT *unreasonable* threat to the public safety, as noted in In re Lee (10-10-06) Second District Court of Appeals, Division Eight; 49 Cal.Rptr.3rd 931, where the court cautioned:

"The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicate that the offender will present an unreasonable public safety risk if released from prison. In re Scott (2005) 133 Cal.App.4[th] 573, 595, (however, In re Lowe (2005) 130 Cal.App.4[th] 1405 suggested "some evidence" applies to the factors, not dangerousness.) Some evidence of the existence of a particular factor does not necessarily equate to some evidence the [inmate's] release unreasonably endangers public safety." Lee, supra, pp. 936-37.

¶The board and governor must focus their parole decisions on whether a prisoner continues to pose an unreasonable risk to public safety. Such a practical inquiry, rooted in real world crime and law and order, has no obvious intersection with incorporeal realm of legal constructs." Id. at p. 940.

This is something they have patently failed to do, as testified by virtually all of their own witnesses as noted in attached Exhibit "B", which has been previously generated BY RESPONDENTS and provided to all concerned parties prior to Petitioner's various hearings and with NO OBJECTIONS from respondents as being accurate and meaningful to ascertain PRESENT DANGEROUSNESS.

"Unreasonable risk" evidence that meets the federal level of reliability must be drawn from an individualized analysis of fifteen (15) factors identified by regulations: CCR § 2402(b); Rosenkrantz IV at pp. 653-54. "Such information shall include circumstances of the prisoner's social history; past and present mental state; past criminal history; [] the base and other commitment offenses; past and present attitude toward (sic) the crime; any conditions of treatment or control ...; and any other information that bears on the prisoner's suitability for release." (Emphasis added.)

This extensive list of factors, including other relevant reliable information that must be considered, makes it clear that the Legislature did not intend for any single factor to initially or consis-tently trump all the others. This is exactly what is happening here however. Decision upon decisions by the BPH suggests that their focus is exclusively on the commitment offense, a sub-factor among the total. The BPH insistently attempts to insulate their failure to individually consider circumstances of suitability using makeweight exceptions to state by rote that, 'although post-conviction behavior was DULY CONSIDERED, and the inmate is otherwise suitable for release to parole, the offense was so heinous, atrocious, or cruel, that Petitioner is ineligible for a finding of suitability. "The evidence under-lying the BPH's decision must have some indicia of reliability." Jancsek v. Oregon Board of Parole (9th Cir. 1987) 833 F.2d 1389, 1390.

The reduction of the parole assessment process to an occluded, myopic pseudo-consideration of one factor, and it alone—unerringly as an unwritten but accepted general rule practiced in all circumstances— was never intended by the Legislature and cannot be permitted nor allowed to continue and still comport with

1    Rosenkrantz, Biggs, Martin, Morrall, Irons, Coleman, et cetera. See also: Environmental Defense Center, Inc. v.

2    E.P.A. (2003) 344 F.3d 832, 858, fn. 36, (holding that a federal agency has acted in an arbitrary and capricious

3    fashion, if "the agency has relied on factors that Congress has not intended to consider, entirely failed to

4    consider an important aspect of the problem, and offered no explanation for its decision that runs counter to the

5    evidence before the agency, or is so implausible that it could not be ascribed to a different view or the product of

6    agency expertise."); Arizona Cattlegrower's Ass'n v. U.S. Fish & Wildlife, B.L.M. (9th Cir. 2001) 273 F.3d 1229,

7    1236 (holding judicial review under the "arbitrary and capricious" standard is "meaningless ... unless we carefully

8    review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors

9    ...[;] while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling act,

10    they must not rubber-stamp ... administrative decisions that they deem inconsistent with a or that frustrate the

11    congressional policy underlying a statute.")

12      Second degree murder is not a crime automatically allows one to be deemed unsuitable for release and

13    parole. And, given the above directive in Environmental Defense Center, Inc. v. E.P.A and Arizona

14    Cattlegrower's Ass'n v. U.S. Fish & Wildlife, B.L.M., coupled with Rosenkrantz, Biggs, Martin, Morrall, Irons,

15    Coleman, et al., there must be a base set of factors upon which a second degree murderer would have to be

16    paroled or the BPH would risk violating due process. To determine what would qualify as more than the minimum

17    necessary for a conviction, the courts must first consider what is required, at the minimum, for a conviction of

18    second-degree murder.

19      The Second District Court of Appeals has explained, in In re Lawrence (2007, Rev. granted 9-21-

20    07), 59 Cal.Rptr.3d 537; "Combining the California and federal standards of review, as they have been

21    articulated thus far by the California Supreme Court, respectively, the commitment crime can lack the power to

22    supply "some evidence" supporting a denial of parole because of the interplay between two factors—the nature

23    of the crime and the passage of time since its commission. That is, the fact there is "some evidence" the crime

24    was committed and committed a certain way at a certain time dies not mean that the crime necessarily

25    represents "some evidence" the prisoner's release on parole will pose an unreasonable risk of danger to the

26    public safety at the present time. Whether it possesses the necessary predictive value depends both on the

27    nature of the crime and how long ago it happened. ... Id. p. 558.

28      "When the Legislature sets an indeterminate maximum term with a fixed minimum term, the latter can be

viewed as setting the period of imprisonment deemed necessary to satisfy the first two purposes, while the justification for continued imprisonment beyond that fixed minimum depends on the need for continued incapacitation of the offender. California's sentencing structure in murder cases makes it clear the denial of parole can only be justified by the third of these purposes—the need for further incapacitation of the prisoner. Unless there is an *unreasonable risk* the parole applicant will re-offend and thus pose a risk to public safety she or he **is supposed to be released on parole**. Neither the Board nor the Governor properly takes account of whether release on parole will impair the retributive or the deterrent value of continued imprisonment at this late stage of the inmate's incarceration. (Ibid. p. 559. Emphasis added to original.)

"[R]eturning to the statutory test, only evidence bearing on the likelihood of recidivism and only to the extent it reveals an "unreasonable risk" of same is relevant to the decision whether to grant or deny parole. As a recent court of appeal opinion emphasized, a parole release decision authorizes the Board [] only to '"identify and weigh the factors relevant to predicting ... ""whether the inmate will be able to live in society *without committing additional antisocial acts.*"'" In re DeLuna (2005) 126 Cal.App.4th 585, 591, quoting Rosenkrantz V at p. 655 (Emphasis in original); Lawrence , supra, p. 560.

The Sixth District Court of Appeals has explained that "[s]econd degree murder requires ... malice—i.e., the perpetrator must kill another person with the specific intent to do so; or he or she must cause another person's death by intentionally performing an act, knowing it is dangerous to life and with conscious disregard for life." In re smith (2003) 114 Cal.App.4th 343, 366, citing P.C. §§ 187-189; and CALJIC No. 811. (Noting "all second degree murders by definition involve some callousness, i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others" and that the facts of the instant crime were callous, but not exceptionally callous.) Id. at pp. 366-7.

From this instructive dialog, the limits on the "minimum necessary to sustain a conviction" of second degree murder can be defined. There must be: 1) a killing of another, 2) malice, 3) no premedi-tation or deliberation, planning, lying in wait, torture, etc., as would be present in a first degree murder, a crime that Petitioner was specifically acquitted by a jury of his peers.

Now that the crime is defined, the question must be what evidence indicates that any particular second degree murder was somehow "beyond the minimum necessary to sustain a conviction." In sum: what evidence indicates the commitment offense was "*especially* heinous" or "*exceptionally* grave", given that there typically

1    must be a finding of some level of heinousness, callousness, and/or gravity of violence in order for a defendant
2    to have had his second degree murder conviction sustained by the appellate courts in the first place and where
3    Petitioner WAS NOT determined to be the unequivocal killer?

4         There was no weapon enhancement that could reasonably demonstrate that this crime was "beyond the
5    minimal elements" of a second-degree murder conviction, and is in no way some evidence establishing that he is
6    *currently* an unreasonable threat to public safety. Petitioner was not the shooter and lacked the requisite intent to
7    charge an enhancement. Indeed, if the BPH were to be able to rely on "weapon of choice" evidence in every
8    case, **every** second degree murder would be "beyond the minimal elements" and there would be no way to
9    commit a second degree murder in California that did not qualify as an "especially" heinous crime and thereby
10   justify imprisonment for life, without any chance of parole. This is not what the Legislature wrote the
11   enhancement statutes for nor the intended outcome of any additional punishment attached thereto, and exceeds
12   the bounds of common sense in every conceivable manner.

13        Having doubts as to these elements, the jury acquitted Petitioner of first degree murder and
14   returned a verdict of second degree murder and there has never been any contention by the appellate courts
15   that it should have been otherwise. The unique elements present here were duly recounted: (by **PRESIDING**
16   **COMMISSIONER ENG**): "Okay. I'm going to go back and take a look at some of your personal stuff. I thought
17   that – okay. You were born in Mexico? **INMATE JIMENEZ**: Yes, ma'am. **PRESIDING COMMISSIONER ENG**:
18   Okay. And you are one of seven children. Were you all born in Mexico? **INMATE JIMENEZ**: Just two weren't ,
19   the two youngest. **PRESIDING COMMISSIONER ENG**: Okay. So where are you in the seven? (sic) **INMATE**
20   **JIMENEZ**: Third. **PRESIDING COMMISSIONER ENG**: You're the third oldest? Okay. So the two youngest were
21   born here because it does state that both parents reside in Long Beach; is that correct? **INMATE JIMENEZ**: Yes,
22   ma'am. ... **PRESIDING COMMISSIONER ENG**: You ended up at Ply High you junior year you did not complete
23   (sic). So you dropped out of school in what, the 11th grade? **INMATE JIMENEZ**: Yes, ma'am. **PRESIDING**
24   **COMMISSIONER ENG**: Were you failing? **INMATE JIMENEZ**: Yes, yes. **PRESIDING COMMISSIONER ENG**: Is
25   that why you dropped out? **INMATE JIMENEZ**: Yes. **PRESIDING COMMISSIONER ENG**: So when you dropped
26   out what did you do? (sic)  **INMATE JIMENEZ**: I worked for my brother-in-law some of that time, for about three
27   months. **PRESIDING COMMISSIONER ENG**: So it states here that your parents were having a tough time
28   meeting the needs of the large family, huh? **INMATE JIMENEZ**: Yes. **PRESIDING COMMISSIONER ENG**: so

1   did you feel because you were the third oldest you had to help them out? **INMATE JIMENEZ**: I wanted to

2   contribute something. .... **PRESIDING COMMISSIONER ENG**: So you r older brother and you both had

3   problems with the law? ... Did you look up to your older brother? **INMATE JIMENEZ**: Yes. **PRESIDING**

4   **COMMISSIONER ENG**: so would you say that you were trying to be more like him? **INMATE JIMENEZ**: In some

5   ways, yes. **PRESIDING COMMISSIONER ENG**: Do you think he was leaving (sic) a good example? **INMATE**

6   **JIMENEZ**: At the time I did think that. **PRESIDING COMMISSIONER ENG**: *It says here that you stayed away*

7   *from home at times rather than see your mother cry*? **INMATE JIMENEZ**: Yes, ma'am. **PRESIDING**

8   **COMMISSIONER ENG**: **Your mother was not happy because she didn't have enough food for the family;**

9   **is that true? ... INMATE JIMENEZ**: At times we had it like that. **PRESIDING COMMISSIONER ENG**: Why

10  would your mother be crying? **INMATE JIMENEZ**: For the struggles (sic). **PRESIDING COMMISSIONER ENG**:

11  Did they ever consider going back to Mexico? **INMATE JIMENEZ**: I think they probably did. **PRESIDING**

12  **COMMISSIONER ENG**: Your father drank a lot? **INMATE JIMENEZ**: Yes. **PRESIDING COMMISSIONER ENG**:

13  And it states here that he sometimes abused you mother physically? **INMATE JIMENEZ**: Yes. **PRESIDING**

14  **COMMISSIONER ENG**: Did you ever witness your father beating your mother or hitting her or slapping her?

15  **INMATE JIMENEZ**: Just slapping, pushing. **PRESIDING COMMISSIONER ENG**: Okay. Did he do that with the

16  kids? **INMATE JIMENEZ**: No. **PRESIDING COMMISSIONER ENG**: *Just your mother*." Certainly not an ideal

17  childhood nor appropriate role models for a culturally confused young boy who felt he had to leave school to help

18  feed his family and survive as best he could. The courts have routinely noted at all levels that youth is not to be

19  held to adult standards of behavior where the development of the person is still ongoing and not fully competent

20  nor mature. (Exhibit "A", pages 23-27, emphasis added.)

21      Rosenkrantz VI 444 F.Supp.2d 1036 noted such a nexus insofar as age, maturity, situational factors and

22  rage are concerned by stating:

23      "The reliability of the facts of his crime as a predictor for his dangerousness is further diminished
        by petitioner's age at the time of the offense. Petitioner turned 18 **[prior to the crime]**, and
24      committed his offense one month later. While *petitioner* was not legally a minor, he was very
        close to being one. [FN17]   As the [U.S.] Supreme Court recently recognized, the
25      evidentiary/predictive value of the conduct of such a young person is diminished. The
        susceptibility of juveniles to immature and irresponsible behavior means '"**their irresponsible**
26      **conduct is not as morally reprehensible as that of an adult**."' Thompson v. Oklahoma (1988)
        487 u.s. 815, 835 (plurality opinion). Their own vulnerability and comparative lack of control over
27      their immediate surroundings mean *juveniles have a greater claim than adults to be forgiven
        for failing to escape negative influences in their WHOLE ENVIRONMENT.* (Emphasis
28      added.)

1    This rendition illustrates further, the importance (given the short tenure of the suggestion that "some
2    evidence" may be found in facts 'beyond the minimum necessary elements' of the commitment offense) of all
3    courts providing enhanced guidance regarding what set of facts are sufficient to support a denial of parole
4    suitability. Invariably, any such guidance should summarily relate to the relevance of the evidence; whether or
5    not it is substantial for federal due process purposes; its relevance and its reliability; and the reasonableness one
6    should exact in being able to conclude that the evidence sub-stantiates that the inmate is a CURRENT,
7    UNREASONABLE THREAT to the safety and security of the public and the ability to lawfully abide within the
8    community.

9    Sole reliance on the commitment offense to deny parole not only augurs the serious risk of being
10   arbitrary but is almost always counter-instructive. In the parole determination process, the panel is tasked with
11   assuring the Executive branch by determining if the prisoner is a CURRENT threat to the public safety. This
12   determination is, in total, the only decision that the BPH is sanctioned to make by the Penal Code and
13   Regulations codified for that purpose. All interpretations of mitigating and aggravating factors, and the weight
14   given to the special circumstances of the offense, merely go to instruct this final conclusion. "A determination of
15   unsuitability I simply shorthand for a finding that a prisoner CURRENTLY would pose an unreasonable risk of
16   danger if released at this time." Smith, supra, at p. 370, (citing C.C.R. § 2402(d), emphasis added.)

18   WHEREFORE, Petitioner respectfully submits these issues, arguments and Exhibits and prays this
19   Honorable Court and all Honorable Justices will grant the writ and Order Petitioner's release forth-with. Or, in the
20   alternative, Order a Rehearing within thirty (30) days of the Order with instructions to individualize his complete
21   suitability consideration without bias or political, personal, or considerations of tenure, and in accordance with the
22   statutory mandate of P.C. § 3041(a), and any further relief as the Court may deem just and proper to protect
23   Petitioner's civil rights.

24   ///
25   ///
26   ///
27
28

$\mathbf{III}$-G

# EXHIBIT   "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
 )
JOSE JIMENEZ )
_____ )

CDC Number E-49850

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

APRIL 12, 2007

11:58 A.M.

PANEL PRESENT:

JANICE ENG, Presiding Commissioner
JAMES MARTIN, Deputy Commissioner

OTHERS PRESENT:

JOSE JIMENEZ, Inmate
MARY ANN TARDIFF, Attorney for Inmate
DON EASTMAN, Deputy District Attorney
Correctional Officer(s) Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No          See Review of Hearing
_____ Yes         Transcript Memorandum

**Jill Pearson**
**Northern California Court Reporters**

ii

INDEX

Page

Proceedings ...............................................1

Case Factors ............................................12

Pre-Commitment Factors ..................................19

Post-Commitment Factors .................................35

Parole Plans ............................................43

Closing Statements ......................................58

Recess ..................................................62

Decision ................................................63

Adjournment .............................................69

Transcriber Certification ...............................70

----oOo----

1

1          **P R O C E E D I N G S**

2          **DEPUTY COMMISSIONER MARTIN:**  We're on tape.

3          **PRESIDING COMMISSIONER ENG:**  Okay.  Good morning.

4     This is a subsequent parole consideration hearing for Jose

5     Jimenez, CDC number E-49850.  Today's date is April 11th,

6     2007 and the time is 11:58 a.m..  We are located at CTF,

7     Soledad.  The inmate was received on March 27, 1990 from

8     Los Angeles County.  His life term began on that same date,

9     March 27, 1990 and the minimum eligible parole date is

10    April 19, 1997.  The controlling offense for which the

11    inmate has been committed is murder two, case number

12    A032130, count one, Penal Code Section 187.  The inmate

13    received a total term of 15 years to life.  This hearing is

14    being recorded so for the purpose of voice identification

15    each of us will be required to state our first and last

16    names, spelling out our last names.  So, sir, when it comes

17    to your turn after you spell your last name please provide

18    us with your CDC number.  I'll begin and we'll move around

19    the room to the left.  My name is Janice Eng, E—N—G,

20    Commissioner.

21         **DEPUTY COMMISSIONER MARTIN:**  I'm James Martin,

22    M—A—R—T—I—N, Deputy Commissioner

23         **DEPUTY DISTRICT ATTORNEY EASTMAN:**  Don Eastman,

24    E—A—S—T—M—A—N, Deputy District Attorney, Los Angeles

25    County.

26         **ATTORNEY TARDIFF:**  Mary Ann Tardiff,

27    T—A—R—D-I, double F, attorney for Mr. Jimenez.

2

1          **INMATE JIMENEZ:** Jose Jimenez, E-49850.

2          **PRESIDING COMMISSIONER ENG:** Did you spell your last

3    name, sir?

4          **INMATE JIMENEZ:** J—I—M—E—N—E—Z.

5          **PRESIDING COMMISSIONER ENG:** Okay.  Thank you.  We

6    also have two correctional officers for security reasons

7    and they will not be participating in the hearing.

8          Before we go any further, sir, I'm going to ask if

9    you could please read that ADA statement in front of you

10   aloud?  You can begin.

11         **INMATE JIMENEZ:**

12              "The Americans with Disabilities Act, ADA,

13              is a law to help people with disabilities.

14              You have a right to receive help for your

15              hearing.  If you need help talking, reading,

16              hearing, seeing, understanding or getting to

17              your hearing you have a right to that help.

18              You have a right to receive help in meeting

19              with your attorney.  If you do not speak

20              English you have a right to an interpreter.

21              If you are deaf and use sign language you

22              have a right to a sign language interpreter.

23              If you cannot read the BPT or CDC must

24              provide you with help to read the forms and

25              papers.  If you need special transportation

26              the BPT or CDC must provide it for you."

27         **PRESIDING COMMISSIONER ENG:** Okay.  Thank you. Do

3

1    you understand what your rights are under the Americans with
2    Disabilities Act?

3         **INMATE JIMENEZ:**  Yes.

4         **PRESIDING COMMISSIONER ENG:**  Okay.  I do note that
5    you signed a BPT form 1973 back on January 4th of 2007.  And
6    that form, sir, is a Reasonable Accommodation Notice and
7    Request in accordance with the provisions under the ADA.
8    And basically, sir, you checked off that you do not have
9    any disabilities as defined under the ADA.  So is that
10   information still correct and is current?

11        **INMATE JIMENEZ:**  Yes, ma'am.

12        **PRESIDING COMMISSIONER ENG:**  Okay.  Sir, do you have
13   any problems walking up or down stairs or for distances of
14   a 100 yards or more?

15        **INMATE JIMENEZ:**  No, ma'am.

16        **PRESIDING COMMISSIONER ENG:**  All right.  And I see
17   that you're wearing glasses.  Are those for reading and
18   distance or --

19        **INMATE JIMENEZ:**  No, just distance.

20        **PRESIDING COMMISSIONER ENG:**  Just distance?  So do
21   you have any problems, do you need any type of magnifying
22   device in order to read documents?

23        **INMATE JIMENEZ:**  No.

24        **PRESIDING COMMISSIONER ENG:**  Okay.  So you should be
25   fine today?

26        **INMATE JIMENEZ:**  Yes, ma'am.

27        **PRESIDING COMMISSIONER ENG:**  Okay.  How about any

4

1    hearing impairments?

2         **INMATE JIMENEZ:** No, ma'am.

3         **PRESIDING COMMISSIONER ENG:** Okay.  Sir, have you

4    ever been included in the Triple CMS or EOP programs?

5         **INMATE JIMENEZ:** No, I haven't.

6         **PRESIDING COMMISSIONER ENG:** And do you know what

7    those are?

8         **INMATE JIMENEZ:** A little bit.

9         **PRESIDING COMMISSIONER ENG:** Okay.  They come under

10   the mental health program umbrella.  So you understand what

11   the mental health is?

12        **INMATE JIMENEZ:** Yes.

13        **PRESIDING COMMISSIONER ENG:** So Triple CMS is I

14   think it's the Clinical Case Management for some in the

15   institution and then the EOP is the Enhanced Outpatient

16   which deals with more severe mental health situations.  The

17   Triple CMS is less severe and could include one on one

18   therapy, etcetera.  Just so you know for future reference.

19        **INMATE JIMENEZ:** Okay, ma'am.

20        **PRESIDING COMMISSIONER ENG:** Most times you know it

21   if you're in it, okay?  All right.  So we'll check off, no.

22   Sir, do you know if you have taken any psychotropic

23   medications, either in prison or on the streets?

24        **INMATE JIMENEZ:** No.

25        **PRESIDING COMMISSIONER ENG:** Okay.  And did you go

26   to school here in the U.S.?

27        **INMATE JIMENEZ:** Yes, I did.

5

1       **PRESIDING COMMISSIONER ENG**:  You did?  Oh, that's
2    what I thought, okay.  And when you were growing up do you
3    recall were you in special education classes?

4            **INMATE JIMENEZ**:  No, ma'am.

5            **PRESIDING COMMISSIONER ENG**:  Okay.  So do you suffer
6    from any disability that would prevent you from
7    participating in the hearing today?

8            **INMATE JIMENEZ**:  No, ma'am.

9            **PRESIDING COMMISSIONER ENG**:  Okay.  Ms. Tardiff, are
10   there any ADA issues that you believe need further
11   discussion?

12           **ATTORNEY TARDIFF**:  No.

13           **PRESIDING COMMISSIONER ENG**:  Thank you.

14           Sir, this hearing is being conducted pursuant to the
15   Penal Code and the rules and regulations of the Board of
16   Parole Hearings Governing Parole Consideration Hearings for
17   Life Inmates.  So the purpose of today's hearing is to once
18   again consider your suitability for parole.  And in doing
19   so we will be considering the number and nature of the
20   crimes for which you were committed, your prior criminal
21   and social history, your behavior and programming since
22   your commitment and your plans if released.  So we've had
23   the opportunity to review your Central File and you will
24   also be given a chance to make any corrections or to
25   clarify the record for us.  We will be considering your
26   progress since your commitment, your counselor's reports
27   and your mental health evaluations.  However, we will be

6

1    focusing also on any progress or new reports since your
2    last hearing. So if you have had any changes to your
3    parole plans you should bring that to our attention and I
4    believe we have already received some letters. Sir, we
5    will reach a decision today and inform you whether or not
6    we find you suitable for parole and the reasons for our
7    decision. So if you are found suitable for parole the
8    length of your confinement will be explained to you at that
9    time. Before we take a recess for deliberations the
10   district attorney's representative who is present, your
11   attorney and you yourself will all have a chance to make a
12   final statement regarding parole suitability. So if you
13   choose to make a final statement to the panel you should
14   focus on why you believe you are suitable for parole today.
15   Then we will then take a recess, we'll clear the room and
16   we'll begin our deliberations and once we complete the
17   deliberations we will resume the hearing and announce our
18   decision. The California Code of Regulations states that
19   regardless of time served a life inmate shall be found
20   unsuitable for and denied parole if in the judgment of the
21   panel the inmate would pose an unreasonable risk of danger
22   to society if released from prison. Sir, you do have
23   certain rights and those rights include the right to a
24   timely notice of this hearing, the right to review your
25   Central File and the right to present relevant documents.
26           So Ms. Tardiff, so far have your client's rights been
27   met?

7

1          **ATTORNEY TARDIFF:** Yes.

2          **PRESIDING COMMISSIONER ENG:** Sir, when did you --

3    when was the last time you reviewed your Central File? Did

4    you recently?

5          **INMATE JIMENEZ:** Yes, recently to prepare for the

6    board.

7          **PRESIDING COMMISSIONER ENG:** Okay. Good. I wanted

8    to be sure because I didn't see anything. Okay. Sir, you

9    have the additional right to be heard by an impartial

10   panel. You've been introduced to this panel do you have

11   any objections?

12         **INMATE JIMENEZ:** No, ma'am.

13         **PRESIDING COMMISSIONER ENG:** Okay. Ms. Tardiff, any

14   objections to the panel?

15         **ATTORNEY TARDIFF:** No.

16         **PRESIDING COMMISSIONER ENG:** Sir, you will receive a

17   copy of our written tentative decision today and that

18   decision does become final within 120 days.

19         **DEPUTY COMMISSIONER MARTIN:** May I interrupt you? I

20   see a general chrono in the Central File.

21         **PRESIDING COMMISSIONER ENG:** What's the date?

22         **DEPUTY COMMISSIONER MARTIN:** And it's dated January

23   4, 2007, that's fairly recently, and it has the signature

24   of Inmate Jimenez and the box that's checked is, *I decline*

25   *to review my Central File.*

26         **PRESIDING COMMISSIONER ENG:** Do you recall that?

27         **DEPUTY COMMISSIONER MARTIN:** (Overlapping) So I

8

1    thought I heard Mr. Jimenez say that he did review it.

2        **INMATE JIMENEZ:**  Well, I had a chance to review it

3    but I --

4        **DEPUTY COMMISSIONER MARTIN:**  (Overlapping) So

5    previously you said you did and now you're saying you

6    declined to review it; is that correct?

7        **INMATE JIMENEZ:**  Yes.

8        **PRESIDING COMMISSIONER ENG:**  Okay.  So you didn't

9    review it, all right.  Okay.  Sir, a copy of the final

10   decision and a copy of the hearing transcript will be sent

11   to you.  But please note on May 1st, 2004 the regulations

12   regarding your right to appeal a decision made at this

13   hearing were repealed.  And you basically have to go to

14   court so if you have any questions about that policy you

15   should discuss that with your legal counsel or see about

16   getting a copy of it to review at your prison law library.

17   Sir, you're not required to admit to or discuss your

18   offense but this panel does accept as true the findings of

19   the court.  So do you understand what that means?

20       **INMATE JIMENEZ:**  Yes, ma'am.

21       **PRESIDING COMMISSIONER ENG:**  Okay.  Commissioner

22   Martin, is there any confidential material in the file and

23   if so will we be using it?

24       **DEPUTY COMMISSIONER MARTIN:**  There is some

25   confidential material and it may be used.

26       **PRESIDING COMMISSIONER ENG:**  All right, thank you.

27       I've already passed the hearing checklist over to

9

1    your legal counsel and also to the Deputy DA and we've all

2    initialed it and dated it and this is labeled Exhibit 1.

3    And, sir, we do this to make sure that all of us are

4    operating off the same set of documents for your hearing.

5        **ATTORNEY TARDIFF:**  I don't have the most current

6    board report or is there one?

7        **PRESIDING COMMISSIONER ENG:**  Actually it was in this

8    updated material.  Is there an extra copy of it?

9        **ATTORNEY TARDIFF:**  I got letters only.

10       **PRESIDING COMMISSIONER ENG:**  All right.  Hold on.

11       **ATTORNEY TARDIFF:**  That's all right.  I mean, if

12   you're going to --

13       **PRESIDING COMMISSIONER ENG:**  (Overlapping) I have

14   letters too but in front of the letters was an updated

15   board report, May 2007.

16       **ATTORNEY TARDIFF:**  Did you get a board report?

17       **DEPUTY DISTRICT ATTORNEY EASTMAN:**  Yeah, if you want

18   to look at it.

19       **ATTORNEY TARDIFF:**  I'll just look at this briefly.

20       **PRESIDING COMMISSIONER ENG:**  I didn't leave it there

21   for you this morning?

22       **ATTORNEY TARDIFF:**  No, I just got these two.

23       **PRESIDING COMMISSIONER ENG:**  I must have --

24       **ATTORNEY TARDIFF:**  No.

25       **PRESIDING COMMISSIONER ENG:**  All right.

26       **ATTORNEY TARDIFF:**  And also I'd like to make a

27   comment on the psych eval.

10

1    **PRESIDING COMMISSIONER ENG:**  Yes.

2    **ATTORNEY TARDIFF:**  There was one requested by the

3    prior board.

4    **PRESIDING COMMISSIONER ENG:**  All right.

5    **ATTORNEY TARDIFF:**  Mr. Jimenez was interviewed I

6    believe March 7th.  As of yet that report has not been

7    received by Mr. Jimenez or anyone to my knowledge in this

8    room.  He is willing to waive that psych eval in order to

9    go forward with this hearing.

10   **PRESIDING COMMISSIONER ENG:**  Okay.

11   **ATTORNEY TARDIFF:**  I spoke with him at length that,

12   you know, basically it was his choice.  He could have the

13   psych and he would need to postpone it or he could go

14   forward with the hearing and waive it and he's chosen to --

15   **PRESIDING COMMISSIONER ENG:**  (Overlapping) Move

16   forward.

17   **ATTORNEY TARDIFF:**  -- waive the psych and move

18   forward.

19   **PRESIDING COMMISSIONER ENG:**  All right.  Sir, do you

20   understand that.  The psychological evaluation is just one

21   of many factors that panels take a look at, it's not

22   usually a deciding factor one way or the other; do you

23   understand that?

24   **INMATE JIMENEZ:**  Yes, ma'am.

25   **PRESIDING COMMISSIONER ENG:**  Okay.  All right.  So

26   you are comfortable with moving forward today?

27   **INMATE JIMENEZ:**  Yes.

11

1      **PRESIDING COMMISSIONER ENG:**  Okay.  Okay.  So any

2   additional documents to be presented to the panel today

3   other than what we have?  I see all these letters.

4      **ATTORNEY TARDIFF:**  There may be.

5      **PRESIDING COMMISSIONER ENG:**  Okay.

6      **ATTORNEY TARDIFF:**  If there's some chronos that need

7   to be submitted during the hearing, we'll just pass them

8   over.

9      **PRESIDING COMMISSIONER ENG:**  All right.  And any

10  preliminary objections?

11     **ATTORNEY TARDIFF:**  No.

12     **PRESIDING COMMISSIONER ENG:**  Okay.  And will your

13  client be speaking with the panel today?

14     **ATTORNEY TARDIFF:**  Will you discuss with the panel?

15     **INMATE JIMENEZ:**  (Overlapping) Yes.

16     **PRESIDING COMMISSIONER ENG:**  Okay.  On all matters?

17     **ATTORNEY TARDIFF:**  Yes.

18     **INMATE JIMENEZ:**  Yes.

19     **PRESIDING COMMISSIONER ENG:**  Okay.  Sir, I'll have

20  to swear you in, so please raise your right hand.  Do you

21  solemnly swear or affirm that the testimony you give at

22  this hearing will be the truth, the whole truth and nothing

23  but the truth?

24     **ATTORNEY TARDIFF:**  Yes.

25     **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.  Sit

26  back and relax.  As much as you can, I guess.  What I'm

27  going to do first is read into the record the Statement of

12

1    Facts about the crime, okay?  And I'm going to take that

2    from the probation officer's report which is in the legal

3    section of our packets, and I believe it starts on pages 2

4    through page 4, okay, and it states,

5              "On October 31st, 1985, defendant and

6              co—defendants beat victim Jose

7              Gonzalez to death.  Victim among three

8              carloads of Eastside Longos gang

9              members advanced on the territory

10             occupied by the Barrio Pobre,

11             P—O—B—R—E, and T—Town Flats Gangs in

12             retaliation for earlier wrongs

13             perpetrated against them.  They

14             confronted the rival gang members,

15             including defendant Jimenez (T—Town

16             Flats gang), co—defendant Martinez

17             (Barrio Pobre gang) and co—defendant

18             Lucero, L—U—C—E—R—O, (La Loma gang)

19             and a gang fight ensued.  After five

20             to ten minutes the fight broke up and

21             the Eastside Longo gang members left

22             the area.  However, victim was left

23             behind.  According to witnesses,

24             co—defendant Lucero initially chased

25             the victim and knocked him to the

26             ground.  Then the defendant and co—

27             defendants using a shovel, 2x4 with a

13

1       nail and a crowbar proceeded to
2       administer a brutal beating upon the
3       unarmed defenseless victim who lay on
4       the ground.  Two female witnesses
5       intervened and after threatening these
6       witnesses the defendant left the
7       scene.  Defendant Lucero, however,
8       returned to the victim and proceeded
9       to strike him with 2x4, knocking out
10      several teeth.  Victim suffered
11      lacerations and punctures to the face,
12      chest and head and had many teeth
13      missing.  He was admitted to the
14      hospital in serious condition and was
15      treated for one hour prior to surgery.
16      He died on November 4th, 1985 as a
17      result of the injuries received.
18      Following arrest and subsequent
19      interrogation, defendant after initial
20      denial acknowledged, quote, *I hit the*
21      *guy with the board in the side but not*
22      *with a nail,* unquote.  He explained
23      that he was, quote, *kicking back*,
24      unquote, with some other gang members
25      when they were attacked by 15 to 20
26      Eastside Longos armed with sticks and
27      bottles.  He subsequently borrowed a

14

1           gun and when the Eastside Longos saw
2           the gun they ran away.  Defendant
3           reports that he was subsequently told
4           by a friend that one of the Longos was
5           laying down in the alley.  Defendant
6           states that he was mad at the Longos
7           because they had jumped him prior to
8           this evening.  So he proceeded to the
9           area, picked up a 4-foot long board
10          with a nail on one end and struck the
11          Longo who was lying on the ground.
12          Defendant denied striking the victim
13          with the nail end and reports that he
14          hit him only once, quote, *because he*
15          *was already so messed up*, unquote.
16          Defendant reports that when he struck
17          the victim, the victim moved a little
18          bit but did not say anything or try to
19          get up.  Defendant left the scene but
20          as he looked back he saw his, quote,
21          *homeboys*, unquote, hitting the victim
22          some more.  Defendant acknowledges
23          that the victim was not armed when he
24          struck him."
25     Okay.  Sir, it was a while ago, back in 1985.  Was that a
26     pretty accurate description of what occurred that night?
27          **INMATE JIMENEZ:**  Yes, ma'am.

15

1       **PRESIDING COMMISSIONER ENG:** That was brutal -

2   --pretty brutal beating; don't you think?

3       **INMATE JIMENEZ:** Yes, it was, ma'am.

4       **PRESIDING COMMISSIONER ENG:** So what was really

5   going on between all of the -- there were a whole bunch of

6   people, right, there?

7       **INMATE JIMENEZ:** Yes.

8       **PRESIDING COMMISSIONER ENG:** And representing all

9   these different gangs; is that correct?

10      **INMATE JIMENEZ:** Yes, ma'am.

11      **PRESIDING COMMISSIONER ENG:** Okay. So why don't you

12  try to explain that to this panel, what was really

13  underlying all this. Was everybody against this Eastside

14  Longo gang?

15      **INMATE JIMENEZ:** Yes, at the time all three gangs

16  were rivals with that particular gang.

17      **PRESIDING COMMISSIONER ENG:** Would you say that the

18  gang that you were affiliated with, which I understand that

19  you had been affiliated with them since you were about 15

20  years of age; is that correct?

21      **INMATE JIMENEZ:** Yes, ma'am.

22      **PRESIDING COMMISSIONER ENG:** Okay. So the T—Town

23  Flats gang, were all of you guys friendly with La Loma and

24  Barrio gang?

25      **INMATE JIMENEZ:** Yes.

26      **PRESIDING COMMISSIONER ENG:** Or did you often get

27  into altercations with each other?

16

1          **INMATE JIMENEZ:**  No, at the time we didn't have any
2    problems with each other.

3          **PRESIDING COMMISSIONER ENG:**  And was there ever a
4    time that your gang was on friendlier terms with the
5    Eastside Longo gang?

6          **INMATE JIMENEZ:**  Yes, there was a time.

7          **PRESIDING COMMISSIONER ENG:**  Was it recent before
8    this October '85 incident?

9          **INMATE JIMENEZ:**  I think it was recent.

10         **PRESIDING COMMISSIONER ENG:**  Um—hmm.  So what caused
11   this escalation?

12         **INMATE JIMENEZ:**  That incident, with me being a
13   T—town; I was in the Barrio Pobre visiting my girlfriend at
14   that time and I had heard that somebody from Eastside Longo
15   had disrespected a guy from BP and his girlfriend at a gas
16   station.  But I didn't really pay too much attention to
17   everything because I was just there visiting a girlfriend.
18   And they had said that the Eastside Longo was going to go
19   there and cause problems, you know, fight.  And sure
20   enough, soon after they had told him that they were going
21   to go, they came.  And there was about two, two, three
22   carloads of them.  They were walking down the street with
23   sticks, knives and, you know, and when the guys from BP and
24   everybody else saw them they all ran, you know, just to
25   protect themselves.  I ran with my girlfriend inside her
26   house.  And as we were in there we heard them, you know,
27   fighting.  When my girlfriend's father took out a gun I

17

1    grabbed it from him with the intent of just scaring them

2    away from there.  I came out, ran out of the house into the

3    front and I pointed it at some of them that were there.

4    When they seen it they ran.

5         **PRESIDING COMMISSIONER ENG:**  Okay.  Wait one second.

6    Are you telling this panel your girlfriend's father pulled

7    out a gun and gave it to you to use?

8         **INMATE JIMENEZ:**  No, he didn't give it to me, I

9    grabbed it.  I took it from him.

10        **PRESIDING COMMISSIONER ENG:**  What do you think he

11   was intending to do when he took out a gun?

12        **INMATE JIMENEZ:**  Just to scare them, to shoot up,

13   because I don't think it even had bullets.

14        **PRESIDING COMMISSIONER ENG:**  So you're not sure

15   about that then?

16        **INMATE JIMENEZ:**  Because he had said, he told me it

17   didn't have bullets.  That's when I grabbed it.

18        **PRESIDING COMMISSIONER ENG:**  Did anybody -- did it

19   ever occur to anybody to call the police?

20        **INMATE JIMENEZ:**  I'm pretty sure somebody did.

21        **PRESIDING COMMISSIONER ENG:**  All right.  So you went

22   out and waved the gun, they saw that and they took off?

23        **INMATE JIMENEZ:**  Yes.

24        **PRESIDING COMMISSIONER ENG:**  Correct, okay.  Now let

25   me ask you something else.  In prior meetings between all

26   these different gang guys, okay, typically out of these

27   four gangs were the gang members usually armed with weapons

18

1   other than sticks and clubs and stuff? Was it very typical

2   to have weapons such as guns and more knives?

3       **INMATE JIMENEZ:** From what I remember growing up,

4   yeah it was typical for a gangbanger to carry knives.

5       **PRESIDING COMMISSIONER ENG:** How about loaded guns?

6       **INMATE JIMENEZ:** Guns.

7       **PRESIDING COMMISSIONER ENG:** There was. So did it

8   occur to you that even though you grabbed your girlfriend's

9   father's gun, even though it didn't have any bullets, you

10  didn't think that if you'd gone outside and waved that, did

11  you think about one of these, who are they, Longo, Eastside

12  Longo gang members pulling out their gun and shooting you?

13      **INMATE JIMENEZ:** That's how naïve I was, ma'am at

14  the time.

15      **PRESIDING COMMISSIONER ENG:** Well, would that have

16  been typical?

17      **INMATE JIMENEZ:** Yes.

18      **PRESIDING COMMISSIONER ENG:** So the scenario could

19  have been, there could have been, you know, you could have

20  been shot dead or you could have shot up a couple more

21  people, too.

22      **INMATE JIMENEZ:** Yes, ma'am.

23      **PRESIDING COMMISSIONER ENG:** When all this occurred,

24  just by having that weapon, not being sure if it was armed

25  or not, and you could easily have let loose. Okay. So you

26  did that, all right, and then -- I mean I'm just trying to

27  understand. Can you explain to this panel what possessed

19

1   you to participate in this type of a beating, this is one
2   guy.  I mean what kind of chance would he have, how could
3   one person fight back against all these other people that
4   have boards and bats or what have you and he's lying on the
5   ground?  Is this a guy that hurt you before or was it what
6   he represented?

7        **INMATE JIMENEZ:**  It was the fact that he was from a
8   gang that we didn't get along with and it had just been a
9   constant fight between us and them.

10       **PRESIDING COMMISSIONER ENG:**  But the constant fight,
11  how do you describe the constant fight?  Was it basically
12  beatings or was it killing?

13       **INMATE JIMENEZ:**  If they would have saw me walking
14  down the street and they would have known that I was from
15  T—Town Flats, just that was an excuse or a reason for them
16  to either chase me or if they had knives they would have
17  stabbed me or if they guns they would have shot me.
18  There's a just a hatred, gang rivalry at the time.

19       **PRESIDING COMMISSIONER ENG:**  Okay.  I'm going to
20  take a look at your background, get a better idea.  We'll
21  get back to talking more about what was going through your
22  head in the crime.  If we take a look at your prior record,
23  I mean, number one you were born on September 16th, 1968; is
24  that correct?

25       **INMATE JIMENEZ:**  Yes, ma'am.

26       **PRESIDING COMMISSIONER ENG:**  So you were 17 at the
27  time that this life crime occurred; is that correct?

20

1        **INMATE JIMENEZ:**  Yes, ma'am.

2        **PRESIDING COMMISSIONER ENG:**  And you're now 38?

3        **INMATE JIMENEZ:**  Yes, ma'am.

4        **PRESIDING COMMISSIONER ENG:**  Okay.  And we'll get

5    back to your personal history.  However, even at 17 being

6    arrested for this life crime, that was not your first

7    contact with law enforcement?

8        **INMATE JIMENEZ:**  No, it was not.

9        **PRESIDING COMMISSIONER ENG:**  Your first contact that

10   we have on record, at least I have here out of the

11   probation officer's report dates back to April 21st, 1983

12   when you were 14.

13       **INMATE JIMENEZ:**  Yes, ma'am.

14       **PRESIDING COMMISSIONER ENG:**  Do you recall that?

15       **INMATE JIMENEZ:**  Yes, ma'am.

16       **PRESIDING COMMISSIONER ENG:**  Assault with a deadly

17   weapon, specifically I believe it was a screwdriver.  You

18   were declared a ward of the court and placed in CCP.  It

19   states that you reported that you intervened in a fight

20   between the victim and his brother.  Is that your brother,

21   sir?

22       **INMATE JIMENEZ:**  My brother.

23       **PRESIDING COMMISSIONER ENG:**  Okay.  The victim knew

24   karate and the defendant armed himself with a screwdriver

25   in order to defend himself.  And that you stated that your

26   brother shot the victim?

27       **INMATE JIMENEZ:**  Yes, ma'am.

21

1       **PRESIDING COMMISSIONER ENG:**  Is that true?  And you
2   were accused of stabbing him.

3       **INMATE JIMENEZ:**  Yes, ma'am.

4       **PRESIDING COMMISSIONER ENG:**  And you stated that you
5   spent 36 weeks at camp.  All right.  Is this an older
6   brother of yours?

7       **INMATE JIMENEZ:**  Yes.

8       **PRESIDING COMMISSIONER ENG:**  Was he an adult or was
9   he a juvenile?

10      **INMATE JIMENEZ:**  No, he was a juvenile.

11      **PRESIDING COMMISSIONER ENG:**  He was a juvenile?  So,
12  okay, what happened to the victim?

13      **INMATE JIMENEZ:**  Umm --

14      **PRESIDING COMMISSIONER ENG:**  Did he live?

15      **INMATE JIMENEZ:**  Yes, ma'am.

16      **PRESIDING COMMISSIONER ENG:**  Okay.  So was this a
17  gang incident too?

18      **INMATE JIMENEZ:**  No, not quite.  This was a time
19  when there was a friend of mine, he was under the influence
20  of alcohol and some other drug, he seen this person on a
21  moped and he wanted to go over and take it from him and the
22  person, you know, of course he's going to, you know, defend
23  what's is and he got off his motorcycle, his moped and he
24  started, you know, defending himself.  I went over there
25  to try to get my friend, you know, to pull him back, get
26  him away from that because he wasn't thinking right.  And
27  the man on the moped, he wanted to charge me too because he

22

1    thought I was going to go and help him.

2         **PRESIDING COMMISSIONER ENG:**  Right.

3         **INMATE JIMENEZ:**  So what I did was I went over and

4    called my brother and we were at our friend's house and my

5    brother happened to be there.  And I told him, *hey, there's*

6    *a guy beating our friend up.*  I don't even remember his

7    name.  But I didn't know my brother had a gun and so we

8    both went to go back and our friend was still, you know,

9    being beat up.  And without thinking, you know, when he

10   seen us, he was going to charge at us today but my brother

11   didn't give him time to react or anything, he just came and

12   he shot him.

13        **PRESIDING COMMISSIONER ENG:**  Did you stab him after?

14        **INMATE JIMENEZ:**  I attempted to stab him?

15        **PRESIDING COMMISSIONER ENG:**  After your brother shot

16   him?

17        **INMATE JIMENEZ:**  During.

18        **PRESIDING COMMISSIONER ENG:**  At the same time?  And

19   now, so that was in '83 and then in December of '84 when

20   you were about 16, it says you violated probation?  States

21   that you relate that you were with a girlfriend who had a

22   lit PCP cigarette and that you were merely holding it for

23   her but you received 18 days of juvenile hall and then were

24   released.  So do you recall that?

25        **INMATE JIMENEZ:**  Yes, ma'am.

26        **PRESIDING COMMISSIONER ENG:**  Is that true?

27        **INMATE JIMENEZ:**  Yes, ma'am.

23

1       **PRESIDING COMMISSIONER ENG:**  And it also says

2    according to probation records you were found in violation

3    of probation for being truant.  And then six months later

4    in June of 85 another violation of probation, this one says

5    for failure to report to the probation officer and follow

6    the school program.  Then another 55 days in juvenile hall

7    pursuant to Ricardo M -- whatever time -- with 30 days

8    stay.  And you acknowledge failure to report to the

9    probation officer leading to the issuance of a bench

10   warrant and you did end up serving 15 days in juvenile

11   hall.  So this was becoming sort of a regular thing with

12   you, wasn't it?

13      **INMATE JIMENEZ:**  Yes, ma'am.

14      **PRESIDING COMMISSIONER ENG:**  So you were at camp but

15   apparently that did nothing to curtail your activities.

16      **INMATE JIMENEZ:**  No, ma'am.

17      **PRESIDING COMMISSIONER ENG:**  Was your brother in a

18   gang, too?

19      **INMATE JIMENEZ:**  Yes, ma'am.

20      **PRESIDING COMMISSIONER ENG:**  Okay.  I'm going to go

21   back and take a look at some of your personal stuff.  I

22   thought that -- okay.  You were born in Mexico?

23      **INMATE JIMENEZ:**  Yes, ma'am.

24      **PRESIDING COMMISSIONER ENG:**  Okay.  And you are one

25   of seven children.  Were all of you born down in Mexico?

26      **INMATE JIMENEZ:**  Just two weren't, the two youngest.

27      **PRESIDING COMMISSIONER ENG:**  Okay.  So where are you

28

1   alcohol, but I never could say that I was a --

2          **PRESIDING COMMISSIONER ENG:**  A drinker?

3          **INMATE JIMENEZ:**  Yeah, a drinker.

4          **PRESIDING COMMISSIONER ENG:**  Do you think seeing

5   your father drinking a lot had anything to do with it?

6          **INMATE JIMENEZ:**  It probably had something to do

7   with me not wanting to drink, I mean not following in his

8   steps.

9          **PRESIDING COMMISSIONER ENG:**  Right, okay.  But what

10  were the drugs that you were using, was it pot and PCP or

11  did you try more?

12         **INMATE JIMENEZ:**  Mostly pot.

13         **PRESIDING COMMISSIONER ENG:**  Mostly pot?

14         **INMATE JIMENEZ:**  Um—hmm.

15         **PRESIDING COMMISSIONER ENG:**  How often would you get

16  high?

17         **INMATE JIMENEZ:**  I'd say probably twice a week or

18  once or twice a week.

19         **PRESIDING COMMISSIONER ENG:**  So when you look back

20  would you say, what?  Really light, occasional user,

21  moderate, more than moderate?

22         **INMATE JIMENEZ:**  Light.

23         **PRESIDING COMMISSIONER ENG:**  Okay.  Did I miss

24  anything regarding your criminal background in terms of all

25  your juvenile record?

26         **INMATE JIMENEZ:**  I believe that's it, ma'am.

27         **PRESIDING COMMISSIONER ENG:**  Yeah.  So basically a

1    lot of this occurred over a three—year period?

2        **INMATE JIMENEZ:** Yes.

3        **PRESIDING COMMISSIONER ENG:** Okay. Did you own a

4    gun?

5        **INMATE JIMENEZ:** No, ma'am.

6        **PRESIDING COMMISSIONER ENG:** Where's your brother

7    today, your older brother?

8        **INMATE JIMENEZ:** I believe he's locked up.

9        **PRESIDING COMMISSIONER ENG:** Is he in on a life

10   crime?

11       **INMATE JIMENEZ:** What was that, ma'am?

12       **PRESIDING COMMISSIONER ENG:** Is he in on a life

13   crime?

14       **INMATE JIMENEZ:** No, no, ma'am.

15       **PRESIDING COMMISSIONER ENG:** Okay. So why don't you

16   explain to this panel what was attractive to you, why did

17   you seek out T—Town gang?

18       **INMATE JIMENEZ:** It was just a group of friends that

19   I chose to hang around with at the time, it just seemed for

20   a kid, it just seems fun, you know, just having fun. To a

21   kid, of course, things seem like a game or fun, you know,

22   you're out there just meeting girls and going to parties

23   and that attracted me, you know, those type of things, you

24   know. The way, you know, the dressing style.

25       **PRESIDING COMMISSIONER ENG:** Was this the same gang

26   your brother was in?

27       **INMATE JIMENEZ:** Yes, ma'am.

1       **PRESIDING COMMISSIONER ENG:** So you were sort of an
2   automatic in; is that how it worked?

3       **INMATE JIMENEZ:** Yeah.

4       **PRESIDING COMMISSIONER ENG:** And did you see this as
5   normal?

6       **INMATE JIMENEZ:** Yes.

7       **PRESIDING COMMISSIONER ENG:** Did you believe that,
8   you know, fighting and possibly hurting other people with
9   weapons, was that sort of a normal way of life?

10      **INMATE JIMENEZ:** In some ways, yes.

11      **PRESIDING COMMISSIONER ENG:** And taking what you
12  want even though it's not yours?

13      **INMATE JIMENEZ:** Yes, in some ways, yes.

14      **PRESIDING COMMISSIONER ENG:** And where did you --
15  Where do you think you learned that set of values; you
16  understand what I'm talking about?

17      **INMATE JIMENEZ:** No, I really don't.

18      **PRESIDING COMMISSIONER ENG:** Did your parents have
19  anything to do with it?

20      **INMATE JIMENEZ:** No, because they tried, you know,
21  to show us the importance of work and education, but they
22  just didn't know how. Because they didn't have the
23  education, knowledge of like parenting, you know, they
24  didn't have that schooling. So they tried, you know, by
25  punishing us, by grounding us and things like that.

26      **PRESIDING COMMISSIONER ENG:** Well, would you say
27  that you understood back then what was right from wrong or

31

1    what was legal versus illegal?

2         **INMATE JIMENEZ:**  No, I didn't, I did not understand.

3         **PRESIDING COMMISSIONER ENG:**  Did you have any

4    understanding that if you did something that there could be

5    repercussions for it?

6         **INMATE JIMENEZ:**  A little bit.

7         **PRESIDING COMMISSIONER ENG:**  So you didn't really

8    understand about following laws or following the rules?

9         **INMATE JIMENEZ:**  Yeah, a little bit but still not

10   quite to the -- what do you say -- to the point where I

11   would completely understand, you know, the consequences and

12   things like that.  Or I might not have taken it as serious,

13   you know, as a normal person would.

14        **PRESIDING COMMISSIONER ENG:**  I have to ask this

15   question.  If you were by yourself and you had beaten up

16   this particular person, okay, this victim, Jose Gonzales,

17   if it had just been you and he and you beat him over the

18   head with a board and left him there, back then did you

19   think there would be any consequences for doing that?

20        **INMATE JIMENEZ:**  At the moment, no.

21        **PRESIDING COMMISSIONER ENG:**  Or even right after?

22        **INMATE JIMENEZ:**  Maybe right after.

23        **PRESIDING COMMISSIONER ENG:**  And what did you think

24   the consequences might be?  What's the first thought?

25   Would it have to do with the gang?  Gang retaliation?

26        **INMATE JIMENEZ:**  That.

27        **PRESIDING COMMISSIONER ENG:**  So you wouldn't have

32

1    thought about law enforcement?

2         **INMATE JIMENEZ:**  No.

3         **PRESIDING COMMISSIONER ENG:**  Your first thought

4    would have been, *oh God, the Longo guys are going to be*

5    *after me;* is that what you're saying?  Okay.  You

6    understand why I'm asking.  I'm trying to understand what

7    your mentality was back then.  So the rules according to

8    you, from what I'm getting, is the rules of the road back

9    then were really run by the gang and had nothing to do with

10   the rest of society?

11        **INMATE JIMENEZ:**  Yeah.

12        **PRESIDING COMMISSIONER ENG:**  Okay.  Do you ever

13   think of it like that?

14        **INMATE JIMENEZ:**  Now, I do.

15        **PRESIDING COMMISSIONER ENG:**  Okay.  We'll probably

16   get back to asking you more questions.  Right now I'm going

17   to pass it over to my fellow commissioner, and if he's got

18   any follow up questions he'll just ask them.  And then

19   he'll bring us up to date on what you've been doing.

20        **DEPUTY COMMISSIONER MARTIN:**  A few questions, thank

21   you, Commissioner.

22        What was the date of your life crime?

23        **INMATE JIMENEZ:**  Excuse me?

24        **DEPUTY COMMISSIONER MARTIN:**  What was the date of

25   your life crime?

26        **INMATE JIMENEZ:**  The day when I got arrested, right?

27        **DEPUTY COMMISSIONER MARTIN:**  No, how about the night

1    you killed the victim?

2          **INMATE JIMENEZ:**  The 31st of October, '85.

3          **DEPUTY COMMISSIONER MARTIN:**  10/31/85.  You were

4    received in CDC in March of '90; am I correct?

5          **INMATE JIMENEZ:**  Yes, sir.

6          **DEPUTY COMMISSIONER MARTIN:**  Why the gap, what was

7    going on?  Were you in county?

8          **INMATE JIMENEZ:**  I was sentenced to the Youth

9    Authority.

10         **DEPUTY COMMISSIONER MARTIN:**  Okay.  So you did youth

11   authority and then at what age did you come to CDC?

12         **INMATE JIMENEZ:**  At 21.

13         **DEPUTY COMMISSIONER MARTIN:**  At 21 you came to the

14   Department of Corrections?

15         **INMATE JIMENEZ:**  Yes, sir.

16         **DEPUTY COMMISSIONER MARTIN:**  Mr. Jimenez, I think

17   you answered one question honestly a minute ago when the

18   commissioner asked you why did you seek out the gang.  And

19   you said, *it was fun.*  I think you enjoyed life in the

20   gang, didn't you?

21         **INMATE JIMENEZ:**  Yeah, not quite in the gang, but

22   the lifestyle.

23         **DEPUTY COMMISSIONER MARTIN:**  You identified with it,

24   didn't you?

25         **INMATE JIMENEZ:**  Yes.

26         **DEPUTY COMMISSIONER MARTIN:**  There have been a

27   couple of sort of sub—themes in the story you've told so

34

1   far.  One was the moped incident.  You portrayed yourself

2   in that story as you went to pull your friend back and in

3   the life crime I read where you left and turned around and

4   saw that others were still beating so you often tell the

5   story where you're trying to change the destiny of the

6   event or you're trying to save the person or you're

7   withdrawing but the other bad guys are carrying on.  You do

8   that, don't you?

9         **INMATE JIMENEZ:**  I don't understand.

10        **DEPUTY COMMISSIONER MARTIN:**  I'm putting to you that

11  you often portray yourself as a savior or a lesser, a

12  lesser participant in an event.  But I'm getting the

13  impression that you enjoyed those events.  I'm getting the

14  impression that the stuff that the gang did was fun to you.

15  The property crimes, it was fun.  It was fun to steal and

16  the drugs, the PCP, you were in that era of PCP.  And even

17  the anti-person crime, you beating some guy up was fun,

18  wasn't it?

19        **INMATE JIMENEZ:**  It was at that time, yeah.

20        **DEPUTY COMMISSIONER MARTIN:**  Yeah, it was.  I don't

21  think you had any empathy for other people's suffering.

22  You were young, you thought you were going to live a

23  thousand years and it was fun to just run around and do

24  that.  You talk about your mom crying because there wasn't

25  enough food on the table.  You know, 1985 was the time of a

26  booming economy, full employment, you could have got a job

27  somewhere, even if it was flipping burgers, couldn't you?

35

1    **INMATE JIMENEZ:** At that time they wouldn't have
2    hired me because I was on probation.

3    **DEPUTY COMMISSIONER MARTIN:** So is that the reason
4    why you couldn't go to work, because you were on probation.
5    Nobody on probation in 1985 had a job?

6    **INMATE JIMENEZ:** I tried.

7    **DEPUTY COMMISSIONER MARTIN:** So your mom cries and
8    you honor that by participating in the property crimes, the
9    anti—person crimes, the drug life. You honor your parents
10   that way instead of going out and getting a job and
11   contributing, putting food on the table so your mom won't
12   cry.

13          Commissioner, with your permission I'll talk about
14   Mr. Jimenez's institutional adjustment?

15   **PRESIDING COMMISSIONER ENG:** Um—hmm.

16   **DEPUTY COMMISSIONER MARTIN:** Mr. Jimenez, I reviewed
17   your C—File, Post-Conviction Progress Report, Correctional
18   Counselor Juan Garcia does the Life Prisoner Evaluation
19   Report for the 2004 calendar, I might have a newer one.
20   And then there was a psych report, goes back to February of
21   2005 by Dr. Hewchuk, h—e—w—c—h—u—k. As mentioned earlier
22   you were received at CDC, what did I say, March 27, 1990.
23   You came to CTF, I think you came twice. I think you were
24   here once and you left and you came back and I think most
25   recently it was June 5th, 1997. You were received medium A
26   custody, you have a classification score of 19, which is
27   good low points, and you have an INS hold on you; is that

36

1   correct?

2           **INMATE JIMENEZ**:  Yes, sir.

3           **DEPUTY COMMISSIONER MARTIN**:  Why is that?

4           **INMATE JIMENEZ**:  I was born in Mexico and I never

5   had a chance to be --

6           **DEPUTY COMMISSIONER MARTIN**:  Naturalized.

7           **INMATE JIMENEZ**:  Naturalized.

8           **DEPUTY COMMISSIONER MARTIN**:  Okay.  I go to the

9   vocation and work as the first category.  I found this

10  certificate for Vocational Print Technologies.  You have

11  chronos, I found a couple in 2004, September and December

12  of 2004 where you have satisfactory grades and you

13  completed that vocation, correct?

14          **INMATE JIMENEZ**:  Yes.

15          **DEPUTY COMMISSIONER MARTIN**:  Any other vocations

16  that you've completed?

17          **INMATE JIMENEZ**:  The print shop.

18          **DEPUTY COMMISSIONER MARTIN**:  Print technologies,

19  that's the one we're talking about.

20          **INMATE JIMENEZ**:  Landscaping.

21          **DEPUTY COMMISSIONER MARTIN**:  I saw a certificate, I

22  didn't -- I saw an acknowledgement but I didn't see a

23  certificate for completing that.  Are you saying it was

24  completed?  I'll check on that.  And then what's your

25  current assignment?  Are you culinary?

26          **INMATE JIMENEZ**:  Vocational computer repair.

27          **DEPUTY COMMISSIONER MARTIN**:  Okay.  Back in May of

37

1    '05 you were culinary for a brief period of time.  I didn't

2    know if you were still there.  All right.  Do you have any

3    physical disabilities?

4         **INMATE JIMENEZ:**  No, sir.

5         **DEPUTY COMMISSIONER MARTIN:**  Okay.  Sometimes guys

6    get into computer things if they can't do other jobs.  How

7    do you like the computer?

8         **INMATE JIMENEZ:**  It's fun.

9         **DEPUTY COMMISSIONER MARTIN:**  Good, okay.  I did not

10   find any academic upgrades.  Are you in school or taking

11   any course, anything like that?

12        **INMATE JIMENEZ:**  I'm not at the moment.

13        **DEPUTY COMMISSIONER MARTIN:**  Okay.  That's all

14   right.  Do you read on your own?  Do you do any self—study?

15        **INMATE JIMENEZ:**  Yes, sir.

16        **DEPUTY COMMISSIONER MARTIN:**  What do you like to

17   read?

18        **INMATE JIMENEZ:**  Well, mostly Christian literature.

19        **DEPUTY COMMISSIONER MARTIN:**  Okay.  Going to the

20   category of self—help, I see you have participated in AA.

21   I found a couple of chronos, actually three chronos from

22   2004 and more recently there were four chronos from 2006.

23   They're all dated October the 8th but they gave you credit

24   for the four quarters of 2006, first, second, third and

25   fourth quarter.  And so you had consistent participation in

26   2006.  I also found a chrono dated October of '06 for Anger

27   Management.  You did twelve sessions, I think it was in

38

1    Cage Your Rage.

2         **INMATE JIMENEZ:**  Yes.

3         **DEPUTY COMMISSIONER MARTIN:**  And there was a

4    certificate or a diploma for that.

5         **INMATE JIMENEZ:**  Yes.

6         **DEPUTY COMMISSIONER MARTIN:**  You were in the BRAG

7    group and for that you have a certificate for July of '06.

8         **INMATE JIMENEZ:**  Yes.

9         **DEPUTY COMMISSIONER MARTIN:**  Good.  Anything else?

10        **INMATE JIMENEZ:**  There was another class, a marriage

11   relationship.

12        **DEPUTY COMMISSIONER MARTIN:**  Okay.  And I see

13   there's a chrono in here for you to be allowed to wear a

14   ring.  I see you're married; is that correct?

15        **INMATE JIMENEZ:**  Yes, sir.

16        **DEPUTY COMMISSIONER MARTIN:**  How long has that been

17   going on?

18        **INMATE JIMENEZ:**  This is my fourth month.

19        **DEPUTY COMMISSIONER MARTIN:**  Oh, okay.  So it's

20   recent?

21        **INMATE JIMENEZ:**  Yes.

22        **DEPUTY COMMISSIONER MARTIN:**  Okay.  Well, good luck

23   on that.

24        **INMATE JIMENEZ:**  Thank you.

25        **DEPUTY COMMISSIONER MARTIN:**  We'll go to the

26   category of disciplinaries.  You have six 128s, the last

27   one, it goes back a ways, the last one goes back to 1995,

1    that's September of '95 you were absent from an assignment.
2    That didn't bother me too much but I'm going to go back two
3    prior to that, you have a prior one of, no, I'm sorry,
4    August the 25th, 1992, aggressive and disrespectful
5    behavior; what was that all about?

6         **INMATE JIMENEZ:** I don't even remember.

7         **DEPUTY COMMISSIONER MARTIN:** Okay. Well, how about
8    this. The CO who was supervising the steam line said to
9    give him your ID card, you said you didn't have an ID card.
10   He said, *well, you can't work here without one.* You said
11   you had left it in your cell. The CO quotes himself
12   saying, *so, if I got you on that wall and I pat you down I*
13   *won't find an ID card*? You reached in your shirt pocket,
14   removed your ID card, this is after you denied having it
15   twice, gave it to the CO and said, quote, *here's my fucking*
16   *ID card, I don't give a fuck.* And you continued to display
17   aggressive and disrespectful behavior. Attempts to
18   verbally counsel Inmate Jimenez were unsuccessful. I'm
19   assuming that the CO was trying to talk you down. Your
20   reply to that was, *I don't give a fuck about this job. I*
21   *didn't want this fucking job to begin with, they just gave*
22   *it to me,* etcetera. So that wasn't a particularly pleasant
23   discourse between you and the correctional officer. What
24   was going on there, bad day or what?

25        **INMATE JIMENEZ:** Yes, I guess it was, sir.

26        **DEPUTY COMMISSIONER MARTIN:** And then regarding your
27   115s, you've only got one and that's good. You've been

40

1    down a while and you only have one and that was for failure
2    to get in a prone position during the alarm.  I guess you
3    were out in the yard, you were sitting on a wall, they
4    sound the horn or they do whatever they do and you were
5    sitting on a wall and the CO said, get down.  And the 115
6    reads that you refused and you remained sitting.  The CO
7    approaches and again orders you to get down, prone
8    position.  *Jimenez continued to refuse my order, began*
9    *stating, I am down, why do I have to get in the prone*
10   *position.*  So here we've got a sort of alarm going off and
11   the CO is, you know, you're refusing an order.  Jimenez
12   non-receptive to counseling, etcetera.  That sounds a lot
13   like the 128, you just get in a mood and you just don't
14   want to do anything, right?

15       **INMATE JIMENEZ:**  In this particular case I had just
16   gone to Lancaster, a new prison, at that time from here.  I
17   went over there from here.  And I didn't know anything
18   about the prone position because if the alarm goes off,
19   when the alarm goes off you normally just sit down and it's
20   all right.  But over there, I had just got there, it was
21   like about two weeks after I got there and I did what I was
22   doing over here which other people were doing the same
23   thing and I had my back towards the officer when he was
24   yelling so I couldn't tell who he was yelling at.  And
25   that's when he came straight to me and I tried to explain
26   to him that I just got there.

27       **DEPUTY COMMISSIONER MARTIN:**  Well, if he says, *get*

41

1    *in the prone position*, why not just hit the deck?  He

2    didn't want to hear your life story?

3         **INMATE JIMENEZ:**  I just didn't understand it.

4         **DEPUTY COMMISSIONER MARTIN:**  Okay.  I did look and

5    you're right, it was at that institution.  So let's now go

6    to the category of the psych eval.  The 2003 psych eval

7    that commented on your risk quotient, those are my words,

8    but it describes you has as having a moderate degree of

9    threat to the public.  Counsel, that's 2003 psych eval.

10        The next year in 2004 --

11        **ATTORNEY TARDIFF:**  (Overlapping) I don't have a

12   2003.  I have a 2002 and then I got an '05.

13        **DEPUTY COMMISSIONER MARTIN:**  Uh—oh.

14        **PRESIDING COMMISSIONER ENG:**  Wait a minute.

15        **ATTORNEY TARDIFF:**  I have a 7/02, July 5th.

16        **PRESIDING COMMISSIONER ENG:**  Yeah, that's what we

17   have on ours, July 5th, 2002.

18        **DEPUTY COMMISSIONER MARTIN:**  Well, I can go back to

19   the 2002 and comment that the Axis I refers to

20   polysubstance abuse, in institutional remission; Axis II,

21   no contributory personality disorder with a GAF score of

22   80.

23        **PRESIDING COMMISSIONER ENG:**  Commissioner, there's a

24   2003?

25        **DEPUTY COMMISSIONER MARTIN:**  That's -- I made that

26   note.

27        **ATTORNEY TARDIFF:**  Is it the same inmate, you might

42

1    want to -- sometimes they put the wrong --

2         **DEPUTY COMMISSIONER MARTIN:** (Overlapping) You know,

3    you might be right, but I thought I --

4         **ATTORNEY TARDIFF:** I mean, you --

5         **PRESIDING COMMISSIONER ENG:** You never know.

6         **ATTORNEY TARDIFF:** You don't know.

7         **DEPUTY COMMISSIONER MARTIN:** Well, I don't know

8    where I found it.

9         **ATTORNEY TARDIFF:** Well, check your copy to see if

10   it says *Jimenez* at the bottom.

11        **DEPUTY COMMISSIONER MARTIN:** Well, I'm not able to

12   locate the copy. I am looking at the 2002, yes, but then

13   it skips to 2005. I saw a 2003 -- oh, I'm sorry. Did I

14   say psych eval?

15        **ATTORNEY TARDIFF:** Yes.

16        **PRESIDING COMMISSIONER ENG:** Right.

17        **DEPUTY COMMISSIONER MARTIN:** Folks, I'm sorry. I

18   meant to comment that the 2003 Life Prisoner Evaluation

19   Report --

20        **PRESIDING COMMISSIONER ENG:** Oh, okay.

21        **DEPUTY COMMISSIONER MARTIN:** Speculated that

22   Mr. Jimenez had a moderate degree of threat to the public.

23   The 2004 Life Prisoner Evaluation Report made no such

24   comment. Well, it was these two reports that heightened my

25   awareness to, as I call it, the risk quotient. So in the

26   2005, in the March psych eval, you had been accused of

27   participating in a riot. I think there was a 115 or there

43

1   was the potential 115 or you were contesting a 115.

2            **INMATE JIMENEZ:** Yes, yes.

3            **DEPUTY COMMISSIONER MARTIN:** That initial report

4   gave you, and I think in the report's words, an elevated

5   risk factor, referring to you as having a risk factor

6   slightly higher than average risk in the community when

7   compared with other released parolees. However, we do have

8   a 2005 update, psych eval update, and there the risk

9   factors are described as no greater than the average

10  citizen in the community. And I believe, sir, that's

11  because, I need your help here, you were cleared of

12  participation in the riot.

13           **INMATE JIMENEZ:** Yes, sir.

14           **DEPUTY COMMISSIONER MARTIN:** Okay. I finally got

15  there. I'm sorry I led everyone astray. But there was a

16  theme of considering your risk of threat or risk of

17  violence, it's been not only been referred to in the Life

18  Prisoner Evaluation Reports but also in the psych eval.

19  Did I leave anything out? Okay. I'm going to return --

20           **ATTORNEY TARDIFF:** Did he get the BRAG?

21           **DEPUTY COMMISSIONER MARTIN:** We talked about the

22  BRAG; we have a chrono from July of '06. I'll return to

23  the Chair.

24           Commissioner, I have to leave the room for just a

25  couple of minutes, please. Can you brief me on the parole

26  plans when I return? Okay.

27           **PRESIDING COMMISSIONER ENG:** Do you want us to take

1    a recess?

2    **DEPUTY COMMISSIONER MARTIN:**  No, I'll just be a

3    couple of minutes.

4    **PRESIDING COMMISSIONER ENG:**  Okay.  Sir, let's talk

5    about your parole plans.  I'm going to take a look and see

6    because we've got this new information.  You plan to, I

7    don't know, you'll have to tell me if this is updated.  The

8    recent board report that we're holding right now, that I'm

9    holding right now, states for the May 2007 calendar, but we

10   know it's April, says that you plan to live with your

11   mother, Leonora, in Long Beach, and that your family will

12   support you financially.  And then it states, if you're

13   deported to Mexico you plan to live with your aunt, Delores

14   Garcia, and I guess this is an address in San Martin,

15   what's h—g-o?

16   **INMATE JIMENEZ:**  It's Hidalgo.

17   **PRESIDING COMMISSIONER ENG:**  H—g-o?

18   **INMATE JIMENEZ:**  Yeah, I think that's an

19   abbreviation.

20   **PRESIDING COMMISSIONER ENG:**  For Hidalgo?  And then

21   j-a-l?  Jalisco?

22   **INMATE JIMENEZ:**  Yes, ma'am.

23   **PRESIDING COMMISSIONER ENG:**  When was the last time

24   you were in Mexico?

25   **INMATE JIMENEZ:**  When they brought me, the age of

26   five.

27   **PRESIDING COMMISSIONER ENG:**  Five?  Never been

45

1    back, huh?  Speak Spanish?

2           **INMATE JIMENEZ:**  Yes.

3           **PRESIDING COMMISSIONER ENG:**  Okay.  That helps.

4    Okay.  And regarding employment states that your brother

5    will help you obtain a job in order to support yourself.

6    Okay.  I'm assuming that this is a younger brother.

7           **INMATE JIMENEZ:**  No.

8           **PRESIDING COMMISSIONER ENG:**  Your older brother?

9           **ATTORNEY TARDIFF:**  They're all in the United

10   States.  In fact, his younger siblings were born in the

11   United States so they're citizens.

12          **PRESIDING COMMISSIONER ENG:**  Right, the two younger

13   ones.  No, but I was asking if your younger brother is

14   going to help you get a job because I thought your older

15   brother is in prison.

16          **INMATE JIMENEZ:**  They're referring to him there.

17          **PRESIDING COMMISSIONER ENG:**  They're referring to

18   your brother in prison?

19          **INMATE JIMENEZ:**  I don't think he was locked up

20   when that report was made.

21          **PRESIDING COMMISSIONER ENG:**  Because this is the

22   most recent one.  Is your brother in prison right now?

23          **INMATE JIMENEZ:**  Yes.

24          **ATTORNEY TARDIFF:**  When you talked to your

25   counselor, what did you tell him about a job offer?

26          **INMATE JIMENEZ:**  I told him it would be over here

27   in San Jose.

46

1          **ATTORNEY TARDIFF:** Okay. Well, that's what the
2     board report, the counselor wrote, that your brother would
3     get you a job.

4          **INMATE JIMENEZ:** I think that's a report from a few
5     years back.

6          **PRESIDING COMMISSIONER ENG:** Well, it's the most
7     recent one that we have and sometimes, unless you provide
8     them with updated information, it could be the same as what
9     you provided at prior times.

10         **ATTORNEY TARDIFF:** Did you get a copy of the recent
11    board report, counselor's report?

12         **INMATE JIMENEZ:** Yes.

13         **ATTORNEY TARDIFF:** You read it?

14         **INMATE JIMENEZ:** Yes, I did and it had that.

15         **PRESIDING COMMISSIONER ENG:** So that's why I was
16    asking which brother they were referring to. I thought it
17    was a younger brother because if your older brother is in
18    prison how is he going to help you find a job, you see? So
19    that really is erroneous; is that correct?

20         **INMATE JIMENEZ:** Yes, ma'am.

21         **PRESIDING COMMISSIONER ENG:** Okay. So let's take a
22    look at some of these letters. I have in the new
23    information we have a letter from Rosa Jimenez, who lives
24    in Garden Grove, and this letter is dated March 21st, 2007,
25    and this is your older sister?

26         **INMATE JIMENEZ:** Yes.

27         **PRESIDING COMMISSIONER ENG:** Okay. And this I

1    believe -- have you seen the letter?

2         **INMATE JIMENEZ:**  Yes, ma'am.

3         **PRESIDING COMMISSIONER ENG:**  Okay.  So is this a

4    general support letter?

5         **INMATE JIMENEZ:**  Yes.

6         **PRESIDING COMMISSIONER ENG:**  I don't think there is

7    anything very specific about what she's offering you, is

8    there in here?  I'm not missing anything?

9         **INMATE JIMENEZ:**  No, just support.

10        **PRESIDING COMMISSIONER ENG:**  Yes, good.  She says

11   she personally has some friends that are willing to offer

12   him a job even though they don't know him.  That's still

13   pretty general.  Okay, okay.  So that's one of the new

14   ones.  And then I know we have some in here because I

15   double checked with the ones that you provided.  And I do

16   have a few that I've pulled out.  Wait a minute, no,

17   they're actually in this packet.  We have a lot of new

18   information that came in.  Okay.  I do have a letter from

19   J. Concrete and Pavers in San Jose from Jose Quintero,

20   Q-U-I-N-T-E-R-O, did I pronounce that correctly?

21        **INMATE JIMENEZ:**  Yes, yes.  Quintero.

22        **PRESIDING COMMISSIONER ENG:**  Okay.  And he basically

23   states that he would give you a chance to work for him if a

24   position was open after your release.  So what do you --

25   who is Jose Quintero?

26        **INMATE JIMENEZ:**  This is my wife's sister's

27   father-in-law.

48

1    **PRESIDING COMMISSIONER ENG:**  Okay, okay.  Do you

2    know anything about his business?

3    **INMATE JIMENEZ:**  Landscaping.

4    **PRESIDING COMMISSIONER ENG:**  Okay.  How come it's J

5    Concrete and Pavers?

6    **INMATE JIMENEZ:**  I'm not sure, but he's a

7    landscaper.

8    **PRESIDING COMMISSIONER ENG:**  But again this letter

9    is dated March 27th, 2007 and that would be for the San Jose

10   area?

11   **INMATE JIMENEZ:**  Yes, ma'am.

12   **PRESIDING COMMISSIONER ENG:**  Okay.  This is your

13   sister, it must be a younger sister.

14   **INMATE JIMENEZ:**  She's the youngest.

15   **PRESIDING COMMISSIONER ENG:**  She's the baby?

16   **INMATE JIMENEZ:**  Yes.

17   **PRESIDING COMMISSIONER ENG:**  Okay.  There's no

18   address here and I'm trying to remember, you at least in

19   yours provided a copy of the envelope, so she lives in Long

20   Beach.

21   **INMATE JIMENEZ:**  Yes.

22   **PRESIDING COMMISSIONER ENG:**  She lives in Long Beach

23   and she says that she would help you with any kind of

24   support that you need.  *Will help him with housing and*

25   *financial support,* and then the rest is pretty much a

26   general support letter, correct?

27   **INMATE JIMENEZ:**  Yes.

49

1     **PRESIDING COMMISSIONER ENG:** Okay. How old is she?

2     **INMATE JIMENEZ:** I believe she's 31.

3     **PRESIDING COMMISSIONER ENG:** So is she married with

4     kids?

5     **INMATE JIMENEZ:** She's got two kids.

6     **PRESIDING COMMISSIONER ENG:** We have a letter dated

7     March 22nd, 2007. And there were a couple of them and I

8     think that because your -- this is from Carolina Jimenez,

9     your wife?

10    **INMATE JIMENEZ:** Yes.

11    **PRESIDING COMMISSIONER ENG:** And she has sent a

12    correction, I think the one we have in the record is a

13    corrected one but I can't remember what mistake she said

14    that she made.

15    **INMATE JIMENEZ:** She had put just my counselor's

16    name and I thought there would be a problem there and I

17    told her to direct it to you.

18    **PRESIDING COMMISSIONER ENG:** The board members,

19    okay. So it's dated March 22nd and basically she says that

20    the two of you married January 6th, this year.

21    **INMATE JIMENEZ:** Yes, ma'am.

22    **PRESIDING COMMISSIONER ENG:** Okay. Prior to that

23    you hadn't been married?

24    **INMATE JIMENEZ:** No, ma'am.

25    **PRESIDING COMMISSIONER ENG:** No children?

26    **INMATE JIMENEZ:** No, ma'am.

27    **PRESIDING COMMISSIONER ENG:** We should have covered

1    that before but okay.  And that she's known you for about

2    eight years.  She says that the two of you met through her

3    brother-in-law, Jose Herraldez [phonetic)?

4         **INMATE JIMENEZ:**  Yes.

5         **PRESIDING COMMISSIONER ENG:**  And how do you know her

6    brother-in-law; is he in prison?

7         **INMATE JIMENEZ:**  He was here.

8         **PRESIDING COMMISSIONER ENG:**  Was he in the gangs

9    too?

10        **INMATE JIMENEZ:**  No.

11        **PRESIDING COMMISSIONER ENG:**  What was he here for?

12        **INMATE JIMENEZ:**  It was drug related.

13        **PRESIDING COMMISSIONER ENG:**  Drug related?  So

14   where's Carolina, she lives in San Jose?

15        **INMATE JIMENEZ:**  Yes, ma'am.

16        **PRESIDING COMMISSIONER ENG:**  Has she sort of been

17   there most of her life, around San Jose?

18        **INMATE JIMENEZ:**  Yes.

19        **PRESIDING COMMISSIONER ENG:**  And she says she's

20   aware of your INS hold and that deportation process would

21   occur.  And she's written a support letter for you and she

22   states that if there's any way possible if you could live

23   in her home on Ryan Street.  Do you know, does she own her

24   own home?

25        **INMATE JIMENEZ:**  Yes, yes.

26        **PRESIDING COMMISSIONER ENG:**  Or is she renting?

27        **INMATE JIMENEZ:**  It's her home.

1        **PRESIDING COMMISSIONER ENG:**  Does she have kids?

2            **INMATE JIMENEZ:**  She has one daughter?

3        **PRESIDING COMMISSIONER ENG:**  How old is the

4    daughter?

5            **INMATE JIMENEZ:**  Ten years old.

6        **PRESIDING COMMISSIONER ENG:**  Ten?  Okay.  So

7    Carolina, had she been married before?

8            **INMATE JIMENEZ:**  No, ma'am.

9        **PRESIDING COMMISSIONER ENG:**  Okay.  So who's the

10   father of her daughter; do you have any idea?

11           **INMATE JIMENEZ:**  I don't know him.

12       **PRESIDING COMMISSIONER ENG:**  So you don't know if

13   he's dead, alive?

14           **INMATE JIMENEZ:**  Oh, I think he's living in Mexico.

15       **PRESIDING COMMISSIONER ENG:**  Oh, he is?

16           **INMATE JIMENEZ:**  Yes.

17       **PRESIDING COMMISSIONER ENG:**  Okay.  So would your

18   wife be going to Mexico with you?

19           **INMATE JIMENEZ:**  Yes, yes, ma'am.

20       **PRESIDING COMMISSIONER ENG:**  When was the last time

21   she was ever in Mexico, living?

22           **INMATE JIMENEZ:**  Living?  I don't know but she goes

23   over there to travel and right now, I think she's over

24   there right now visiting her brother-in-law.

25       **PRESIDING COMMISSIONER ENG:**  So where is her family

26   from down in Mexico?

27           **INMATE JIMENEZ:**  No, they're all from here.

52

1        **PRESIDING COMMISSIONER ENG:**   She was born and raised
2    in the U.S.?

3        **INMATE JIMENEZ:**   San Jose.

4        **PRESIDING COMMISSIONER ENG:**   Okay.  So how do you
5    think she's going to adjust to living in Mexico?

6        **INMATE JIMENEZ:**   No, we've talked about it and she's
7    willing to start a new life over there.

8        **PRESIDING COMMISSIONER ENG:**   Okay.  And then we have
9    some additional letters.  I've got one from Rosa Linda
10   Herraldez in San Jose.

11       **INMATE JIMENEZ:**   Yes.

12       **PRESIDING COMMISSIONER ENG:**   Okay.  I have to be
13   careful because I think one of these was ripping, this is
14   the one.  Dated March 7, 2007 and states that I am Jose's
15   sister-in-law, known him for seven years.  Her husband,
16   Jose Herraldez, knows you and introduced my sister, so this
17   is your wife's sister?

18       **INMATE JIMENEZ:**   Yes, ma'am.

19       **PRESIDING COMMISSIONER ENG:**   She says she can help
20   you with guidance and moral support since she's a teacher.
21   She has a BA degree in Social Sciences and Child
22   Development.  Okay.  So it's a general support letter,
23   correct?

24       **INMATE JIMENEZ:**   Yes.

25       **PRESIDING COMMISSIONER ENG:**   And then I do -- I
26   think all these other ones I already read, I believe, okay?
27   Except for this one, this one is from Mexico, from

53

1   Guadalajara, you pronounce that Jalisco?

2       **INMATE JIMENEZ:** Jalisco.

3       **PRESIDING COMMISSIONER ENG:** I'm trying not to

4   mispronounce. I don't know if you've -- I have horrible

5   pronunciation. And this is from Jorge Garcia Rodriguez, so

6   who is this?

7       **INMATE JIMENEZ:** My uncle.

8       **PRESIDING COMMISSIONER ENG:** He's your uncle, okay.

9   So has he always lived down in Guadalajara?

10      **INMATE JIMENEZ:** Yes.

11      **PRESIDING COMMISSIONER ENG:** All right. So he

12  states that you can count on his support since -- *all my*

13  *support since he'll have a home, food and above all I work*

14  *in the business of -- I don't know what -- Delacatos*

15  *Occidenti {phonetic], whatever that is, that devises dull,*

16  *caustic and melts the stone of silicato, where we will be*

17  *able to be performed and to show this one to be returned --*

18  I don't understand any of that. Why don't you explain, it

19  must have gotten lost in the translation. So why don't you

20  try to explain what your uncle is trying to tell us.

21      **INMATE JIMENEZ:** I was explaining to Ms. Tardiff

22  that I think the translator over there did not know how to

23  speak English.

24      **PRESIDING COMMISSIONER ENG:** So do you have any idea

25  what your uncle was trying to tell us?

26      **INMATE JIMENEZ:** Basically that he works in a

27  factory and that he's willing to help me work there and

1   that's the opportunity he's giving me and a place to live.

2            **PRESIDING COMMISSIONER ENG:**  What do you know about

3   this uncle?  By the way this --

4            **INMATE JIMENEZ:**  (Overlapping) He's my mom's

5   brother.

6            **PRESIDING COMMISSIONER ENG:**  It's your mother's

7   brother, okay.  And this letter is dated February 28th,

8   2007.  And again it's down in Guadalajara.  Your family

9   wasn't from Guadalajara, were they?

10           **INMATE JIMENEZ:**  Yes.

11           **PRESIDING COMMISSIONER ENG:**  They were?

12           **INMATE JIMENEZ:**  Yes.

13           **PRESIDING COMMISSIONER ENG:**  And you've never been

14  back to Guadalajara?  Okay.  Do you know about where your

15  uncle lives?  Does he have a large family?

16           **INMATE JIMENEZ:**  No, I think it's just him and his

17  wife.  All his kids are grown.

18           **PRESIDING COMMISSIONER ENG:**  Does he have an

19  apartment or does he have a house?

20           **INMATE JIMENEZ:**  It's a house.

21           **PRESIDING COMMISSIONER ENG:**  Is it in the city or is

22  it in the countryside?  You don't know yet, huh?

23           **INMATE JIMENEZ:**  I don't know yet.

24           **PRESIDING COMMISSIONER ENG:**  Okay.  Is there

25  anything else, did I miss any?

26           **INMATE JIMENEZ:**  No.

27           **PRESIDING COMMISSIONER ENG:**  Okay.  You didn't miss

55

1    that much out there.  Okay.  All right.  So we send out

2    3042 Notices and those notices do go to agencies that have

3    a direct interest in your case.  I don't recall seeing any

4    letters, better double check though.  However, as I'm

5    checking I will state for the record that we do have

6    present with us a representative from the District

7    Attorney's Office of Los Angeles County and I'm sure he

8    will be making a statement regarding parole suitability

9    prior to our recess for deliberations.  So we are not in

10   receipt of a letter.  So at this point in time what we

11   generally do, sir, is open it up to follow-up questions and

12   first of all we'll do that with the panel.  I can't help

13   but notice, are you feeling okay?

14        **INMATE JIMENEZ:**  I'm very nervous.

15        **PRESIDING COMMISSIONER ENG:**  Okay.  But I noticed it

16   right away and then I thought, oh, my goodness, I didn't

17   know if it was just a profound sadness or you're hiding

18   behind -- what's going on -- or if you were ill.  Okay.

19   but you're okay?

20        **INMATE JIMENEZ:**  Yes, ma'am.

21        **PRESIDING COMMISSIONER ENG:**  Okay.  So any follow up

22   questions.  Right now I don't have any.  Oh, sir, were you

23   going to AA for a while?

24        **INMATE JIMENEZ:**  Yes.

25        **PRESIDING COMMISSIONER ENG:**  How long did you go to

26   AA?

27        **DEPUTY COMMISSIONER MARTIN:**  I mentioned chronos

56

1    back in 2004 and he was a consistent attendee all through
2    2006, there were four chronos for each of the four quarters
3    of last year.

4         **PRESIDING COMMISSIONER ENG:**  And I may have missed
5    this and I'm sorry if I did but what did you get out of it?
6         **INMATE JIMENEZ:**  It taught me to understand a little
7    about addiction and if you do, if you work on it, if you
8    work those steps, I'm pretty sure it can help an
9    individual.

10        **PRESIDING COMMISSIONER ENG:**  Anything else?  Did you
11   think that it related to anything specific to you?

12        **INMATE JIMENEZ:**  No, because I didn't get the chance
13   to become an alcoholic but it's helpful because you hear
14   the stories, positive things come out of it, you know, and
15   if I did feel that I was an alcoholic it would help, you
16   know.  But basically my self-help has been attending
17   church, you know, that's been my self-help really.

18        **PRESIDING COMMISSIONER ENG:**  Let me ask you
19   something, were you raised Catholic?

20        **INMATE JIMENEZ:**  Yes.

21        **PRESIDING COMMISSIONER ENG:**  And even when you were
22   younger, when your family came to the United States, did
23   you and your family go to church regularly?

24        **INMATE JIMENEZ:**  Yes, yes.

25        **PRESIDING COMMISSIONER ENG:**  Were you going
26   regularly even through your teen years?

27        **INMATE JIMENEZ:**  No, not regularly.

57

1      **PRESIDING COMMISSIONER ENG:**  So how do you feel
2      about what you did, about your prior criminal history,
3      relative to your beliefs as a Catholic?  How do you come to
4      grips with that?

5      **INMATE JIMENEZ:**  I accept it, you know, my
6      responsibility, my actions, my behavior.  I do feel, you
7      know, very, very said for my family, especially for his
8      family, also because his family are probably in the same
9      predicament as I was, as my family was.  I understand, you
10     know, how they must be going through, you know, the
11     suffering and the pain and I just hope that they can
12     forgive for what I did.

13     **PRESIDING COMMISSIONER ENG:**  Okay.  Do you have any
14     questions you would like to ask?

15     **DEPUTY COMMISSIONER MARTIN:**  Just one.  What's your
16     stepdaughter's name?

17     **INMATE JIMENEZ:**  Armida.

18     **DEPUTY COMMISSIONER MARTIN:**  Rita?

19     **INMATE JIMENEZ:**  Armida.

20     **DEPUTY COMMISSIONER MARTIN:**  Say again?

21     **INMATE JIMENEZ:**  Armida.

22     **DEPUTY COMMISSIONER MARTIN:**  Armita, A—R—M—I—T—A?

23     **INMATE JIMENEZ:**  No, d—a.

24     **DEPUTY COMMISSIONER MARTIN:**  D—A, A—R—M—I—D—A.  How
25     good is her Spanish?

26     **INMATE JIMENEZ:**  Not good.

27     **DEPUTY COMMISSIONER MARTIN:**  Are you going to take

58

1    her to Mexico with you and Carolina?

2         **INMATE JIMENEZ:**  Yes.  At the moment, she is

3    teaching her how to speak because her father doesn't speak

4    English.  She's been wanting to teach her so she's doing

5    that right now.

6         **DEPUTY COMMISSIONER MARTIN:**  No other questions.

7         **PRESIDING COMMISSIONER ENG:**  Mr. Eastman, any

8    questions?

9         **DEPUTY DISTRICT ATTORNEY EASTMAN:**  No.

10        **PRESIDING COMMISSIONER ENG:**  Okay.  Ms. Tardiff, any

11   questions?

12        **ATTORNEY TARDIFF:**  No.

13        **PRESIDING COMMISSIONER ENG:**  Let's move into final

14   statements.  Mr. Eastman?

15        **DEPUTY DISTRICT ATTORNEY EASTMAN:**  Thank you.  The

16   district attorney objects to a finding of suitability for

17   the inmate.  It is our opinion that for a large variety of

18   reasons the inmate is unsuitable in virtually all of the

19   categories although there are good things to be said about

20   conduct in the institution.  But of course the life crime

21   and the lifestyle of the inmate as a juvenile, and he used

22   the word gangbanger, is absolutely inexcusable.  I remember

23   a friend being quoted one time about rehabilitation, saying

24   that some of the people had never been habilitated.  That's

25   kind of crude but it's not a bad analogy to what the inmate

26   said today about himself at the time when he was 16, 17, 18

27   years of age.  His conduct in the institution in the early

59

1    years continued with the same attitude.  The motive for the
2    crime and this is what is terrible about this crime and
3    terrible about so many gang homicides is there just
4    virtually is no motive, it was very trivial.  The victim
5    was left alone by his fellow gang members and was just
6    pounced upon and beaten to death and this inmate
7    participated and apparently had fun doing so.  It is a
8    crime for which an enormous amount of remorse and insight
9    has to be developed and inmate in our opinion has not
10   developed the kinds of insight that are needed to satisfy
11   we suggest a panel that he really has come to grips with
12   the enormity of this crime and understands what he did.  I
13   will leave it to the panel, there were good questions as to
14   many of the weaknesses in the inmate's programming in the
15   institution, even in recent years when the number of
16   disciplinaries has fallen off.  The self—help is not what
17   it should be, the activities and the in the last area, the
18   area of parole plans.  Going to a foreign country, going to
19   a poor country one has not lived in since they were a small
20   child requires almost by definition much more precision in
21   terms of the parole plans than would be required if the
22   person were going to parole to some place that he was more
23   familiar with.  And his parole plans in our opinion lack
24   the kind of precision that is needed.  So we ask for a
25   denial.  Thank you very much.

26          **PRESIDING COMMISSIONER ENG:**  Ms. Tardiff?
27          **ATTORNEY TARDIFF:**  Thank you.  Since Mr. Jimenez has

60

1    been incarcerated he has done quite a few things to fulfill
2    suitability requirements.  The district attorney remarked
3    that he was unsuitable in all categories, I think that's a
4    rather exaggerated statement.  He did obtain his GED in
5    '94.  He's vocationally upgraded, landscaping and printing.
6    Currently he's in vocational computer repair.  So he's done
7    a good job in those two areas.  He's been in PIA to some
8    extent.  His disciplinary history is very good.  He's only
9    had one 115 his entire incarceration and that was in '93,
10   it did not involve force or violence, 13 years ago, 14
11   years ago, again a factor of suitability.  Self—help, he's
12   done Anger Management, BRAG, Marriage Relationship course,
13   AA all year and from his own testimony participating in
14   church services has been of the greatest benefit to him.
15   So he's done well in that category as well.  There's not a
16   whole lot of other categories for him to -- I mean he can
17   keep improving obviously but I think he's done a very good
18   job in every area of programming he needs to be doing.  His
19   parole -- I'll go to the psych evals.  In '96 the psych
20   eval, the psychologist stated that, he appears to be trying
21   hard to be rehabilitated.  That he continues improvement.
22   And his violence potential in the past was less than
23   average -- I mean greater than average  and it's now
24   decreasing.  In '98 he got a less than average inmate
25   rating and then in '02 slightly higher than the average
26   citizen.  Noted that his insight and judgment were intact,
27   he had a high GAF score of 80 and his prognosis  for

61

1    community living was positive. And then in July of '05 he
2    received a very favorable report. His violence potential
3    was the same as the average citizen and it closed, *at this*
4    *time Inmate Jimenez is a suitable candidate for parole*
5    *release consideration.* So I think it's obvious that he's
6    not unsuitable in all categories as was stated before, but
7    in fact he's probably fulfilled the majority of the
8    suitability factors. His parole plans, he has parole plans
9    in both the United States and Mexico. The remark that
10   because he was not familiar with Mexico, being deported
11   back there, because he left there when he was four or five
12   and doesn't really know anything, requires more precision,
13   I m not sure exactly what that means. But unfortunately
14   until he goes there I don't know how much more precise they
15   can be. He has a job and housing in Mexico with his uncle,
16   I think that's sufficient parole plans. They'll also be
17   checked out by Sacramento should he receive a date. And
18   then lastly the amount of time that he's served since he's
19   been incarcerated. He's been-- he actually has grown up in
20   prison, he was 17 when he came in. Obviously he's not a
21   17-year old teenager today, he's a grown man. He had to
22   learn a lot while he was in here. I think any risk of
23   dangerousness would be gang affiliation and he does not
24   have any indication in his record that he currently is
25   involved in the gangs in prison which I'm sure we're all
26   aware is quite prevalent, so I don't believe that there are
27   any risk factors. Being deported to Mexico pretty much

1    will do away with California gangs or the area that he had

2    gang involvement and I don't think his criminality was

3    associated with anything but gang involvement.  So I would

4    submit at this time he does not pose a risk to society.

5    Thank you.

6            **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.

7            Mr. Jimenez, you have an opportunity if you want to

8    to make a final statement regarding your parole

9    suitability.

10           **INMATE JIMENEZ:**  Well, first of all I'd just like to

11   apologize for my nervousness.  I just want to say I'm

12   sorry, you know, I extend this sorriness [sic] for my

13   victim's family most importantly and I just leave it in

14   your hands.  Thank you.

15           **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.  The

16   time is 1:26.

17                         **R E C E S S**

18                          ----oOo---

19

20

21

22

23

24

25

26

27

63

1        **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3        **DEPUTY COMMISSIONER MARTIN:**  We're back on tape.

4        **PRESIDING COMMISSIONER ENG:**  Oh, okay.  We're still

5    missing someone -- but okay.  The time is 1:45.  All

6    parties that were present prior to our recess for

7    deliberations have since returned.

8            In the matter of Jose Jimenez, CDC number E-49850

9    the panel has reviewed all the information received from

10   the public and relied on the following circumstances in

11   concluding that the victim [sic] is not suitable for parole

12   and would pose an unreasonable risk of danger to society or

13   a threat to public safety if released from prison.

14           One of the major factors, sir, is that commitment

15   offense was so brutal.  It was carried out in such a cruel,

16   and callous manner.  Multiple victims and perpetrators were

17   involved in this same incident because we had four

18   different gangs involved initially in this altercation.

19   And it was very unfortunate that this one person, Jose

20   Gonzalez, who happened to be a member of the Eastside Longo

21   gang ended up somehow being left behind and ended up losing

22   his life.  This particular victim, Mr. Gonzalez, was

23   brutally beaten by members of the three gangs, the T-Town

24   Flats, Barrio and La Loma and of course Mr. Jimenez was one

25   of the major perpetrators, being armed with a, I believe it

26   was a piece of wood with a nail sticking out of it.

27   **JOSE JIMENEZ      E-49850      DECISION PAGE 1      4/11/07**

64

1    Everyone continued to beat this poor man. He ended up
2    being, talk about being abused, he was somewhat defiled and
3    somewhat mutilated if you take a look at the coroner's
4    report and what he suffered during this offense. It was
5    carried out in a manner that demonstrates an absolute
6    callous disregard for human suffering. This man didn't
7    stand a chance. He was not armed, he was ganged up and
8    being beaten to death by a bunch of people holding 2x4s,
9    bats or what have you, but he absolutely didn't stand a
10   chance and then was left there basically to die. And the
11   motive for the crime appears to us to be basic gang
12   rivalry. These conclusions are drawn from the Statement of
13   Facts where on that evening of October 31st, 1985,
14   Mr. Jimenez and all his co-defendants beat Mr. Gonzalez to
15   death and according to witnesses one of the crime partners
16   Lucero initially chased the victim and knocked him to the
17   ground. Then Mr. Jimenez and other crime partners using a
18   shovel, 2x4 with a nail and a crowbar proceeded to
19   administer a brutal beating upon the unarmed defenseless
20   victim who lay on the ground. Even to the point where
21   there were two females who were witnesses tried to
22   intervene. However, basically they were chased away and
23   basically threatened themselves. So Lucero, defendant
24   Lucero returned to the victim and proceeded to strike him
25   with a 2x4, knocking out several teeth.
26           Regarding this inmate's prior record he started at a
27   **JOSE JIMENEZ     E-49850     DECISION PAGE 2     4/11/07**

65

1    relatively young age. He does have a record of violence
2    and actual assaultive behavior. His first contact with law
3    enforcement goes back to 1983 when he was only 14 years of
4    age and he was arrested for assault with a deadly weapon,
5    specifically a screwdriver, where his older brother had
6    shot this victim and according to the records he ended up
7    stabbing him with a screwdriver. He does have an
8    escalating pattern of criminal conduct that led up to this
9    life crime. Again subsequent to the 1983 incident for
10   assault with a deadly weapon he was found to be in
11   violation of probation a year later at 16, in the summer of
12   1984, and he was sentenced to more time. Apparently he was
13   with a girlfriend who had a PCP cigarette and he was
14   holding it for her. Then about six months later in 1985
15   when he was 17 he was again picked up for a violation of
16   probation and it was really a failure to report to his
17   probation officer, which led to the issuance of another
18   bench warrant. So from a very early age this inmate showed
19   that he really had a total disregard for the laws of
20   society and was really driven by the laws of the gang.
21   Again he has failed previous grants of probation,
22   specifically because he was a juvenile during all these
23   times because he was 17 when he committed the life crime,
24   he has failed attempts such as juvenile probation and
25   juvenile camp. He does have history of tumultuous
26   relationships with others and this is evidenced by his
27   **JOSE JIMENEZ     E-49850     DECISION PAGE 3     4/11/07**

66

1    heavy gang involvement since the age of 15.  And had a
2    relatively unstable social history.  He was one of seven
3    siblings, the two youngest ones were born in the U.S. but
4    he was one of 5 that his parents brought to the United
5    states from Mexico when he was only 5 years of age.  But
6    his older brother was a gang member and in our discussions
7    this inmate stated how he did look up to his brother and
8    ended up following in his footsteps right into the gang
9    activity, which again led him to this life offense.

10          Regarding his institutional behavior, the misconduct
11   while incarcerated does include six 128A counseling
12   chronos, the last one being in September of '95 for being
13   absent from his assignment and only one more serious 115
14   disciplinary back in August of 93 for failure to get into a
15   prone position during an alarm.  This panel finds that this
16   inmate does not have any realistic parole plans and we
17   understand that it is going to be very difficult in that we
18   don't see him as having any viable residential plans in his
19   last country of legal residence.  He will be deported to
20   Mexico and he does not have any acceptable employment
21   plans.  However, he does have some marketable skills, but
22   he does need time to figure out how to better develop his
23   parole plans back in Mexico being that he hasn't been in
24   that country since he was the age of five.  Regarding 3042
25   notices, the panel does note that the representative from
26   the District Attorney's Office of Los Angeles County was
27   **JOSE JIMENEZ      E-49850      DECISION PAGE 4      4/11/07**

1    present today and did state their opposition to parole.

2          The panel makes the following findings, that this
3    prisoner does need more documented self—help in order to
4    face, discuss, understand and cope with stress and anger in
5    a non—destructive manner.  Until progress is made this
6    prisoner continues to be unpredictable and a threat to
7    others.  However, this panel does believe that Mr. Jimenez
8    should be commended for number one, being able to obtain
9    his GED while he was incarcerated.  He was also able to
10   obtain two vocations and is working, I believe, in a third
11   one, and that his recent completion of 12, I believe it was
12   Anger Management sessions within the BRAG program just
13   recently in 2006.  However, we find that these positive
14   aspects of his behavior do not outweigh the factors of
15   unsuitability.

16         Sir, this is a two—year denial. In a separate
17   decision the hearing panel finds that it is not reasonable
18   to expect that a parole would be granted at a hearing
19   during the following two years.  Specific reasons for this
20   finding are as follows.  Again, the prisoner committed the
21   offense in a very cruel, very cold and callous manner.
22   Specifically he participated in beating to death this
23   unarmed gang rival, basically participated in beating him
24   to death and then just leaving him there without any regard
25   for this man's life.  And basically the only thing that he
26   and his - all the other gang members thought of was
27   **JOSE JIMENEZ      E-49850      DECISION PAGE 5      4/11/07**

68

1    possible retaliation by the rival gang.  But really total
2    disregard for the laws of the land here.  Multiple victims
3    at first and multiple perpetrators were involved in this
4    incident.  Again there were three carloads of the Eastside
5    Longo gang members and then we had T—Town Flats gang, we
6    had the La Loma gang members and the Barrio gang members
7    and the key people that were the crime partners to this
8    inmate happened to be representatives from the other gangs.
9    The victim was in fact abused, defiled and somewhat
10   mutilated during the offense.  Specifically it states, I
11   may have lost it now, darn it, oh I lost it.  But basically
12   this victim suffered lacerations, punctures to the face,
13   chest, head along with many of his teeth missing and I
14   believe my fellow commissioner stated somewhere that he
15   read that it was really hard to even identify the victim.
16   It was carried out in a manner that demonstrates a total
17   disregard for human suffering let alone human life, and
18   again the motive for the crime was really based on gang
19   rivalry, extremely trivial in relation to the results of
20   this offense, and somebody losing his life in the way that
21   he did.  This prisoner has a prior record of violent and
22   somewhat aggressive behavior in that at the young age of 14
23   he was already involved in an assault with a deadly weapon
24   and basically had to go to juvenile camp.  Again he does
25   have a history of criminality and misconduct because at the
26   age of 14, pretty much every year leading up to the age of
27   **JOSE JIMENEZ      E-49850      DECISION PAGE 6      4/11/07**

1    17 when he was arrested for the life crime, he has had
2    contact with law enforcement and problems with violating
3    his probation.  He does have that unstable history and
4    tumultuous relationships with others and this is indicative
5    of the fact that this inmate chose to become affiliated
6    with a gang since the age of 15, following in his brother's
7    footsteps.  Therefore, this panel really believes that this
8    inmate does need a longer period of observation and
9    evaluation before the board should find that he is suitable
10   for parole.  This panel recommends that the inmate remain
11   disciplinary free, the more distance you get from all these
12   disciplinaries the better off you are.  That if available,
13   you continue to upgrade yourself vocationally and
14   educationally and also that you participate in any and all
15   type of self—help.  We felt, sir, that we know it's going
16   to be difficult for you to pull together those parole plans
17   and we felt that it would not be fair to give you 12 months
18   to do that in that you do need that additional time because
19   you have not been back in that country since you were a
20   young child and --

21                    A D J O U R N M E N T

22                         --oOo--

23   **PAROLE DENIED FOR TWO YEARS**
                                     AUG 1 0 2007
24   **THIS DECISION WILL BE FINAL ON:** _____

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED**

27   **JOSE JIMENEZ     E-49850     DECISION PAGE 7     4/11/07**

70

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, JILL PEARSON, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 69, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JOSE JIMENEZ, CDC No. E-49850, on APRIL 11, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated JUNE 17, 2007 at Sacramento County, California.

Jill Pearson

_____
Jill Pearson, Transcriber
**Northern California Court Reporters**

# EXHIBIT "B"



### PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### AUGUST 2005 LIFER CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD
### JULY 26, 2005

This is an update to a psychological evaluation for the Board of Prison Terms on inmate Jose Jimenez, CDC# E-49850, conducted by the writer on 02/11/05. In that report, the writer concluded that, due to a recent CDC-115 received by the inmate on 11/20/04 for participating in a riot, community risk factors for inmate Jimenez would be slightly higher than the average citizen.

Since the preparation of the 02/11/05 report, inmate Jimenez has been completely exonerated, and the 115 withdrawn. Consequently, his risk factors are now significantly reduced, to no greater than the average citizen in the community. At this time, inmate Jimenez is a suitable candidate for parole release consideration.

*E. W. Hewchuk, Ph.D.*
*Staff Psychologist*
*Correctional Training Facility, Soledad*

*B. Zika, Ph.D.*
*Senior Supervising Psychologist*
*Correctional Training Facility, Soledad*

*EWH/gmj*

*D: 07/26/05*
*T: 07/27/05*

*D:\Word Files\BPT - 2005\JIMENEZ, JOSE E-49850 08-05 HEWCHUK.doc*

### PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### OCTOBER 2002 LIFER CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD
### JULY 5, 2002

This is the fifth psychological evaluation for the Board of
Prison Terms on inmate Jose Jimenez, CDC# E-49850.   This
report is the product of a personal interview, conducted on
07/05/02, as well as a review of his Central file and unit
health record.   This single contact interview is for the
express purpose of preparing this report.

The inmate was informed of the nature and the purpose of the
interview, and the lack of confidentiality inherent in the
present assessment.  He was also informed that a report for
the Board of Prison Terms would be prepared.  He understood
this and agreed to participate.

### PSYCHOSOCIAL ASSESSMENT

#### I.    IDENTIFYING INFORMATION:

Inmate Jimenez is a 33-year-old, single, Hispanic male.
His stated religious affiliation is Protestant (he was
born Catholic, but is currently an active participant
in chapel services).  No unusual physical
characteristics were noted.  He continues to go by his
old gang nickname, "Speedy," which he said he has been
unable to shake off.

#### II.   DEVELOPMENTAL HISTORY:

Inmate Jimenez was the third of seven children, having
an older brother and sister, and four younger sisters.
He was raised by both parents.

He stated there were no prenatal or perinatal concerns
or birth defects.  He had no abnormalities of
developmental milestones.  All speech, language and
motor development occurred unremarkably.  He denied any
history of cruelty to animals, enuresis or acts of
arson.  He stated he had no significant childhood

**JIMENEZ, JOSE**
**CDC NUMBER:   E-49850**
**BPT PSYCHOLOGICAL EVALUATION**
**PAGE TWO**

> medical history, and denied a childhood history of
> physical or sexual abuse as either a perpetrator or a
> victim.

### III.  EDUCATIONAL HISTORY:

> Inmate Jimenez completed the tenth grade and dropped
> out of high school in the 11th grade.  He subsequently
> completed a GED while incarcerated at the California
> State Prison, Los Angeles County (LAC) in 1994.

### IV.  FAMILY HISTORY:

> Inmate Jimenez was born in Mexico.  At the age of five,
> he came to California with his family.  He has regular
> contact with both parents, and with his brother and
> sisters.

### V.  PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

> Inmate Jimenez is a heterosexual male.  He denied
> any history of high-risk sexual behavior or sexual
> aggression, either prior to or since incarceration.

### VI.  MARITAL HISTORY:

> Inmate Jimenez has never been married and has no
> children.

### VII.  MILITARY HISTORY:

> Inmate Jimenez denied any history of military service.

### VIII. EMPLOYMENT/INCOME HISTORY:

> Since inmate Jimenez was arrested for the present
> offense at age 17, he had little opportunity for
> employment.  He never had any paid employment, but
> helped his brother-in-law with his job as a parking lot
> sweeper.
>
> Since his incarceration, inmate Jimenez has completed
> vocational landscaping, participated in a welding
> program (until it was stopped at the institution where
> he was incarcerated).  He has had numerous jobs, such

JIMENEZ, JOSE
CDC NUMBER:   E-49850
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

> as maintenance/mechanic work, kitchen work, PIA
> industries, and his present work in the vocational
> print shop.

## IX.   SUBSTANCE ABUSE HISTORY:

Inmate Jimenez said he used "whatever was around."
According to his Central file, he has admitted in the
past to using alcohol, marijuana and PCP.  He states he
has had some attendance at Alcoholics Anonymous.

## X.   PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Jimenez has no prior diagnoses or serious
illnesses.  He denied any history of medical or
psychiatric hospitalizations.  He denied any history of
serious accidents or head injuries, a history of
suicidal behavior, a history of seizures or other
neurological conditions, or any significant impairments
or disabilities.  He is on no medications at this time.

## XI.   PLANS IF GRANTED RELEASE:

Should inmate Jimenez be given a parole date, he
states, "I would live with my parents (in Los Angeles),
work with my brother, and do landscaping or
construction."

### CLINICAL ASSESSMENT

## XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Jimenez appears to be his stated age of 33.  He
was appropriately dressed and groomed.  He was
coherent, cooperative, calm and alert throughout the
interview.  His speech was clear and readily
understandable.  His flow of thought and affect were
within the normal range.  There were no hallucinations
nor delusions noted.  He was fully oriented.  His
intellectual functioning was estimated to be within the
average range.  His attention and concentration were
adequate for the purposes of this examination.  There

JIMENEZ, JOSE
CDC NUMBER:  E-49850
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

was no evidence of a mood or thought disorder.   His
insight and judgment appeared to be intact.   He showed
fair insight into his commitment offense.

**CURRENT DIAGNOSTIC IMPRESSIONS:**

**AXIS I:**     Polysubstance Abuse, in institutional
             remission.
**AXIS II:**    No Contributory Personality Disorder.
**AXIS III:**   No Contributory Physical Disorder.
**AXIS IV:**    Incarceration.
**AXIS V:**     GAF = 80.

Should this inmate at this time be given a parole or
release date, his prognosis for maintaining his present
gains in the community is positive.

## XIII. REVIEW OF LIFE CRIME:

Inmate Jimenez described the circumstances surrounding
his commitment offense.

He stated that he felt angry towards the enemy gang,
the East Side Longos, because they had jumped him a few
times, from which he received "a few bumps and
bruises."   Asked how the victim wound up on the ground,
he said, "When I got there, he was already on the
ground."   He admitted hitting the victim with a 4" x 4"
board.   This was a board that had a rusty nail sticking
out at one end, and he was accused of striking the
victim with the nail, something he denies, stating, "I
was holding the nail end in my hand."

However, this contradicts the account in the Central
file, in which a witness said the three gang members
attacked an enemy gang member who got left behind after
his fellow gang members had left the scene, how the
victim was knocked down to the ground by one man using
a shovel, how the three continued to beat the victim
together.   Also, the police report described many
lacerations and puncture wounds.

Asked about his feelings about the incident, he said,
"It's hard to explain.   It was something that shouldn't
have happened.   If I was a little bit mature, I

JIMENEZ      E-49850      CTF-CENTRAL      07/09/02      gmj

JIMENEZ, JOSE
CDC NUMBER:  E-49850
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE


wouldn't have done the same choices."  As to his
mistakes that day, he said, "Being involved, and
participating in the incident."

## XIV. ASSESSMENT OF DANGEROUSNESS:

A.   This inmate has not received any CDC-115 violations
during his entire incarceration with one exception.
In 08/93, a failure to "prone out" during an alarm.
He received a serious CDC-128A in 08/92 for
aggressive and disrespectful behavior.  Therefore,
since he has had no violent behavior during his
incarceration of 17 years, it is felt that he would
pose a less than average risk for violence when
compared to this Level II inmate population.

B.   If released to the community, his violence
potential is estimated to be no more than slightly
higher than the average citizen in the community.
This assessment is in consideration of the
following factors:

1)   Although this was certainly a very brutal
attack on a defenseless victim by a group of
gang members, the inmate was 17 years old at
the time and very immature, and strongly
identified as a gang member.

2)   His arrest record shows only two prior
incidents of violence (assault with a deadly
weapon, and for stabbing someone with a screw
driver when he was 14 years old).

3)   Inmate Jimenez said he stopped identifying as a
gang member after he had been in prison a
number of years, up to the point when he was in
his early 20s.

4)   Inmate Jimenez has been attending church
regularly since at least 1996.

## XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.   This inmate is competent and responsible for his
behavior.  He has the capacity to abide by

JIMENEZ      E-49850       CTF-CENTRAL       07/09/02      gmj

JIMENEZ, JOSE
CDC NUMBER:  E-49850
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX

institutional standards and has generally done so
during his incarceration period.

B.   This inmate does not have a mental health disorder
which would necessitate treatment, either during
his incarceration period or following parole.

C.   Since inmate Jimenez denies having any alcohol or
drug abuse problem, no recommendations are made in
this area.

*William Gamard, Ph.D.*

**WILLIAM GAMARD, Ph.D.**
**Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

*B. Zika, Ph.D.*

**B. ZIKA, Ph.D.**
**Senior Supervising Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

WG/gmj

D:   07/05/02
T:   07/09/02

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
OCTOBER 1998

CORRECTIONAL TRAINING FACILITY
JULY 1, 1998

This is a psychological evaluation for the Board of Prison Terms on inmate Jimenez.
This report is the product of a personal interview, conducted on 7/1/98, as well as a
review of his unit health record. His C-File was not reviewed as it has been unavailable.
This interview was a single contact with this inmate for the sole purpose of preparing this
report.

Inmate Jimenez was convicted of a gang related murder. Asked for his thoughts and
feelings regarding this crime, he stated at that time he was "immature and dumb". He
stated that this incident continues to bother him. He took responsibility for this
commitment offense.

The inmate stated his most recent CDC-115 violation was in 1994.

He has attended Alcoholics Anonymous in the past, but he does not currently do so.
Educationally, he completed his G.E.D. Vocationally, he has experience as a welder and
in textiles. If paroled, his plans include becoming a "normal citizen" and working either
in welding or with his brother in the landscaping field.

MENTAL STATUS EXAMINATION:       Inmate Jimenez is a 29 year-old well
                                 Hispanic male, of average build, who
appeared slightly older than his stated age. He was appropriately dressed and groomed.
He was alert, cooperative and calm. His speech, affect, and flow of thought were all
within the normal range. His intellectual functioning was estimated to be within the
average range. He demonstrated some insight and understanding into his commitment
offense. His judgment appears to be sound. There was no evidence of a mood or thought
disorder.

DIAGNOSTIC IMPRESSIONS:

AXIS I:     Conduct disorder, group type; by history.
            Alcohol abuse, in remission.
AXIS II:    No contributory personality disorder.
AXIS III:   No contributory physical disorder.

JIMENEZ, JOSE
CDC NUMBER: E-49850
PAGE TWO

CONCLUSIONS AND RECOMMENDATIONS:

1)      This man is competent and responsible for his behavior. He has the capacity to
        abide by institutional standards.

2)      Regarding violence potential, in consideration of a number of factors, including
        his criminal history, as well as his history of CDC-115's, in the past his violence
potential outside of a controlled setting, was considered to be average. Currently, it is
considered to have decreased. His violence potential relative to this inmate population is
below average.

3)      As he has a history of alcohol abuse, abstinence, monitoring and attendance at
        Alcoholics Anonymous should be mandatory conditions of parole.

4)      This man does not have a mental health disorder, which would necessitate
        treatment either during his incarceration period or following parole.

**STEVEN J. TERRINI, Ph.D.**
**Staff Psychologist**
**Correctional Training Facility, Soledad**

SJT:cjw

D:      7/1/98
T:      7/3/98

# RICHARD J. DONOVAN CORRECTIONAL FACILITY

# HEALTH CARE SERVICES

## PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS

### October 1996 Calendar

This is the third report to the Board of Prison Terms on this inmate.

This writer has had a thirty minute interview with this inmate and has reviewed his C-File and Medical Record.

**CURRENT DEVELOPMENTS AND PROGRESS:**
Mr. Jimenez obtained his GED in 1994 at Lancaster State Prison. Presently he is involved with church programs including KAIROS which teaches spiritual feelings and thoughts. This is held in Chapel II and he attends once a month for three months. He has also participated in the Hands of Peace Program to learn to solve problems without violence. This was a three day seminar and he received a certificate. He is currently working in welding and plans to get a certificate in this. He is doing well and is getting good evaluations. He has been doing this for two years at Richard J. Donovan and also at Lancaster.

The instant offense was the murder of Jose Gonzalez. This was a gang action and both the victim and the defendants were gang members. The defendant using a shovel and a 2x4 and a crow bar, according to the C-File gave the victim a brutal beating while he was lying unarmed and defenseless on the ground. The victim had many lacerations and punctures and had many teeth knocked out. He was admitted to the hospital in serious condition and died shortly afterwards. The inmate and two co-defendants were involved in this senseless beating and killing of the victim who at the time of the attack posed no threat to them. When asked about remorse the inmate states that he feels sorry and that "at that time I wasn't thinking. I was thinking criminally." When asked what he would do in the same situation today he replied "I would walk away". He states "I feel I am a different person".

**MENTAL STATUS EXAMINATION:**
On mental status examination he does not have any evidence of an affective or a thought disorder. His mental status examination is essentially normal.
D: 7-25-96
T: 7-29-96
JIMENEZ, JOSE  E-49850 F2-7-115L   RJDCF/SD (dg)

BPT CONTINUED
PAGE 2

<u>PSYCHIATRIC DIAGNOSIS:</u>
Axis I:   No diagnosis.
Axis II:  Antisocial Personality Disorder, improved.

This inmate comes from a poor immigrant family having been
born in Mexico and immigrating to California in 1973 with
his family.  He is fairly contrite and anxious to say the
right things and make a good impression.  He appears to be
trying hard to be rehabilitated so that he can return to the
community.

<u>PSYCHIATRIC CONCLUSIONS:</u>
GENERAL CONCLUSIONS:
The diagnosed psychpathology has been related to criminal
behavior indirectly.  During observation in the institution
he has psychiatrically improved moderately.  In a less
controlled setting, such as return to the community, this
inmate is considered likely to continue improvement.  From a
psychiatric standpoint, this inmate is benefitting from his
present rehabilitation program.  Violence potential outside
a controlled setting in the past is considered to have been
greater than average and at present is estimated to be
decreased.

<u>PAROLE AND RELEASE:</u>
Conditions of parole should include routine monitoring of
drug and alcohol intake.  This inmate is not on any drug
therapy.  I have no further recommendations to the
classification committee.

SHELDON J. FALKENSTEIN, M.D.
Staff Psychiatrist

D: 7-25-96
T: 7-29-96
JIMENEZ, JOSE  E-49850 F2-7-115L    RJDCF/SD (dg)

# EXHIBIT "C"

Sent to Inmate on 3/6/07

## KLIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## MAY 2007 CALENDAR

**JIMENEZ, JOSE**                                                        **E49850**

## I.    COMMITMENT FACTORS:

A.    **Life Crime:** Murder 2nd degree, PC 187(a), Weapons: Shovel, two-by-four with a nail, and a crowbar. Los Angeles County Case #A032130. Victim: Jose Gonzales, age unknown. Date received by CDCR: 3/27/90. Sentence: 15 years to Life. MEPD: 4/19/97.

   1.    **Summary of Crime:** On 10/31/85, three car loads of East Side Longos gang members including victim Jose Gonzales, advanced on the territory and confronted rival gang members, including Jimenez (T-Town Flats gang), in retaliation for earlier wrongs perpetrated against them. A gang fight started. After approximately ten minutes, the fight broke up and the East Side Longo gang members left the area leaving the victim behind. According to witnesses, co-defendant Lucero chased Gonzales and knocked him to the ground. Then Jimenez and co-defendants Lucero (La Loma Gang) and Martinez (Barrio Pobre gang), beat the unarmed and defenseless Gonzales using a shovel, a two-by-four with a nail and a crow bar. Two female witnesses's intervened, and after threatening these witnesses, Jimenez left the scene. Lucero (co-defendant), however returned to the victim and proceeded to strike him with a two-by-four, knocking out several teeth. Gonzales suffered lacerations, punctures to the face, chest, head and had many teeth missing. Gonzales was admitted to the hospital in serious condition and treated for one hour prior to surgery. He died on November 4, 1985, as a result of the injuries received. The preceding summary of the commitment offense was taken from the Probation Officer's Report, pages two and three dated 4/3/86.

   On 11/14/85, Jimenez was arrested and booked for the charge of Murder in the second degree.

   2.    **Prisoner's Version:** Jimenez stated that his version remains the same as given during his October 1998 Board Report, which is as follows: "I hit the guy with the board in the side, but not with a nail." Jimenez stated he was "kicking back" with some other gang members when they were attacked by some 15 to 20 East Side Longos, armed with sticks and bottles. Jimenez subsequently borrowed a gun, and when the East Side

Longos saw the gun, they ran away. Jimenez stated that he was then told by a friend that one of the Longos was laying down in the alley. Jimenez was mad at the Longos for jumping on him , so he proceeded to the area, picked up a four foot long board with a nail on one end and struck the Longo who was lying on the ground. He denied striking the victim with the nail and stated he only hit him once because he was already injured. Jimenez stated that when he struck the victim, the victim moved a little bit but did not say anything or try to get up. Jimenez left the scene, but as he looked back, he saw his "homeboys" hitting the victim some more. He admitted the victim was not armed when he struck him. Jimenez expressed remorse for his actions. He stated, "I wish I had just run away." The pressure to prove himself to fellow gang members was strong. He stated, "I wish I hadn't done what I did."

## 3.   **Aggravating/Mitigating Circumstances:**

### a.   **Aggravating Factors:**

- The offense was carried out in a dispassionate and calculated manner.
- The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
- The victim was abused, defiled or mutilated during the offense.
- The prisoner has a previous record of violence and assaultive behavior.

### b.   **Mitigating Factors:** N/A.

## B.   **Multiple Crime(s):** N/A.

### 1.   **Summary of Crime:** N/A.

### 2.   **Prisoner's Version:** N/A.

## II.   **PRECONVICTION FACTORS:**

**A.   Juvenile Record:** Jimenez was first arrested at the age of fourteen in 1983. He was arrested for Assault with a Deadly Weapon on 4/21/83. On 6/3/83 a petititon was filed and he was made a ward of the court and placed on probation, and sentenced to County Camp. He intervened in a fight, armed with a screwdriver and stabbed the victim. On 12/21/84, a violation of probation petititon was filed for Failure to Report to Probation Officer and Follow School Program. On 7/1/85 he was given 55 days in Juvenile Hall with 30 days stayed. Juvenile Information was obtained from Probation Officer's Report, page 6.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
MAY 2007 CALENDAR

B.    **Adult Convictions and Arrests:**  Instant offense only.

C.    **Personal Factors:**  Jimenez is a 38 year old, undocumented male born on
September 16, 1968, in Mexico. He was one of seven siblings born to the union
of Jesus and Leanor Jimenez. Both parents reside in Long Beach. Jimenez relates
that he came to California with his parents in 1973 from Mexico. Originally, they
settled in the Carson area then relocated to Long Beach. He attended Catskill
Elementary School, Millikin High School his sophomore year, and Poly High his
junior year which he did not complete. It was difficult for his parents to meet all
of the needs of such a large family. Jimenez felt he needed to contribute but was
unable to help. He stayed away from home at times, rather than see his mother
cry because of not having enough food for the family. Jimenez stated he had a
closer relationship with his mother than his father, due to his father's drinking and
sometimes physical abuse towards his mother. He denies being abused as a child.
Jimenez was employed working with his brother-in-law cleaning super market
parking lots prior to his incarceration. Jimenez states that he drank beer, smoked
marijuana and used PCP usually at parties and he claims he never got into the
heavy use of drugs.

## III.    POSTCONVICTION FACTORS:

A.    **Special Programming/Accommodations:** N/A.

B.    **Custody History:** All relevant documents, including hearing transcripts have
been considered and all information remains the same. Jimenez has remained at
CTF in the general population with Medium A custody. Jimenez is currently
assigned to the Computer Repair Shop. (See Post Conviction Progress Report)

C.    **Therapy and Self-Help Activities:** Documents from previous hearings remain
valid. Since his last BPH hearing, Jimenez participated in the Alcoholics
Anonymous Group. (See Post Conviction Progress Reports)

D.    **Disciplinary History:** Documents from previous hearings remain valid. Jimenez
continues to remain disciplinary free.

E.    **Other:** Jimenez attended his Subsequent #5 Parole Consideration Hearing on
5/3/06. Parole was denied for 1 year. The Board recommended that Jimenez
remain disciplinary free, participate in self-help programs and group therapy and
earn positive chronos.

## IV.    FUTURE PLANS:

JIMENEZ, JOSE            E49850                    CTF-SOLEDAD        **MAY/2007**

LIFE PRISONER EVALUATION REPORT **4**
PAROLE CONSIDERATION HEARING
MAY 2007 CALENDAR

    **A.**    **Residence:**  Upon parole, Jimenez plans to live with his mother, Leonor Jimenez, at 327 E. 17th Street, Long Beach, California 90813. He stated that his family will support him financially. If he is deported to Mexico, he plans to live with his *c r w f or* aunt, Dolores Garcia, 27 de Septiembre #52, San Martin Hgo, Jal. 47153.

    **B.**    **Employment:**  Jimenez stated that his brother will help him obtain a job in order to support himself.

    **C.**    **Assessment:**  In review of Jimenez' parole plans this counselor does not foresee any problems, however, it is recommended that Jimenez update his support letters prior to his hearing as well as obtain legitimate employment offers.

**V.**    **USINS STATUS:** USINS Hold #A76269448.

**VI.**    **SUMMARY:**

    **A.**    Prior to release the prisoner could benefit from:

        1.  Continuing to be disciplinary free.
        2.  Participating in self-help and therapy programs.
        3.  Upgrading vocationally and educationally.

    **B.**    This report is based upon a thorough review of Jimenez' Central File and a (1) hour interview with Jimenez.

    **C.**    Per the Olson Decision, Jimenez was afforded an opportunity to review his Central File. Refer to CDCR 128-B in the General Chrono Section of the Central File.

    **D.**    No accommodation was required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
MAY 2007 CALENDAR

R Brown                    2-27-07
R. Brown                      Date
Correctional Counselor I

_CcII_    2·26·07
D. Carrazzo                   Date
Correctional Counselor II

I. Guerra                  2-2-07
Facility Captain               Date

_CdPR_    2/28/07
D./S. Levorse                 Date
Classification and Parole Representative

JIMENEZ, JOSE          E49850          CTF-SOLEDAD          **MAY/2007**

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 5/6/05 to 8/18/05 | | | **PLACEMENT**:  Remained at CTF in the general population.<br>**CUSTODY**: Medium A.<br>**VOC. TRAINING**:  None noted this review period.<br>**ACADEMICS**:  None noted this review period.<br>**WORK RECORD**:  Jimenez has been assigned to the Culinary.  Jimenez' supervisor report dated 5/9/05 reflects no ratings.<br>**GROUP ACTIVITIES**:  Jimenez has been a member of the Alcoholics Anonymous Group, verified by CDCR 128B dated 8/9/05.<br>**PSYCH. TREATMENT**:  None noted this review period.<br>**PRISON BEHAVIOR**:  Remained disciplinary free this period.<br>**OTHER**: N/A. |

CORRECTIONAL COUNSELOR SIGNATURE

*R. Braun*

DATE

2-27-07

| JIMENEZ | E49850 | CTF-SOLEDAD | MAY/2007 |
|---|---|---|---|

BPT 1004 (REV 7/86)

Page _1_

BOARD OF PRISON TERMS                                                                                              STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 8/19/05 to 8/18/06 | | | **PLACEMENT**: Remained at CTF in the general population.<br>**CUSTODY**: Medium A.<br>**VOC. TRAINING**: None noted this review period.<br>**ACADEMICS**: None noted this review period.<br>**WORK RECORD**: Jimenez has been assigned to the Culinary with no Work Supervisor Reports.<br>**GROUP ACTIVITIES**: Jimenez has been assigned to the Alcoholics Anonymous Group, verified by CDCR 128B dated 10/12/05.<br>**PSYCH. TREATMENT**: None noted this review period.<br>**PRISON BEHAVIOR**: Remained disciplinary free this period.<br>**OTHER**: N/A. |

ORDER:

☐ BPT date advanced by     months.        ☐ BPT date affirmed without change.
☐ PBR date advanced by     months.        ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

JIMENEZ            E49850                  CTF-SOLEDAD            MAY/2007

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 8/19/06 to 12/31/06 | | | **PLACEMENT**: Remains at CTF in the general population. **CUSTODY**: Medium A. **VOC. TRAINING**: None noted this review period. **ACADEMICS**: None noted this review period. **WORK RECORD**: Jimenez was assigned to the Culinary until 12/2/06 when he was re-assigned as a Computer Repair Student, with no Work Supervisor Reports. **GROUP ACTIVITIES**: None noted this review period. **PSYCH. TREATMENT**: None noted this review period. **PRISON BEHAVIOR**: Remained disciplinary free this period. **OTHER**: N/A. |

ORDER:
- [ ] BPT date advanced by _____ months.
- [ ] PBR date advanced by _____ months.
- [ ] BPT date affirmed without change.
- [ ] PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- [ ] Previously imposed conditions affirmed.
- [ ] Add or modify

- [ ] Schedule for Progress Hearing on appropriate institutional calendar

| JIMENEZ | E49850 | CTF-SOLEDAD | MAY/2007 |

# EXHIBIT "D"

```
1    CALIFORNIA BOARD OF PAROLE HEARINGS
2            D E C I S I O N
3        DEPUTY COMMISSIONER BLONIEN:  Okay, we're
4    back on tape.
5        PRESIDING COMMISSIONER GARNER:  All right.
6    The time is now 2:10 p.m. in the matter of Jose
7    Jimenez; E, Edward, 49850.  Mr. Jimenez, the
8    panel has reviewed all the information received
9    from the public and relied on the following
10   circumstances in concluding that you are not
11   suitable for parole and would pose an
12   unreasonable risk of danger to society or a
13   threat to public safety if you were released from
14   prison.  We considered many factors, but we
15   started with the commitment offense, and the
16   panel noted that the offense was carried out in
17   an especially cruel and callous manner.  We have
18   the victim, Jose Gonzales -- he was nearly beaten
19   to death on the 31st of October in 2000 -- excuse
20   me -- in 1985 and died on November 4th of 1985.
21   The offense was carried out in a very
22   dispassionate and calculated manner.  The victim
23   was on the ground, he was posing no threat, and a
24   shovel was used, a two-by-four with a nail
25   protruding, and a crowbar was used to attack him.
26   The offense was carried out in a manner which
27   JOSE JIMENEZ  E-49850  DECISION PAGE 1    5/3/06
```

40

1  demonstrates an exceptionally callous disregard
2  for human suffering in that the victim suffered
3  multiple wounds, lacerations, punctures to the
4  face, chest, and head; and, again, while he was
5  on the ground and posing no threat.  The motive
6  for the crime was very trivial; it was gang
7  retaliation; and it's something that,
8  unfortunately, when the gang mentality sets in
9  (indiscernible).  Before we go any further, one
10 of the things that both panel members wanted to
11 ask you is are you feeling okay today?
12      **INMATE JIMENEZ:**  Yes, sir.
13 **PRESIDING COMMISSIONER GARNER:**  You're feeling
14 fine?  Okay.  All right.  The conclusions were
15 drawn from a statement of facts, and that was
16 from the September 2003 Board report in that on
17 October 31st, 1985, three carloads of Eastside
18 Longo gang members including victim, Jose
19 Gonzales, advanced on the territory and
20 confronted rival gang members, including Jimenez,
21 the T-Towners Flat gang, in retaliation for
22 earlier wrongs perpetrated against them.  A gang
23 fight ensued.  After approximately 10 minutes,
24 the fight broke up; and the Eastside Longo gang
25 members left the area, leaving the victim behind.
26 According to witnesses, co-defendant, Lucero,
27 JOSE JIMENEZ  E-49850  DECISION PAGE 2  5/3/06

41

1   chased Gonzales and knocked him to the ground.
2   Then Jimenez and co-defendant, Lucero, from the
3   La Loma gang, and Martinez, from the Barrio Pobre
4   gang, beat unarmed and defenseless Gonzales using
5   a shovel, a two-by-four with a nail, and crowbar.
6   Two female witnesses intervened; and after
7   threatening these witnesses, Jimenez left the
8   scene.   Lucero, the co-defendant, however,
9   returned to the victim and proceeded to strike
10  him with the two-by-four, knocking out several
11  teeth.   Gonzales suffered lacerations, punctures
12  to the face, chest, head and had many teeth
13  missing.   Gonzales was admitted to the hospital
14  in serious condition and treated for one hour
15  prior to surgery.  He died on November 4, 1985,
16  as a result of injuries he received.  So far as
17  your previous record, the panel noted on previous
18  occasions that you inflicted serious injury on a
19  victim, and the situation was an ADW with a
20  screwdriver, you have a behavior record of
21  violent assaultive behavior and that you failed
22  to profit from society's previous attempts to
23  correct your criminality through county camp,
24  juvenile probation, and a term in juvenile hall.
25  So far as the prior criminality, we've already
26  noted that it was the ADW.  Your institutional
27  JOSE JIMENEZ  E-49850  DECISION PAGE 3   5/3/06

1   behavior -- the panel noted that you haven't
2   sufficiently participated in beneficial self-help
3   programs.  You've indicated you've been involved
4   -- when Commissioner Blonien asked you about the
5   12 Steps, you indicated you weren't working the
6   Steps.  In getting commitment to these programs,
7   they're going to be very key in your successful
8   ability to get yourself out of here.  So far as
9   your misconduct while incarcerated, you've had
10  six 128s, the last one being September of '95;
11  and this was being absent from an assignment and
12  the 115 that was issued in august of 1993; and
13  this was for not (indiscernible) out during an
14  alarm.  So far as the psychological reports that
15  were prepared by Dr. Hewchuk, the one report
16  prepared on 7/26 -- July 26th of '05 -- and
17  February 11 of '05, the panel found that the
18  reports are contradictory because they basically
19  are silent to a significant comment that the
20  Board found in Dr. Gamard's report from July 9th
21  of 2002 with respect to the violence potential.
22  And so, you know, what we've done is we've asked
23  that a new psych report, complete report, be
24  prepared to give the next Board a better idea --
25  excuse me -- as to your current level of
26  potential for violence in the community.  An area
27  JOSE JIMENEZ  E-49850  DECISION PAGE 4   5/3/06

43

1  you're going to need to work on is the next one
2  we want to talk to you about, and that's your
3  parole plans.  The panel noted that they
4  essentially don't exist, and what you're going to
5  need to do is develop parole plans from both
6  Mexico and in the U.S.  And one of the things
7  that I did note after looking at the letter from
8  the Wehner Framing, there's no indication of
9  where it is, so we need to at least have an idea
10 of where they're located.  A business license is
11 always helpful.  And also some housing
12 opportunities that might be available to you in
13 the United States.  So those are a couple of
14 things that you're going to need to start work on
15 fairly soon.  So far as the 3042 Notices, the
16 District Attorney from Los Angeles County
17 representative was here; and you heard the
18 comments he made opposing the granting of parole
19 and also the letter that was received from the
20 Long Beach Police Department also indicating
21 opposition to parole.  We want to commend you for
22 getting your GED in 1994, for completing Impact
23 in 2004, and for obtaining two vocational
24 certificates, which will be very helpful to you
25 at the time you get yourself a date.  So what
26 we're going to do is we're going to deny you for
27 JOSE JIMENEZ  E-49850  DECISION PAGE 5  5/3/06

44

1    one year, encourage you to get to work real quick

2    on the parole plans, get yourself back into self-

3    help as soon as you can, and start working the

4    Steps, because I think as Commissioner Blonien

5    was trying to get out of you is it's not going to

6    the meetings, it's what you get out of it; and

7    getting out of here, it's not about us, it's

8    about you.  It's what you bring to the table;

9    it's what you give us to make our decision.  So,

10   Commissioner Blonien, anything additional?

11          **DEPUTY COMMISSIONER BLONIEN:**  No.  Thank

12   you.

13          **PRESIDING COMMISSIONER GARNER:**  All right.

14   It is now 2:16 p.m., and that concludes this

15   hearing.

16                    --oOo--

17

18

19

20

21

22

23   PAROLE DENIED ONE YEAR.
                                      AUG 3 1 2006
24   THIS DECISION WILL BE FINAL ON:_____.

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   JOSE JIMENEZ  E-49850  DECISION PAGE 6   5/3/06

45

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, C.M. LOPEZ, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1-44, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the **SUBSEQUENT** PAROLE CONSIDERATION HEARING OF JOSE JIMENEZ, CDC NO. E-49850, ON MAY 3, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated June 5, 2006, at Sacramento, California.

C.M. LOPEZ
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

49

1        **CALIFORNIA BOARD OF PRISON TERMS**

2                **D E C I S I O N**

3            **DEPUTY COMMISSIONER BACHLOR:** We're

4    back on record.

5            **PRESIDING COMMISSIONER MOORE:** All

6    right.  Let the record show that all

7    interested parties have returned to the room.

8    Jose Jimenez, E as in Edward 49850.  This Panel

9    has reviewed all information received from the

10   public and relied on the following

11   circumstances in concluding that the prisoner

12   is not suitable for parole and would pose an

13   unreasonable risk of danger to society or a

14   threat to public safety, if released from

15   prison at this time.  The paramount reasoning

16   would be the timing and the gravity of the

17   committing offense.  (Inaudible.)  This was a

18   gang fight involving rival gangs, the T-Town

19   Flats gang versus the Eastside Longos gang.

20   And the prisoner was involved in the midst of

21   this fight, this gang fight situation that took

22   place.  The actual battle had already subsided.

23   When police had been summoned, the masses had

24   started to leave the location.  However,

25   subsequent to that, the prisoner and his crime

26   partners found a -- one of the rival gang

27   **JOSE JIMENEZ E-49850 DECISION PAGE 1  11/6/03**

50

1    members hiding in a nearby alley area.  And
2    then he was set upon by the prisoner and his
3    crime partners.  The prisoner did strike the
4    victim three times, at least, with a two by
5    four.  The victim succumbed to his injuries.
6    As well as, the victim was somewhat abused and
7    mutilated, in that the victim suffered
8    lacerations, punctures to his face, chest,
9    head, and many of his teeth happened to be
10   knocked out.  The victim was set upon with the
11   two by four, nails in it, a crowbar, a shovel.
12   The offense was carried out in a manner, which
13   demonstrates exceptionally insensitive
14   disregard for human suffering.  And the motive
15   for the crime was inexplicable and very trivial
16   in relationship.  As I mentioned, this was
17   about retaliation for the wrongdoings of the
18   rival gang.  These conclusions are drawn from
19   the Statement of Facts, wherein the prisoner
20   and his crime partners caused the demise of
21   Jose Gonzales in a street gang fight, a rival
22   gang retaliation.  Previous record, the
23   prisoner has, on previous occasions, inflicted
24   or attempted to inflict serious injury on
25   another victim.  The prisoner was arrested as a
26   juvenile for assault with a deadly weapon.  As
27   **JOSE JIMENEZ  E-49850  DECISION PAGE 2  11/6/03**

51

1    well as, the prisoner had an escalating pattern
2    at the time of the instant offense of criminal
3    conduct.  He had a history of unstable and
4    tumultuous relationships with others commencing
5    at an early age, dropping out of school,
6    developing a problem with substance abuse of
7    alcohol and drugs.  He has failed previous --
8    to profit from society's previous attempts to
9    correct his criminality.  Such attempts
10   included probation, a felony juvenile camp,
11   juvenile hall time.  The prisoner had an
12   unstable social history and prior criminality,
13   which includes the use, as I mentioned, of --
14   and abuse of drugs and alcohol.  As well as an
15   active participation in the street gang's
16   lifestyle.  Institutionally, the prisoner has
17   programmed in a limited manner.  He's made some
18   efforts to attempt to complete an additional
19   vocation.  He has not sufficiently participated
20   in beneficial self-help and therapy programming
21   at this time.  He's recently gotten back into
22   AA.  He was on the waiting list last time.  As
23   well as a vocational trade that was -- he has
24   almost completed.  He has not yet completed the
25   Printing, Graphic Arts trade at this time.
26   He's gotten no new 115s.  The last one was in
27   **JOSE JIMENEZ  E-49850  DECISION PAGE 3  11/6/03**

- 52

1    '93.   The psychosocial report, authored by
2    William Gamard, Ph.D., Staff Psychologist,
3    Gamard, G-A-M-A-R-D, written July the 5th of
4    2002, is not totally supportive.   In that, the
5    doctor -- in the doctor's opinion, that the
6    prisoner's violence potential is not more than
7    slightly higher than the average citizen in the
8    community.   Parole plans, the prisoner lacks
9    realistic parole plans in the last county of
10   legal residence for the commitment county.   He
11   does have some alternative plans, however, none
12   because he has a US INS hold and he had no
13   letters from Mexico today.   Thirty forty-two
14   notices, the hearing Panel notes responses to
15   3042 notices indicate opposition.
16   Specifically, the District Attorney's Office of
17   Los Angeles County.   As well as the Long Beach
18   Police Department, a letter received on
19   September the 26th of this year from Sergeant
20   Paul Arcala, Homicide detail, the investigating
21   office or agency, is in opposition to a finding
22   of suitability.   The prisoner's counselor, a
23   CC-I W. Poole, P-O-O-L-E, wrote that, in the
24   prisoner's -- the current Board report of the
25   prisoner, he would pose a moderate degree of
26   threat, if released to the public at this time.
27   **JOSE JIMENEZ  E-49850  DECISION PAGE 4  11/6/03**

53

1   Remarks, the prisoner still needs some self-
2   help in order to face, discuss, understand and
3   cope with stress in a nondestructive manner, to
4   better understand the causative factors,
5   Mr. Jimenez.  And until progress is made, the
6   prisoner continues to be unpredictable and a
7   threat to others.  The prisoner's gains are
8   recent.  He must demonstrate the ability to
9   maintain these gains over an extended period of
10  time.  I'm talking about possible completions
11  of a program and just recently getting back
12  into AA.  He still needs to do some work in
13  terms of working on the 12-Steps.
14  Nevertheless, the prisoner should be commended.
15  He already has one marketable trade, in terms
16  of Landscaping, Horticulture.  He's
17  accomplished a GED.  He's doing some positive
18  kinds of things.  He's made the turn.  However,
19  these positive aspects of his behavior don't
20  outweigh the factors of unsuitability at this
21  time.  Mr. Jimenez, this would be a one-year
22  denial, another one-year denial, Mr. Jimenez,
23  for you.  And the recommendations are to remain
24  disciplinary free.  If it's available to you,
25  to upgrade, complete that vocation, that second
26  vocation that you're attempting to do.  You
27  **JOSE JIMENEZ  E-49850  DECISION PAGE 5  11/6/03**

54

1   said probably a month and it should be out of

2   your way.  I'm wishing you good luck in that

3   regard.  As well as, if it's available to you,

4   to participate in beneficial self-help and

5   therapy programming, whatever may be available,

6   in order to better understand the causative

7   factors, as I mentioned.  Commissioner, any

8   comments to this prisoner?

9       **DEPUTY COMMISSIONER BACHLOR:**  Yeah.

10  I'd strongly recommend that you continue in the

11  NA/AA and you learn those 12 steps.  Whether or

12  not you think you had a problem, there is

13  indication you were using marijuana at a young

14  age.  But you can also use those 12 steps for a

15  lot more than just drugs and alcohol recovery.

16  So, I'd really recommend you focus on that in

17  this next year and just keep doing well.

18  You're doing very well and I think you're

19  getting close, as long as you stay on the track

20  you're on.  All right?

21      **INMATE JIMENEZ:**  Thank you.

22      **DEPUTY COMMISSIONER BACHLOR:**  Good

23  luck.

24      **PRESIDING COMMISSIONER MOORE:**  That

25  will conclude the hearing today, Mr. Jimenez.

26  The time is 1245 hours.  Good luck to you, sir.

27  **JOSE JIMENEZ  E-49850  DECISION PAGE 6  11/6/03**

55

1          **INMATE JIMENEZ:** Thank you.

2          **PRESIDING COMMISSIONER MOORE:**

3    Mr. Spowart, have a good one.

4          **ATTORNEY SPOWART:** Yeah. The same to

5    you, Commissioner.

6          **PRESIDING COMMISSIONER MOORE:** I see

7    you're working here in a couple of weeks, the

8    17th?

9          **ATTORNEY SPOWART:** The 17th. Are you

10   going to be here?

11         **PRESIDING COMMISSIONER MOORE:** I'm back

12   again. Of course, there will be two Panels

13   here that week, so --

14         **ATTORNEY SPOWART:** (Inaudible.)

15         **PRESIDING COMMISSIONER MOORE:** -- I

16   don't know which one we're on but I'll see you

17   then.

18         **ATTORNEY SPOWART:** Okay.

19                    --o0o--

20

21

22

23

24

25   **PAROLE DENIED ONE YEAR**

26   **FINAL DATE OF DECISION** ————————————————

27   **JOSE JIMENEZ  E-49850  DECISION PAGE 7  11/6/03**

56

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KARIN R. LEWIS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 55, and which recording was duly recorded at the CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JOSE JIMENEZ, CDC No. E-49850, on NOVEMBER 6th, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated November 18th, 2003, at Sacramento County, California.

Karin R. Lewis
Transcriber
**CAPITOL ELECTRONIC REPORTING**

1           **CALIFORNIA BOARD OF PRISON TERMS**

2                **D E C I S I O N**

3           **DEPUTY COMMISSIONER LEHMAN:**  We're back on

4      the record.

5           **PRESIDING COMMISSIONER MUNOZ:**  All right.

6      Twelve minutes after 11:00 a.m. and the Parole

7      Consideration Hearing for Inmate Jimenez has

8      resumed with all parties having returned to the

9      hearing room.  And Mr. Jimenez, this Panel reviewed

10     all information received from the public and relied

11     on the following circumstances in concluding that

12     you are unsuitable for parole and that you would

13     pose an unreasonable risk of danger to society if

14     released from prison at this time.  After

15     considering many factors, my colleague and I

16     decided on a one year denial in your case.  We --

17     As I said, we did consider many factors (inaudible)

18     commitment offense and its nature.  The commitment

19     offense was carried out in a cruel manner which a

20     callous disregard for human suffering.  The motive

21     for this crime was trivial, a gang related crime,

22     obviously.  It was a gang related crime, obviously.

23     These crimes are always trivial and inexcusable.

24     The victim was abused, beat and somewhat mutilated

25     during the commission of this crime.  He had

26     (inaudible) of his teeth knocked out.  These

27     **JOSE JIMENEZ    E-49850    DECISION PAGE 1    9/26/02**

56

1    conclusions were drawn from the Statement of Facts
2    wherein the prisoner had become involved in a gang
3    fight situation involving rivals of the (inaudible)
4    the actual gang party. The actual battle had been
5    waged and over, and the police had come, and
6    everybody was dispersed. A rival gang member was
7    located in a nearby alley and was then set upon by
8    the inmate and his crime partners. The inmate did
9    strike the victim three times, at least, with a
10   board. And the inmate -- the victim succumbed to
11   his injuries. And this Panel feels the inmate had
12   a direct cause in the demise of a human being.
13   This inmate does have an unstable social history
14   and prior criminality, which includes the use and
15   abuse of drugs and his active participation in the
16   street gang lifestyle. He has on a previous
17   occasion inflicted serious injury on a victim.
18   That was an arrest as a juvenile, ADW. He was, at
19   the time of the commitment offense, involved in an
20   escalating pattern of criminal conduct. And apart
21   of the gang activity, he also was a high school
22   dropout, and he has failed previous grants of
23   probation and failed to profit from society's
24   previous attempts to control his criminality. Such
25   attempts include juvenile conviction that I
26   mentioned, placement in felony juvenile camp, and
27   **JOSE JIMENEZ    E-49850    DECISION PAGE 2    9/26/02**

57

1  also juvenile hall as a result of violating his

2  probation.  And in regards to this offense, he was

3  initially placed in CYA.  Institutional behavior,

4  this Panel feels he has not sufficiently

5  participated in beneficial self-help and therapy

6  programming, and his disciplinary record when

7  compared to the inmate (inaudible) this Panel, his

8  disciplinary record is pretty good.  He has one 115

9  during his period of incarceration.  That was way

10  back in 1993, nine years ago.  He has a total of

11  six 128(a)'s, the last one in 1995.  The most

12  recent psychiatric evaluation is not totally

13  supportive of release.  It was authored by

14  Dr. Ganard and dated 7/5/02.  And he opined that

15  the inmate's violence potential is no more than

16  slightly higher than average -- than the average

17  citizen in the community.  And Mr. Spowart, the

18  inmate's attorney, pointed out, the prior

19  evaluation was -- had a better (inaudible) than

20  this one.  So, even though the psych report is

21  fairly recent, we are going to order another psych

22  report before the next appearance before the Board

23  of Prison Terms.  We'll try to get that ironed out.

24  As far as your parole plans go, sir, what I suggest

25  to you is that you submit dual option parole plans

26  the next time you come before the Panel.  Plans are

27  **JOSE JIMENEZ    E-49850    DECISION PAGE 3    9/26/02**

58

1    to be clearly outlined for both your country of
2    origin, and because the possibility exists,
3    although it's a small possibility that you'll be
4    allowed to remain in California, go ahead and
5    submit those types of plans too and have letters of
6    support and confidential from both locations.  We
7    note that the District Attorney from the County of
8    Los Angeles is opposed to parole suitability for
9    you.  And we make the following findings.  That you
10   need to at least disciplinary wise stay on the path
11   that you're on.  You behave yourself well.  Keep it
12   up.  And we appreciate that.  And you also indicate
13   you're on the waiting list for AA, NA, and that's a
14   good idea for you to resume that kind of
15   participation.  And you are to be commended for
16   some of things you've accomplished during the
17   period of incarceration.  You did obtain your GED.
18   You completed a vocation in landscape and
19   horticulture vocation, and you're currently
20   involved in the printing vocation.  You've received
21   laudatory chronos for that, and we certainly hope
22   you complete that vocation also.  Anything that you
23   can do to enhance -- to enhance your chance to
24   obtain parole suitability we urge you to do.  The
25   positive aspects of your behavior do not outweigh
26   the factors of unsuitability.  Again, sir, this is
27   **JOSE JIMENEZ     E-49850    DECISION PAGE 4   9/26/02**

59

1     a one year denial, and you may be disappointed at
2     the outcome of this hearing, but we hope you
3     interpret the one year denial as a good sign, as
4     encouragement from this Panel that you are headed
5     in the right direction.  You had a four year denial
6     last time you appeared, so the fact that you had
7     three years lopped off is a good sign (inaudible).
8     We were impressed by the presentation both by your
9     attorney and also by the way you presented
10    yourself.  So, if you are disappointed, sir, don't
11    let that disappointment turn to bitterness.  Keep
12    doing what you're doing.  You have the potential to
13    get out of this prison someday.  And Commissioner
14    Lehman, any comments you want to add, Sir?

15           **DEPUTY COMMISSIONER LEHMAN:**  I'd just like
16    to reiterate what you said in regard to the four
17    year denial previously and a one year denial today,
18    sir.  That's -- I would say -- I would call it
19    unusual.  Usually, people do not go in that
20    progression.  But you -- I think your performance
21    in prison has been remarkable for a lot of the
22    reasons we talked about here today.  And what this
23    means for you is that in all likelihood, if you
24    don't get into any trouble or you don't, you know,
25    backtrack in any way, you'll probably get a parole
26    hearing every year.  I can't promise that.
27    **JOSE JIMENEZ     E-49850     DECISION PAGE 5     9/26/02**

1    Anything is possible, but you probably will now.

2    And that's going to be -- greatly increase your

3    chances of walking out of here someday.  And I just

4    want to commend you for your good work and tell you

5    good luck.

6             **PRESIDING COMMISSIONER MUNOZ:**  (Inaudible).

7    Thank you for being here this morning.  It's 20

8    minutes after 11:00 a.m.  That concludes the

9    hearing for Mr. Jimenez.

10                         --o0o--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   **PAROLE DENIED ONE YEAR**
                                      **OCT 1 8 2002**
26   **EFFECTIVE DATE OF THIS DECISION**_____

27   **JOSE JIMENEZ     E-49850    DECISION PAGE 6     9/26/02**

61
## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, DEBRA M. SEVEY, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 60, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JOSE JIMENEZ, CDC No. E-49850, on SEPTEMBER 26, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated October 9, 2002 at Sacramento County, California.

Debra M. Sevey
Transcriber
CAPITOL ELECTRONIC REPORTING

# EXHIBIT   "E"

1
2
3          SUPERIOR COURT OF CALIFORNIA

4               COUNTY OF SANTA CLARA

5
6
      _____
7     In re                           )      No.: 68038
                                       )
8          DONALD RAY LEWIS,           )
                                       )      ORDER
9     On Habeas Corpus                 )
      _____)
10
11
12                      **INTRODUCTION**

13        Petitioner alleges that he has been denied due process of law

14    because the Board has used standards and criteria which are

15    unconstitutionally vague in order to find him unsuitable for parole.

16    Alternatively, he argues that those standards, even if

17    constitutionally sound, are nonetheless being applied in an arbitrary

18    and meaningless fashion by the Board.  He relies upon evidence that

19    in one hundred percent of 2690 randomly chosen cases, the Board found

20    the commitment offense to be "especially heinous, atrocious or

21    cruel", a factor tending to show unsuitability under Title 15

22    §2402(c)(1).

23        **Are the Board Criteria Unconstitutionally Vague?**

24        Our courts have long recognized that both state and federal due

25    process requirements dictate that the Board must apply detailed

26    standards when evaluating whether an individual inmate is unsuitable

27    for parole on public safety grounds.  (See *In re Dannenberg* (2005) 34

28

1  Cal.4th 1061 at p. 1096, footnote 16.)  Those standards are found in
2  15 CCR §2402(c) (*Dannenberg, supra,* 34 Cal.4th at p. 1080,) and do
3  include detailed criteria to be applied by the Board when considering
4  the commitment offense:

5      (c) Circumstances Tending to Show Unsuitability. The following
       circumstances each tend to indicate unsuitability for release.
6      These circumstances are set forth as general guidelines; the
       importance attached to any circumstance or combination of
7      circumstances in a particular case is left to the judgment of
       the panel. Circumstances tending to indicate unsuitability
8      include:

9      (1) Commitment Offense. The prisoner committed the offense in an
       especially heinous, atrocious or cruel manner. The factors to be
10     considered include:

11         (A) Multiple victims were attacked, injured or killed in
           the same or separate incidents.
12
           (B) The offense was carried out in a dispassionate and
13         calculated manner, such as an execution-style murder.

14         (C) The victim was abused, defiled or mutilated during or
           after the offense.
15
           (D) The offense was carried out in a manner which
16         demonstrates an exceptionally callous disregard for human
           suffering.
17
           (E) The motive for the crime is inexplicable or very
18         trivial in relation to the offense.

19
       In response to Petitioners claim that the regulations are
20
   impermissibly vague, Respondent argues that while "especially
21
   heinous, atrocious or cruel" might be vague in the abstract it is
22
   limited by factors (A)-(E) of §2402(c)(1), and thus provides a
23
   'principled basis' for distinguishing between those cases which are
24
   contemplated in that section and those which are not.  An examination
25
   of cases involving vagueness challenges to death penalty statutes is
26
   instructive here and shows that Respondent's position has merit:
27
       "Our precedents make clear that a State's capital sentencing
28

                                    2

1  scheme also must genuinely narrow the class of persons eligible
   for the death penalty. When the purpose of a statutory
2  aggravating circumstance is to enable the sentencer to
   distinguish those who deserve capital punishment from those who
3  do not, the circumstance must provide a principled basis for
   doing so.  If the sentencer fairly could conclude that an
4  aggravating circumstance applies to every defendant eligible for
   the death penalty, the circumstance is constitutionally infirm."
5  (*Arave v. Creech* (1993) 507 U.S. 463, 474, citing *Maynard v.
   Cartwright* (1988) 486 U.S. 356, 364: "invalidating aggravating
6  circumstance that 'an ordinary person could honestly believe'
   described every murder," and, *Godfrey v. Georgia* (1980) 446 U.S.
7  420, 428-429: "A person of ordinary sensibility could fairly
   characterize almost every murder as 'outrageously or wantonly
8  vile, horrible and inhuman.'")

9
       It cannot fairly be said that 'every murder' could be
10
   categorized as "especially heinous, atrocious or cruel" under the
11
   Board regulations, since the defining factors contained in
12
   subdivisions (A)-(E) clearly narrow the group of cases to which it
13
   applies.  Although Petitioner also argues that the "vague statutory
14
   language is not rendered more precise by defining it in terms or
15
   synonyms of equal or greater uncertainty" *(People v. Superior Court*
16
   *(Engert)* (1982) 31 Cal.3d 797, 803, *Pryor v. Municipal Court* (1979)
17
   25 Cal.3d 238, 249. *See also Walton v. Arizona* (1990) 497 U.S. 639,
18
   654), the factors in those subdivisions are not themselves vague or
19
   uncertain.  The mere fact that there may be some subjective component
20
   (such as "exceptionally callous" disregard for human suffering) does
21
   not render that factor unconstitutionally vague.  The proper degree
22
   of definition of such factors is not susceptible of mathematical
23
   precision, but will be constitutionally sufficient if it gives
24
   meaningful guidance to the Board.
25
       A law is void for vagueness if it "fails to provide adequate
26     notice to those who must observe its strictures and
       impermissibly delegates basic policy matters to policemen,
27     judges, and juries for resolution on an ad hoc and subjective
       basis, with the attendant dangers of arbitrary and
28

1    discriminatory application." *(People v. Rubalcava* (2000) 23
2    Cal.4th 322, 332, quoting *People ex rel. Gallo v. Acuna* (1997)
     14 Cal. 4th 1090, 1116, quoting *Grayned v. City of Rockford*
3    (1972) 408 U.S. 104, 108-109.)

4    A review of cases expressing approval of definitions to limit the

5    application of otherwise vague terms in death penalty statutes leads

6    inextricably to the conclusion that the limiting factors in §2402(c)

7    easily pass constitutional muster.  An Arizona statute was upheld

8    that provided a crime is committed in an 'especially cruel manner'

9    when the perpetrator inflicts mental anguish or physical abuse before

10   the victim's death," and that "mental anguish includes a victim's

11   uncertainty as to his ultimate fate."  (*Walton v. Arizona* (1990) 497

12   U.S. 639, 654.)  Similarly, the court in *Maynard* v. *Cartwright*, 486

13   U.S. at 364-365, approved a definition that would limit Oklahoma's

14   "especially heinous, atrocious, or cruel" aggravating circumstance to

15   murders involving "some kind of torture or physical abuse.  In

16   Florida, the statute authorizing the death penalty if the crime is

17   "especially heinous, atrocious, or cruel," satisfied due process

18   concerns where it was further defined as "the conscienceless or

19   pitiless crime which is unnecessarily torturous to the victim."

20   *State v. Dixon* (1973) 283 So. 2d 1 at p. 9.

21       Here, the factors in subdivisions (A)-(E) provide equally clear

22   limiting construction to the term "especially heinous, atrocious, or

23   cruel" in §2402(c).

**Has the Board Engaged in a Pattern of Arbitrary Application of the**
24   **Criteria?**

25       As previously noted, 15 CCR §2402 provides detailed criteria for

26   determining whether a crime is "exceptionally heinous, atrocious or

27   cruel" such that it tends to indicate unsuitability for parole.  Our
28

1  courts have held that to fit within those criteria and thus serve as

2  a basis for a finding of unsuitability, the circumstances of the

3  crime must be more aggravated or violent than the minimum necessary

4  to sustain a conviction for that offense. (*In re Rosenkrantz* (2002)

5  29 Cal.4th 616, 682-683.) Where that is the case, the nature of the

6  prisoner's offense, *alone*, can constitute a sufficient basis for

7  denying parole. (*In re Dannenberg, supra,* 34 Cal.4th at p. 1095.)

8  Petitioner claims that those criteria, even if constitutionally

9  sound, have been applied by the Board in an arbitrary and capricious

10 manner rendering them devoid of any meaning whatever. The role of

11 the reviewing court under these circumstances has been addressed

12 previously in the specific context of Parole Board actions:

13 "[Courts have] an obligation, however, to look beyond the facial
   validity of a statute that is subject to possible
14 unconstitutional administration since a law though fair on its
   face and impartial in appearance may be open to serious abuses
15 in administration and courts may be imposed upon if the
   substantial rights of the persons charged are not adequately
16 safeguarded at every stage of the proceedings. We have
   recognized that this court's obligation to oversee the execution
17 of the penal laws of California extends not only to judicial
   proceedings, but also to the administration of the Indeterminate
18 Sentence Law." (*In re Rodriguez* (1975) 14 Cal.3d 639, 648,
   quoting *Minnesota v. Probate Court* (1940) 309 U.S. 270, 277.)
19

20 Similarly, in *In re Minnis* (1972) 7 Cal.3d 639, 645, the case

21 closest on point to the present situation, the California Supreme

22 Court stated: "This court has traditionally accepted its

23 responsibility to prevent an authority vested with discretion from

24 implementing a policy which would defeat the legislative motive for

25 enacting a system of laws." Where, as here, the question is whether

26 determinations are being made in a manner that is arbitrary and

27 capricious, judicial oversight "must be extensive enough to protect

28

1  limited right of parole applicants 'to be free from an arbitrary
2  parole decision... and to something more than mere pro-forma
3  consideration.'" (*In re Ramirez* (2001) 94 Cal.App.4th 549 at p. 564,
4  quoting *In re Sturm* (1974) 11 Cal.3d 258 at p. 268.)

5      This Court, therefore, now examines Petitioner's "as applied"
6  void for vagueness challenge.

7

8                      **The Evidence Presented**

9      A similar claim to those raised here, involving allegations of
10 abuse of discretion by the Board in making parole decisions, was
11 presented to the Court of Appeal in *In re Ramirez, supra*. The court
12 there observed that such a "serious claim of abuse of discretion"
13 must be "adequately supported with evidence" which should be
14 "comprehensive." (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5.)
15 The claim was rejected in that case because there was not "a
16 sufficient record to evaluate." (*Ibid.*) In these cases, however,
17 there is comprehensive evidence offered in support of Petitioner's
18 claims.

19     Discovery orders were issued in five different cases involving
20 life term inmates (Petitioners) who all presented identical claims.[1]

21

22 [1] This Court takes judicial notice of the several other cases currently
   pending (Criscione #71614, Jameison #71194, Bragg #108543, Ngo #127611.)
23 which raise this same issue and in which proof was presented on this same
   point. (Evidence Code § 452(d). See specifically, in the habeas corpus
24 context, *In re Vargus* (2000) 83 Cal.App.4th 1125, 1134-1136, 1143, in which
   judicial notice was taken of the evidence in four other cases and in which
25 the court noted: "Facts from other cases may assist petitioner in
   establishing a pattern." See generally *McKell v. Washington Mutual, Inc.*
26 (2006) 142 Cal.App.4th 1457, 1491: "trial and appellate courts ... may
   properly take judicial notice of ... established facts from both the same
   case and other cases." And see *AB Group v. Wertin* (1997) 59 Cal.App.4th
27 1022, 1036: Judicial notice taken of other cases when matters are "just as
   relevant to the present [case] as they are to the others.")
28

1 | The purpose of the discovery was to bring before the Court a
2 | comprehensive compilation and examination of Board decisions in a
3 | statistically significant number of cases.  The Board decisions under
4 | examination consisted of final decisions of the Board for life-term
5 | inmates convicted of first or second degree murder and presently
6 | eligible for parole.  Included were all such decisions issued in
7 | certain months, chosen by virtue of their proximity in time to the
8 | parole denials challenged in the pending petitions.  All Board
9 | decisions in the months of August, September and October of 2002,
10 | July, August, September, October, November, and December of 2003,
11 | January and February of 2004, February of 2005, and January of 2006
12 | were compiled.  This resulted in a review of 2690 cases decided in a
13 | total of 13 months.

14 |     The purpose of the review was to determine how many inmates had
15 | actually been denied parole based in whole or in part on the Board's
16 | finding that their commitment offense fits the criteria set forth in
17 | Title 15 §2402(c)(1) as "especially heinous, atrocious or cruel."  A
18 | member of the research team conducting the review, Karen Rega,
19 | testified that in its decisions the Board does not actually cite CCR
20 | rule §2402(c), but consistently uses the specific words or phrases
21 | ("verbiage from code") contained therein, so that it could easily be
22 | determined when that criteria was being applied.  (For example,
23 | finding "multiple victims" invokes §2402(c)(1)(A); finding the crime
24 | "dispassionate" "calculated" or "execution style" invokes
25 | §2402(c)(1)(B); that a victim was "abused" "mutilated" or "defiled"
26 | invokes §2402(c)(1)(C); a crime that is "exceptionally callous" or
27 | demonstrated a "disregard for human suffering" fits criteria
28 |

7

1 | evidence" was noted as possibly being dispositive. And see *People v.*
2 | *Flores* (2006) 144 Cal.App.4th 625 in which a statistical survey and
3 | analysis, combined into an "actuarial instrument" was substantial
4 | proof.)

5 | A statistical compilation and examination such as has been
6 | presented in these cases is entirely appropriate and sufficient
7 | evidence from which to draw sound conclusions about the Board's
8 | overall methods and practices.

9 |

10 | **THE EXPERT'S TESTIMONY**

11 | Petitioners provided expert testimony from Professor Mohammad
12 | Kafai regarding the statistics and the conclusions that necessarily
13 | follow from them. Professor Kafai is the director of the statistics
14 | program at San Francisco State University, he personally teaches
15 | statistics and probabilities, and it was undisputed that he was
16 | qualified to give the expert testimony that he did. No evidence was
17 | presented that conflicts or contradicts the testimony and conclusions
18 | of Professor Kafai. By stipulation of the parties, Professor Kafai's
19 | testimony was to be admissible and considered in the cases of all
20 | five petitioners. (See page 35 of the June 1, 2007, evidentiary
21 | hearing transcript.)

22 | Professor Kafai testified that the samples in each case, which
23 | consisted of two or three months of Board decisions, are
24 | statistically sufficient to draw conclusions about the entire
25 | population of life term inmates currently facing parole eligibility
26 | hearings. Given that every inmate within the statistically
27 | significant samples had his or her crime labeled "'particularly
28 |

10

1  egregious'" or "especially heinous, atrocious or cruel" under Title
2  15 §2402(c)(1), it can be mathematically concluded that the same
3  finding has been made for every inmate in the entire population of
4  9,750. Although he testified that statisticians never like to state
5  unequivocally that something is proven to a 100% certainty, (because
6  unforeseen anomalies are always theoretically possible,) he did
7  indicate the evidence he had thus far examined came as close to that
8  conclusion as could be allowed. Not surprisingly, Professor Kafai
9  also testified that "more than 50% can't by definition constitute an
10  exception."

11      Having found the data provided to the expert to be sound this
12  Court also finds the expert's conclusions to be sound. In each of
13  the five cases before the Court over 400 inmates were randomly chosen
14  for examination. That number was statistically significant and was
15  enough for the expert to draw conclusions about the entire population
16  of 9,750 parole eligible inmates. The fact that the approximately
17  2000 inmates examined in the other cases also had their parole denied
18  based entirely or in part on the crime itself (§2402(c)(1)), both
19  corroborates and validates the expert's conclusion in each individual
20  case and also provides an overwhelming and irrefutable sample size
21  from which even a non expert can confidently draw conclusions.

22

23                            **DISCUSSION**

24      Although the evidence establishes that the Board frequently says
25  parole is denied "first," "foremost," "primarily," or "mainly,"
26  because of the commitment offense, this statement of primacy or
27  weight is not relevant to the question now before the Court.

28

1  Petitioners acknowledge that the Board generally also cites other

2  reasons for its decision. The question before this Court, however,

3  is not whether the commitment offense is the primary or sole reason

4  why parole is denied -- the question is whether the commitment

5  offense is labeled "'particularly egregious'" and thus could be used,

6  under *Dannenberg,* primarily or exclusively to deny parole.

7      The evidence proves that in a relevant and statistically

8  significant period where the Board has considered life term offenses

9  in the context a parole suitability determination, every such

10 offense has been found to be "particularly egregious" or "especially

11 heinous, atrocious or cruel."[2] This evidence conclusively

12 demonstrates that the Board completely disregards the detailed

13 standards and criteria of §2402(c). "Especially" means particularly,

14 or "to a distinctly greater extent or degree than is common."[3]  (EC §

15 451(e).)  By simple definition the term "especially" as contained in

16 section 2402(C)(1) cannot possibly apply in 100% of cases, yet that

17 is precisely how it has been applied by the Board. As pointed out by

18 the Second District Court of Appeal, not every murder can be found to

19 be "atrocious, heinous, or callous" or the equivalent without "doing

20

21 [2] In a single case out of the 2690 that were examined Petitioner has conceded that
   the Board did not invoke §2402(c)(1). This Court finds that concession to be
   improvidently made and the result of over caution. When announcing the decision at
22 the initial hearing of S. Fletcher (H-10330) on 4/6/06, the commissioner did begin
   by stating "I don't believe this offense is particularly aggravated..." However
   the commissioner proceeds to describe the crime as a drug deal to which Fletcher
23 brought a gun so "we could say there was some measure of calculation in that." The
   commissioner continued by observing that the reason someone would bring a gun to a
24 drug transaction was to make sure things went according to their plan "so I guess
   we can say that that represents calculation and perhaps it's aggravated to that
   extent."  As is the Board's standard practice, by using the word 'calculated' from
25 §2402(c)(1)(b) the Board was invoking that regulation. Certainly if Mr. Fletcher
   had brought a habeas petition Respondent's position would be that there is 'some
26 evidence' supporting this. The ambiguity created by the commissioner's initial
   statement was cleared up several pages later when he announces that "based upon the
27 crime coupled with ..." parole was denied for four years. (See *In re Burns* (2006)
   136 Cal.App.4th 1318, 1326, holding §2402(c)(1) criteria are necessary for a multi-
   year denial.)

28

                                   12

1 │ violence" to the requirements of due process. (*In re Lawrence* (2007)
2 │ 150 Cal.App.4th 1511, 1557.) This is precisely what has occurred
3 │ here, where the evidence shows that the determinations of the Board
4 │ in this regard are made not on the basis of detailed guidelines and
5 │ individualized consideration, but rather through the use of all
6 │ encompassing catch phrases gleaned from the regulations.

7 │

8 │ ## THE BOARD'S METHODS

9 │ Because it makes no effort to distinguish the applicability of
10 │ the criteria between one case and another, the Board is able to force
11 │ every case of murder into one or more of the categories contained in
12 │ §2402(c).

13 │ For example, if the inmate's actions result in an instant death
14 │ the Board finds that it was done in a "dispassionate and calculated
15 │ manner, such as an execution-style murder." At the same time the
16 │ Board finds that a murder not resulting in near instant death shows a
17 │ "callous disregard for human suffering" without any further analysis
18 │ or articulation of facts which justify that conclusion. If a knife
19 │ or blunt object was used, the victim was "abused, defiled, or
20 │ mutilated." If a gun was used the murder was performed in a
21 │ "dispassionate and calculated manner, such as an execution-style
22 │ murder." If bare hands were used to extinguish another human life
23 │ then the crime is "particularly heinous and atrocious."

24 │ Similarly, if several acts, spanning some amount of time, were
25 │ necessary for the murder the Board may deny parole because the inmate
26 │ had "opportunities to stop" but did not. However if the murder was

27 │
―――――――――――――――――――――――――――――――――――――――――――――――――――――
[3] Princeton University World Net Dictionary (2006).

28 │

13

1   A "petitioner's young age at the time of the offense" must be
2   considered. (*In re Elkins* (2006) 144 Cal.App.4th 475, 500, quoting
3   *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F. Supp. 2d 1063, 1065,
4   1085: "The reliability of the facts of the crime as a predictor for
5   his dangerousness was diminished further by his young age of 18, just
6   barely an adult. 'The susceptibility of juveniles to immature and
7   irresponsible behavior means their irresponsible conduct is not as
8   morally reprehensible as that of an adult.'")[5]

9      The Board's formulaic practice of stating §2402(c)(1) phrased in
10  a conclusory fashion, and then stating "this is derived from the
11  facts" without ever linking the two together, is insufficient. (*In
12  re Roderick*, (2007) ___ Cal.App.4th ___ (A113370): "At minimum, the
13  Board is responsible for articulating the grounds for its findings
14  and for citing to evidence supporting those grounds." (See also *In
15  re Barker* (2007) 151 Cal.App.4th 346, 371, disapproving
16  "conclusorily" announced findings.)

17     After two decades, mundane "crimes have little, if any,
18  predictive value for future criminality. Simply from the passing of
19  time, [an inmate's] crimes almost 20 years ago have lost much of
20  their usefulness in foreseeing the likelihood of future offenses than
21  if he had committed them five or ten years ago." (*In re Lee* (2006)
22  143 Cal.App.4th 1400, 1412.) It should be noted that this rule

23

willfulness and bias. The jury had a reasonable doubt that Petitioner committed
24  first degree murder but under the Board's 'reasoning' and 'analysis' this puts him
in a worse position than if they had not. Had the jury convicted him of the
greater offense Petitioner has served so much time that he would already be having
25  subsequent parole hearings on a first and the Board would not have been able to use
the 'some evidence' of first degree behavior against him. As observed previously,
26  the Board's position in this regard is "so ridiculous that simply to state it is to
refute it." (*Weider, supra*, 145 Cal.App.4th at p. 583.)
[5] This point is particularly significant in the case of Mike Ngo. Mr. Ngo was only
27  18 at the time of his crime. The impetus behind the shooting was youth group or

28

16

1   applies with even more force when the Board is relying on any
2   criminality that occurred before the crime.  In that situation, just
3   as with the crime itself, the Board must explain why such old events
4   have any relevance and especially when the inmate has spent a decade
5   as a model prisoner.

6       Murders situationally related to intimate relationships are
7   unfortunately commonplace because emotions are strongest in such
8   domestic settings.  When a murder occurs because of "stress unlikely
9   to be reproduced in the future" this is a factor that affirmatively
10  points towards suitability.  (In re Lawrence (2007) 150 Cal.App.4th
11  1511 and cases cited therein.)

12      "The evidence must substantiate the ultimate conclusion that the
13  prisoner's release currently poses an unreasonable risk of danger to
14  the public.  It violates a prisoner's right to due process when the
15  Board or Governor attaches significance to evidence that forewarns no
16  danger to the public."  (In re Tripp (2007) 150 Cal.App.4th 306,
17  313.)

18      The Board "cannot rely on the fact that the killing could have
19  been avoided to show the killing was especially brutal."  (In re
20  Cooper (2007) 153 Cal.App.4th 1043, 1064.)

21      The Board's focus must be upon how the inmate "actually
22  committed his crimes" not the "incorporeal realm of legal
23  constructs."  (Lee, supra, 143 Cal.App.4th at p. 1413.)  This is
24  especially significant when the murder conviction is based on the
25  felony murder rule, provocative act doctrine, or accomplice liability
26  such that the inmate did not intend to kill or may not have even been

27  _____
    gang rivalries, posturing, and threats which mature adults would not have been
28

                                17

1    the actual killer.

2        The Board has ample guidance before it in the decisions of the

3    various reviewing courts to constrain its abuse, but has failed to

4    avail itself of the opportunity to do so.

5

6                    **SEPARATION OF POWERS DOCTRINE**

7        The evidence presented, as discussed above, has established a

8    void for vagueness "as applied" due process violation.  That same

9    evidence also proves a separate but related Constitutional violation

10   -- an as applied separation of powers violation.

11       The separation of powers doctrine provides "that the legislative

12   power is the power to enact statutes, the executive power is the

13   power to execute or enforce statutes, and the judicial power is the

14   power to interpret statutes and to determine their

15   constitutionality." (*Lockyer v. City and County of San Francisco*

16   (2004) 33 Cal.4th 1055, 1068.)  Because the evidence has proven the

17   Board is not executing/enforcing the legislature's statutes as

18   intended it is this Court's duty to intervene.  The question here is

19   whether the Board is violating the separation of powers doctrine by

20   appropriating to itself absolute power over parole matters and

21   disregarding the limits and guidelines placed by the statute.[6]

22       "Government Code section 11342.2 provides: 'Whenever by the

23

_____

24   caught up in.
     [6] "It is settled that Administrative regulations that violate acts of the
25   Legislature are void and no protestations that they are merely an exercise of
     administrative discretion can sanctify them.  They must conform to the legislative
     will if we are to preserve an orderly system of government.  Nor is the motivation
26   of the agency relevant: It is fundamental that an administrative agency may not
     usurp the legislative function, no matter how altruistic its motives are."
27   (*Agricultural Labor Relations Board v. Superior Court of Tulare County* (1976) 16
     Cal.3d 392, 419 quoting *Morris v. Williams* (1967) 67 Cal.2d 733, 737, and *City of
     San Joaquin v. State Bd. of Equalization* (1970) 9 Cal.App.3d 365, 374.)

28

                                    18

1   express or implied terms of any statute a state agency has authority
2   to adopt regulations to implement, interpret, make specific or
3   otherwise carry out the provisions of the statute, no regulation
4   adopted is valid or effective unless consistent and not in conflict
5   with the statute and reasonably necessary to effectuate the purpose
6   of the statute.'  Administrative regulations that alter or amend the
7   statute or enlarge or impair its scope are void and courts not only
8   may, but it is their obligation to strike down such regulations."
9   (*Pulaski v. Occupational Safety & Health Stds. Bd.* (1999) 75
10  Cal.App.4th 1315, 1341, citations omitted.)

11       The vice of overbroad and vague regulations such as are at issue
12  here is that they can be manipulated, or 'interpreted,' by executive
13  agencies as a source of unfettered discretion to apply the law
14  without regard to the intend of the people as expressed by the
15  legislature's enabling statutes.  In short, agencies usurp unlimited
16  authority from vague regulations and become super-legislatures that
17  are unaccountable to the people.  As it has sometimes been framed and
18  addressed in the case law, a vague or all encompassing standard runs
19  the risk of "violat[ing] the separation of powers doctrine by
20  'transforming every [executive decisionmaker] into a "mini-
21  legislature" with the power to determine on an ad hoc basis what
22  types of behavior [satisfy their jurisdiction].'"  (*People v. Ellison*
23  (1998) 68 Cal.App.4th 203, 211, quoting *People v. Superior Court*
24  *(Caswell)* (1988) 46 Cal.3d 381, 402.)

25       "It is concern about 'encroachment and aggrandizement,' the
26  [United States Supreme Court] reiterated, that has animated its
27  separation of powers jurisprudence.  'Accordingly, we have not
28

                                    19

```
 1  hesitated to strike down provisions of law that either accrete to a
 2  single Branch powers more appropriately diffused among separate
 3  Branches or that undermine the authority and independence of one or
 4  another coordinate Branch.'" (Kasler v. Lockyer (2000) 23 Cal.4th
 5  472, 493, quoting Mistretta v. United States (1989) 488 U.S. 361,
 6  382.) This articulation of the principle speaks directly to the
 7  situation at hand. The Board, by its enactment and interpretation of
 8  Title 15, §2402, has appropriated to itself absolute power over
 9  'lifer' matters. Overreaching beyond the letter and spirit of the
10  Penal Code provisions, Title 15, §2402(c)(1) has been interpreted by
11  the Board to supply the power to declare every crime enough to deny
12  parole forever. The fact that Title 15, §2402, has been invoked in
13  every case, but then sometime later not invoked, tends to show either
14  completely arbitrary and capricious behavior or that unwritten
15  standards are what really determine outcomes. In either event, all
16  pretenses of taking guidance from, or being limited by, the
17  legislature's statutes have been abandoned. "[I]t is an elementary
18  proposition that statutes control administrative interpretations."
19  (Ohio Casualty Ins. Co. v. Garamendi (2006) 137 Cal.App.4th 64, 78.)
20  Title 15 §2402 as applied, however, has no controls or limitations.
21      The PC § 3041(b) exception to the rule can only be invoked when
22  the "gravity of the current convicted offense or offenses, or the
23  timing and gravity of current or past convicted offense or offenses,
24  is such that consideration of the public safety requires a more
25  lengthy period of incarceration for this individual." The word
26  "gravity" is a directive for comparison just as "more lengthy"
27  indicates a deviation from the norm. While Dannenberg held there
28
```

20

1 | does not need to be intra case comparison for the purposes of term
2 | uniformity or proportionality, there necessarily has to be some sort
3 | of comparison for the purposes of adhering to the legislative mandate
4 | that parole is available. The Board employs no meaningful yardstick
5 | in measuring parole suitability. This is a violation of the
6 | separation of powers doctrine. (*People v. Wright* (1982) 30 Cal.3d
7 | 705, 712-713. And see *Terhune v. Superior Court* (1998) 65
8 | Cal.App.4th 864, 872-873. Compare *Whitman v. Am. Trucking Ass'ns*
9 | (2001) 531 U.S. 457, 472, describing a delegation challenge as
10 | existing when the legislature fails to lay down "an intelligible
11 | principle to which the person or body authorized to act is directed
12 | to conform.")

13 |

14 | **RESPONDENT'S POSITION**

15 |     The Attorney General has suggested, without pointing to any
16 | concrete examples, that it is possible that the Board, when invoking
17 | the crime as a reason to deny parole, is not placing it within
18 | §2402(c)(1) but instead using is as some sort of 'lesser factor'
19 | which, only when combined with other unsuitability criteria, can
20 | contribute to a valid parole denial. The two problems with this
21 | position are, first, there is no evidentiary support for this
22 | assertion, and second, it would have no impact on the constitutional
23 | infirmities outlined and proven above.

24 |     Even if Respondent had produced evidence that the Board was
25 | utilizing the crime as a 'lesser factor' which needs others to fully
26 | support a parole denial, the Board would then be admitting it was
27 | denying parole, in part, for the very reason that the person is

28 |

1  before the panel and eligible for parole in the first place - the
2  commitment offense. Respondent's argument suggests that a crime that
3  only qualified as the *Dannenberg* "minimum necessary" could still be
4  invoked as a reason for denying parole. Respondent argues that when
5  the crime is invoked 'not in the *Dannenberg* sense,' there must be
6  other reasons for the parole denial and the crime alone would not be
7  enough in this context. This position is inconsistent with the law
8  and fundamental logic.

9      A crime qualifies under *Dannenberg* when it is "particularly
10 egregious," or one where "no circumstances of the offense reasonably
11 could be considered more aggravated or violent than the minimum
12 necessary to sustain a conviction for that offense." (*Dannenberg*,
13 *supra*, 34 Cal.4th at pp. 1094-1095.) These are the only two choices.
14  If a crime consists of only the bare elements then it is not
15 aggravated and it cannot, in and of itself, serve as a basis for
16 parole denials once the inmate becomes eligible for parole. It is
17 the reason an inmate may be incarcerated initially for the equivalent
18 of 15 or 25 years, and then examined to determination rehabilitation
19 efforts when they come before the Board, but a crime that is no more
20 than the bare minimum cannot be factored into the equation pursuant
21 to PC § 3041(b) or any of the case law interpreting it.

22      In oral argument Respondent suggested a second way the
23 commitment offense can be used outside of §2402(c)(1). If for
24 example a crime had its roots in gang allegiances or rivalries and
25 the inmate continued to associate with gangs while incarcerated, then
26 an aspect of the crime, even if the crime otherwise consisted of no
27 more than the minimum elements, could be combined with other behavior
28

22

1  to support a parole denial. Similarly, if a crime was rooted in an
2  inmate's then existing drug addiction, and the Board was to point to
3  a recent 115 involving drugs, the evidence that the inmate's drug
4  issues had not been resolved would justify a parole denial even if
5  the crime itself was not aggravated. A finding that the inmate is
6  not suitable for release under these circumstances, however, is not
7  based on the facts of the commitment offense as tending to show
8  unsuitability. It is based on the conclusion that can be drawn about
9  Petitioner's lack of rehabilitation or change since the offense, and
10  thus, his present dangerousness.

11      Respondent has not demonstrated any flaws in Petitioner's
12  methodology or analysis, nor provided any actual evidence of the
13  crime being invoked *other* than pursuant to §2402(c)(1). Drawing
14  conclusions from the Board's direct statements, or its precise
15  recitations of the §2402(c)(1) language, logically indicates an
16  invocation of §2402(c)(1), and Respondent's suggestion otherwise is
17  insupportable.

18

19                    **THE QUESTION OF BIAS**

20      Because the issue has been squarely presented, and strenuously
21  argued by Petitioners, this Court is obligated to rule on the charge
22  that the Board's actions prove an overriding bias and deliberate
23  corruption of their lawful duties.

24      In the discrimination and bias case of *USPS Bd. of Governors v.*
25  *Aikens* (1983) 460 U.S. 711, the United States Supreme Court
26  acknowledged "there will seldom be 'eyewitness' testimony as to the
27  [] mental processes" of the allegedly biased decisionmaker. Instead,
28

                                  23

1  an examination of other cases for trends or patterns can provide the
2  necessary circumstantial evidence. (See *Aikens, supra*, at footnote
3  2.) Reaffirming that such circumstantial evidence will be sufficient
4  the Court stated: "The law often obliges finders of fact to inquire
5  into a person's state of mind. As Lord Justice Bowen said in
6  treating this problem in an action for misrepresentation nearly a
7  century ago, 'The state of a man's mind is as much a fact as the
8  state of his digestion. It is true that it is very difficult to
9  prove what the state of a man's mind at a particular time is, but if
10 it can be ascertained it is as much a fact as anything else.'"
11 (*Aikens,* at pp. 716-717, quoting *Edgington v. Fitzmaurice* (1885) 29
12 Ch. Div. 459, 483.)[7]

13     The discovery in these cases was granted in part due to the
14 Petitioners' prima facie showing of bias and the necessity that it be
15 "adequately supported with evidence" if such evidence is available.
16 (*Ramirez, supra,* 94 Cal.App.4th at p. 564, fn. 5. See also *Nasha v.*
17 *City of Los Angeles* (2004) 125 Cal.App.4th 470, 483: "A party seeking
18 to show bias or prejudice on the part of an administrative decision
19 maker is required to prove the same 'with concrete facts.'" And see
20 *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674,
21 841: "The challenge to the fairness of the adjudicator must set forth
22 concrete facts demonstrating bias or prejudice." See also *Hobson v.*

23

24 [7] As occurred in *Aikens, supra,* and as suggested in prior orders of this Court,
Respondent should have provided direct evidence from the decisionmakers. While the
fact that a *Defendant* does not explain his or her actions cannot be held against
25 him, (*Griffin v. California* (1965) 380 U.S. 609, *Doyle v. Ohio* (1976) 426 U.S.
610,) it is appropriate to give some weight to the consideration that the Board has
26 failed to offer any direct evidence or explanation on its own behalf. While the
case of *Hornung v. Superior Court* (2000) 81 Cal.App.4th 1095 stands for the
proposition that Petitioner may not inquire into the Board members mental
27 processes, Respondent is not precluded from offering such direct evidence if they
were able to testify as to their good faith and conscientious efforts.
28

24

1  *Hansen* (1967) 269 F.Supp. 401, 502, the watershed Washington D.C.
2  school desegregation case in which the court determined from a
3  statistical and factual analysis that racial bias was influencing
4  policy.)

5      In the case of *People v. Adams* (2004) 115 Cal.App.4th 243, 255,
6  a similar claim of biased decision making was asserted and it was
7  rejected because, although the defendant clearly articulated it, "he
8  has not demonstrated it.  Therefore, he has failed to bear his burden
9  of showing a constitutional violation as a demonstrable reality, not
10 mere speculation."  In the present cases Petitioners have provided
11 overwhelming concrete evidence.  It is difficult to believe that the
12 Board's universal application of §2402(c)(1) has been an inadvertent
13 mistake or oversight on their part.  It is hard to credit the Board's
14 position that it does not know its own patterns and practices reveal
15 a complete lack of standards or constraints on their power.
16 Respondent's protestations ring hollow, and it seems a statistical
17 impossibility, that the Board's use of "detailed" criteria in such a
18 fashion that they are rendered meaningless is a result of good faith
19 efforts on their part.  That every murder is "especially heinous,
20 atrocious or cruel," and can therefore be an exception to the rule
21 that a parole date should be set, does not seem to be an accident on
22 their part.

23     Although no court has thus far agreed with the accusation that
24 the Board approaches its duties with a predetermination and a bias,
25 no court has previously been presented the comprehensive evidence
26 outlined herein.  While this Court does not turn a blind eye to the
27 reasonable conclusion that the Board's unconstitutional practices are
28

1  willful, there is another possibility. The pattern of errors
2  demonstrated by the discovery in this case, and the continuously
3  growing body of Court of Appeal opinions finding consistent and
4  persistent abuse of discretion, may instead be caused by the fact
5  that the Board is simply overworked and substantively untrained. The
6  impossibility of the blanket applicability of §2402(c)(1) may be only
7  the result of sloppy preparation and inadvertent carelessness.

8      The Board must first be given an opportunity to comply with the
9  necessary remedy provided by this court before it is possible to
10 enter a finding of conscious bias and illegal sub rosa policy. To do
11 otherwise would ignore the complexities and magnitude of the largely
12 discretionary duties with which that Board is vested.

13

14                        **CONCLUSION**

15     The conclusive nature of the proof in this case, and the
16 suggestion of institutional bias do not preclude formulation of an
17 remedy which will guarantee adequate restrictions on, and guidance
18 for, the Board's exercise of discretion in making parole suitability
19 determinations. The Board can be made to lawfully perform its duties
20 if given explicit instructions.

21     As noted supra, a reason the proof in this case irrefutably
22 establishes constitutional violations is because the Board does not,
23 in actual fact, operate within the limiting construction of the
24 regulations. The Board's expansive interpretation allows it to
25 operate without any true standards. Although numerous rulings of
26 both state and federal courts of appeal have invalidated the Board's
27 application of the §2402(c) criteria to particular facts, the Board
28

                            26

1   does not take guidance from these binding precedents and ignores them
2   for all other purposes. In the most recent of these cases, *In re*
3   *Roderick*, (2007) ___ Cal.App.4th ___ (A113370) the First District
4   held four of five §2402 factors "found" by the Board to be
5   unsupported by any evidence. At footnote 14 the court took the time
6   to criticize the Board for its repeated use of a "stock phrase"
7   "generically across the state." The court also clarified that "at
8   minimum, the Board is responsible for articulating the grounds for
9   its findings and for citing to evidence supporting those grounds."

10      There is nothing in the evidence presented that would allow any
11  conclusion but that, without intervention of the Courts, the Board
12  will ignore the lessons of these rulings in the future and continue
13  to employ its formulaic approach of citing a criteria from
14  §2402(c)(1), repeating the facts of the crime, but never
15  demonstrating a logical connection between the two. This is the
16  core problem with the Board's methodology -- they provide no
17  explanation or rationale for the findings regarding the crime itself.
18      This practice results in violence to the requirements of due
19  process and individualized consideration which are paramount to the
20  appropriate exercise of its broad discretion.

21      The only solution is one that compels the Board to identify the
22  logical connection between the facts upon which it relies and the
23  specific criteria found to apply in the individual case. For
24  example, the Board often finds that an inmate's motive is "trivial"
25  without ever suggesting why, on these facts, that motive is not just
26  as trivial as the motive behind any other murder. What motive is not
27  trivial? By any definition "trivial" is a word of comparison and
28

1  only has meaning when there can be examples that are not "trivial."

2      Similarly, although the Sixth District made it plain four years

3  ago that "all [] murders by definition involve some callousness," (*In*

4  *re Smith* (2003) 114 Cal.App.4th 343, 345,) the Board has continued to

5  deny countless paroles labeling the crime "callous" without ever

6  suggesting what crime would not qualify as "callous" and without

7  consistently explaining why the individual case before it

8  demonstrates "exceptional" callousness.

9      Respondent has consistently refused to suggest what possible

10  instances of murder would *not* fit the Board's amorphous application

11  of the §2402 criteria. Citing *Dannenberg*, Respondent insists such

12  comparative analysis is unnecessary. Respondent fundamentally

13  misunderstands the *Dannenberg* holding.

14      The PC § 3041(b) exception to the rule can only be invoked when

15  the "gravity of the current convicted offense or offenses, or the

16  timing and gravity of current or past convicted offense or offenses,

17  is such that consideration of the public safety requires a more

18  lengthy period of incarceration for this individual." The word

19  "gravity" is a directive for comparison just as "more lengthy"

20  indicates a deviation from the norm. While *Dannenberg* held there

21  does not need to be intra case comparison for the purposes of term

22  uniformity or proportionality, there necessarily has to be some sort

23  of comparison for the purposes of adhering to the legislative mandate

24  that parole is available. This is implicit in §2402 because the

25  qualifier "especially," in "especially heinous atrocious or cruel,"

26  requires that some form of comparison be made. While the original

27  drafters of §2402 seemed to have recognized this fact, the ongoing

28

1  conduct of the Board has completely ignored it, and this is the

2  essence of the due process violation Petitioners have asserted.

3       As noted in his dissent in the recent case of *In re Roderick,*

4  *supra,* Justice Sepulveda would have deferred to the Board's

5  'exercise' of discretion because "Board members have both training

6  and vast experience in this field.  They conduct literally thousands

7  of parole suitability hearings each year.  The Board therefore has

8  the opportunity to evaluate the egregiousness of the facts of a great

9  number of commitment offenses.  ...  The Board's training and

10 experience in evaluating these circumstances far exceeds that of

11 most, if not all, judges."  The evidence in this case, however,

12 suggests a flaw in granting such deference.  Since the Board

13 continues to place every murder in the category of offenses "tending

14 to show unsuitability," something is certainly wrong.  Since the

15 Board's vast experience is undeniable, the problem must be in the

16 Board's training and understanding of the distinguishing features of

17 the guidelines and criteria.  Although Justice Sepulveda presumes

18 that Board members receive substantive training, there is no evidence

19 before this court to suggest that it does, and substantial

20 circumstantial evidence to suggest that it does not.

21       In the vast numbers of Santa Clara County cases reviewed by this

22 Court, the Board's formulaic decisions regarding the commitment

23 offense do not contain any explanation or thoughtful reasoning.

24 Instead, the Board's conclusionary invocation of words from

25 §2402(c)(1) is linked to a repetition of the facts from the Board

26 report by the stock phrase: "These conclusions are drawn from the

27 statement of facts wherein ..."  Thereafter the inmate files a habeas

28

 1 | corpus petition and Respondent, after requesting an extension of
 2 | time, files a boilerplate reply asserting the Board's power is
 3 | "great" and "almost unlimited" and thus any "modicum" of evidence
 4 | suffices.  Respondent does not cite or distinguish the expanding body
 5 | of case law that is often directly on point as to specific findings
 6 | made.  Thereafter, if the writ is granted, the Board is directed to
 7 | conduct a new hearing "in compliance with due process" and that order
 8 | is appealed by Respondent.  On appeal the order is usually upheld
 9 | with modifications and in the end, after countless hours of attorney
10 | and judicial time, the Board conducts a new two hour hearing at which
11 | they abuse their discretion and violate due process in some different
12 | way.

13 |     This system is malfunctioning and must be repaired.  The
14 | solution must begin with the source of the problem.  The Board must
15 | make efforts to comply with due process in the first instance.  The
16 | case law published over the last five years provides ample and
17 | sufficient guidelines and must be followed.  Although the Board
18 | methods suggest it believes this to be optional, it is not.

19 |
20 |                         **THE REMEDY**

21 |     Thus, it is the order of this Court that the Board develop,
22 | submit for approval, and then institute a training policy for its
23 | members based on the current and expanding body of published state,
24 | and federal, case law reviewing parole suitability decisions, and
25 | specifically the application of §2402 criteria.  In addition to
26 | developing guidelines and further criteria for the substantive
27 | application of §2402 the Board must develop rules, policies and
28 |

1    procedures to ensure that the substantive guidelines are followed.

2        This Court finds its authority to impose this remedy to flow
3    from the fundamental principles of judicial review announced over two
4    centuries ago in Marbury v. Madison (1803) 5 U.S. (1 Cranch) 137.
5    Citing that landmark case, the California Supreme Court has
6    recognized "Under time-honored principles of the common law, these
7    incidents of the parole applicant's right to 'due consideration'
8    cannot exist in any practical sense unless there also exists a remedy
9    against their abrogation." (In re Sturm (1974) 11 Cal.3d 258, 268.)

10        In Strum the court directed that the Board modify its rules and
11    procedures so that thereafter "The Authority will be required [,]
12    commencing with the finality of this opinion, to support all its
13    denials of parole with a written, definitive statement of its reasons
14    therefor and to communicate such statement to the inmate concerned."
15    (Sturm at p. 273.)

16        Similarly, in the case of Minnis, supra, the California Supreme
17    Court held the Board's policy of categorically denying parole to drug
18    dealers was illegal.  Based on its analysis the court there was
19    clearly prepared to order that Board to modify its rules and
20    procedures however such was unnecessary because the Board
21    "voluntarily rescinded" the illegal policy.  While the remedy in this
22    case is of greater scope than that necessary in either Strum or
23    Minnis, supra, so too has been the showing of a systematic abuse of
24    discretion and distortion of process.

25        The most recent case to address the court's roles and duties in
26    overseeing the parole suitability process has been In re Rosenkrantz,
27    supra, 29 Cal.4th 616.  In that case the court explained that

28

31

1  judicial review of a Governor's parole determination comports with,
2  and indeed furthers, separation of powers principles because the
3  courts are not exercising "complete power" over the executive branch
4  and do not "defeat or materially impair" the appropriate exercise or
5  scope of executive duties.  (*Rosenkrantz* at p. 662.)  Citing *Strum,*
6  *supra*, the court reaffirmed that a life term inmate's "due process
7  rights cannot exist in any practical sense without a remedy against
8  its abrogation."  (*Rosenkrantz* at p. 664.)

9      The *Rosenkrantz* court also put forth what it believed was an
10  extreme example but which, unfortunately, has been shown to exist in
11  this case.  The court stated: "In the present context, for example,
12  judicial review could prevent a Governor from usurping the
13  legislative power, in the event a Governor failed to observe the
14  constitutionally specified limitations upon the parole review
15  authority imposed by the voters and the Legislature."  This is
16  exactly what the evidence in this case has proven.  As noted above
17  the Board has arrogated to itself absolute authority, despite
18  legislative limitations and presumptions, through the mechanism of a
19  vague and all inclusive, and thus truly meaningless, application of
20  standards.  The remedy this Court is imposing is narrowly tailored to
21  redress this constitutional violation.

22      The consequence of the Board's actions (of giving § 2402(c)(1)
23  such a broadly all encompassing and universal application) is that
24  they have unwittingly invalidated the basis of the California Supreme
25  Court's holding in *Dannenberg*.  The reason the four justice majority
26  in *Dannenberg* upheld the Board's standard operating procedures in the
27  face of the Court of Appeal and dissent position is because "the

28

32

1  Board must apply detailed standards when evaluating whether an
2  individual inmate is unsuitable for parole on public safety grounds."
3  (*Dannenberg* at p. 1096, footnote 16. See also page 1080: "the
4  regulations do set detailed standards and criteria for determining
5  whether a murderer with an indeterminate life sentence is suitable
6  for parole.") However, Petitioners in these cases have proven that
7  there are no "detailed standards" at all. Instead the Board has
8  systematically reduced the "detailed standards" to empty words. The
9  remedy this Court orders, that there truly be "detailed standards,"
10 requires the promulgation of further rules and procedures to
11 constrain and guide the Board's powers. This remedy differs in
12 specifics, but not in kind, from what courts have previously imposed
13 and have always had the power to impose.

14      The Board must fashion a training program and further rules,
15 standards and regulations based on the opinions and decisions of the
16 state and federal court cases which provide a limiting construction
17 to the criteria which are applied.[8]  The Board must also make
18 provisions for the continuing education of its commissioners as new
19 case law is published and becomes binding authority. This Court will
20 not, at this point, outline the requirements and lessons to be taken
21 from the above cases. It is the Board's duty, in the first instance
22 to undertake this task. The training program, and associated rules
23 and regulations, shall be served and submitted to this Court, in

24 _____

[8]While the showing and analysis in this case was limited to § 2402(c)(1), the
25 conclusions that the evidence compelled, that the Board has been carelessly
   distorting and misapplying the regulations, is not so limited. Accordingly, the
26 training program that is necessary for the Board can not reasonably be limited to
   just § 2402(c)(1). Thus, to the extent case law recognizes, clarifies and
   establishes remedies for other due process violations they must also be
27 incorporated into the necessary rules and training the Board is required to abide
   by.

28

1  writing, within 90 days.  Counsel for Petitioners, and any other
2  interested parties, may submit briefs or comments within 30 days
3  thereafter.  After receipt and review of the materials this Court
4  will finalize the training program, and associated rules, and the
5  Petitioners in these cases shall receive a new hearing before a Board
6  that does not operate with the unfettered discretion and caprice
7  demonstrated by the evidence here presented.

8                                **ORDER**

9     For the above reasons the habeas corpus petition is granted and
10  it is hereby ordered that Petitioner be provide a new hearing which
11  shall comply with due process as outlined above.  Respondent shall
12  provide weekly updates to this Court on the progress of its
13  development of the new rules and regulations outlined above.

14
15
16
17  DATED:  _Aug 30_ , 2007      _Linda R. Condron_
18                              LINDA R. CONDRON
                                JUDGE OF THE SUPERIOR COURT
19
20  cc:  Petitioner's Attorney (Jacob Burland)
         Attorney General (Denise Yates, Scott Mather)
21
22
23
24
25
26
27
28

34

# EXHIBIT "F"

bd

United States District Court
for the
Eastern District of California
December 22, 2004

\* \* CERTIFICATE OF SERVICE \* \*

2:96-cv-00783

Coleman

v.

Board of Prison Term

---

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  December 22, 2004, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

        Tami M Warwick                         TM/PAN
        Attorney General's Office for the State of California
        PO Box 944255                          AR/LKK
        1300 I Street
        Suite 125
        Sacramento, CA  94244-2550

        Ann Catherine McClintock
        Federal Defender
        801 I Street
        Third Floor
        Sacramento, CA  95814

                                    Jack L. Wagner, Clerk

                                    BY: _____
                                          Deputy Clerk

1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MELVYN COLEMAN,

11          Petitioner,                No. CIV S-96-0783 LKK PAN P

12       vs.

13   BOARD OF PRISON TERMS, et al.,

14          Respondent.               ORDER

15   _____/

16          Petitioner, a state prisoner proceeding pro se, has filed this application for a writ

17   of habeas corpus. The matter was referred to a United States Magistrate Judge pursuant to 28

18   U.S.C. § 636(b)(1)(B) and Local General Order No. 262.

19          On December 22, 2004, the magistrate judge filed findings and recommendations

20   herein which were served on all parties and which contained notice to all parties that any

21   objections to the findings and recommendations were to be filed within twenty days. Respondent

22   has filed objections to the findings and recommendations.

23          In accordance with the provisions of 28 U.S.C. § 636(b)(1)(C) and Local Rule 72-

24   304, this court has conducted a de novo review of this case. Having carefully reviewed the

25   entire file, the court finds the findings and recommendations to be supported by the record and by

26   proper analysis.

1

1          Accordingly, IT IS HEREBY ORDERED that:

2              1. The findings and recommendations filed December 22, 2004, are adopted in

3    full; and

4              2. The petition for habeas corpus will be granted unless, within 60 days,

5    respondent provides a fair parole suitability hearing, conducted by a board free of any prejudice

6    stemming from a gubernatorial policy against parole for murderers.

7    DATED: May 19, 2005.

8                                        /s/Lawrence K. Karlton
                                         LAWRENCE K. KARLTON
9                                        SENIOR JUDGE
                                         UNITED STATES DISTRICT COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

                                            2

1

2

3 **FILED**

4          [.:) 2 2 2004

5

         CLERK, U.S. DISTRICT COURT
6          EASTERN DISTRICT OF CALIFORNIA

7

8               United States District Court

9              Eastern District of California

10

11

12 Melvyn H. Coleman,             No. Civ. S-96-0783 LKK PAN P

13        Petitioner,            Findings and Recommendations

14     vs.

15 Board of Prison Terms, et al.,

16        Respondents.

17                 -oOo-

18      Petitioner seeks a writ of habeas corpus.

19      In his November 14, 1997, second amended petition petitioner

20 claims his federal due process guarantee was violated because the

21 California Board of Prison Terms (Board) has failed to conduct a

22 fair parole suitability hearing.

23      In 1974 petitioner was convicted of first degree murder,

24 attempted murder, first degree robbery, first degree burglary and

25 other charges.  The victims, Mr. And Mrs. Siewart, returned to

26 their home while petitioner was burglarizing it; he then

1  approached before they got out of their car and robbed and shot
2  them, killing Mr. Siewart and seriously wounding Mrs. Siewart.
3  Petitioner had a prior juvenile record.

4      Under California law, a prisoner including a convicted
5  murderer serving an indeterminate term (i.e., seven years to
6  life) is entitled to a hearing before a panel composed of members
7  of the Board to determine his suitability for parole.  By
8  statute, parole at some point normally is appropriate and the
9  Board "shall set a release date unless it determines that the
10 gravity of the current convicted offense or offenses, or the
11 timing and gravity of current or past convicted offense or
12 offenses, is such that consideration of the public safety
13 requires a more lengthy period of incarceration. . . ." Cal.
14 Penal Code § 3041(b).  Procedures  governing suitability hearings
15 are set forth in Penal Code § 3041.5 (providing prisoners with
16 notice and an opportunity to be heard and requiring a written
17 statement of reasons if the panel refuses to set a parole date).
18 Regulations prescribe factors for the panel to consider in
19 determining whether each prisoner is suitable or unsuitable for
20 parole.  15 CAC § 2281.[1]

21

22 [1] Factors supporting a finding of unsuitability include: (1) whether the
   prisoner's offense for which he is confined was committed in an "especially
23 heinous, atrocious or cruel manner"; (2) the prisoner's record of violence prior
   to the offense; (3) whether the prisoner has an unstable social history; (4)
24 whether the prisoner has committed sadistic sexual offenses; (5) whether the
   prisoner has a lengthy history of severe mental problems related to the offense;
25 and (6) whether the prisoner has engaged in serious misconduct in prison or jail.
   Factors supporting a finding of suitability include: (1) whether the prisoner has
26 a juvenile record; (2) whether the prisoner has experienced reasonably stable
   relationships with others; (3) whether the prisoner shows signs of remorse; (4)

2

1    Petitioner presents evidence that under Governors Wilson and
2  Davis the Board disregarded regulations ensuring fair suitability
3  hearings and instead operated under a sub rosa policy that all
4  murderers be found unsuitable for parole.  The record shows that
5  between 1992 and 1998 less than one percent of the prisoners in
6  this group were released on parole.  During the previous period
7  the parole rate had been about four percent.  Petitioner presents
8  sworn testimony that the policy was enforced by (1) appointing
9  Board members less likely to grant parole and more willing to
10  disregard their statutory duty; (2) removing Board members more
11  likely to grant parole; (3) reviewing decisions finding a
12  prisoner suitable and setting a new hearing before a different
13  panel; (4) scheduling rescission hearings for prisoners who had
14  been granted a parole date; (5) re-hearing favorable rescission
15  proceedings and hand-picking panels to ensure the desired
16  outcome; (6) panel members agreeing upon an outcome in advance of
17  the hearing; and (7) gubernatorial reversal of favorable parole
18  decisions.  See e.g., declaration of former BPT Commissioner
19  Albert Leddy (Leddy) paras. 5, 6, 8-17, 20 (attached as Ex. 17 to
20  petitioner's March 27, 2003, motion for discovery); deposition of
21  Leddy taken in In re Fortin, et al., San Diego Superior Court

22

23  whether the prisoner committed his crime as the result of significant stress in
   his life; (5) whether the prisoner suffered from Battered Woman Syndrome when she
24  committed the crime; (6) whether the prisoner lacks any significant history of
   violent crime; (7) whether the prisoner's present age reduces the probability of
25  recidivism; (8) whether the prisoner has made realistic plans for release or has
   developed marketable skills that can be put to use on release; and (9) whether
26  the prisoner's institutional activities indicate an enhanced ability to function
   within the law upon release.  15 CAC § 2281.

3

1 case number HSC10279 at 18-19, 47-50, 56-59, 61-63, 65-66, 88-89,
2 95, 97-99, 102, 106, 110, 118 & 126 (attached as Ex. 10 to
3 petitioner's March 27, 2003, motion for discovery); deposition of
4 former BPT Commissioner Edmund Tong taken in Kimble v. Cal. BPT,
5 C.D. Cal. case number CV 97-2752 at 42-43, 45-47, 71, 73, 80-82,
6 85-86, 96, 103, 105, 107 & 109 (lodged December 30, 2003).[2]

7      The unrefuted record shows the no-parole-for-murderers
8 policy existed and continued under Governor Davis.   In In re
9 Rosencrantz, the California Supreme Court took note of evidence
10 presented in the state trial court establishing that the Board
11 held 4800 parole suitability hearings between January 1999
12 through April 2001, granting parole to 48 murderers (one
13 percent).   29 Cal. 4th 616, 685 (2003).   Of those 48, the
14 governor reversed 47 of the Board's decisions and only one
15 murderer out of 4800 actually was released on parole.   Id.
16 Petitioner in Rosenkrantz also submitted evidence of the
17 following interview of Governor Davis reflected in the April 9,
18 1999, edition of the Los Angeles Times: " '. . . [T]he governor
19 was adamant that he believes murderers - even those with second-
20 degree convictions - should serve at least a life sentence in
21 prison.   [Para.]   Asked whether extenuating circumstances should

---

23 [2] Meanwhile, the annual cost to taxpayers of conducting these "pro forma"
hearings is enormous, amounting to millions of dollars per year. See Exhibit 7
24 to petitioner's March 27, 2003, motion for discovery (California Legislative
Analyst's Office - Analysis of the 2000-01 Budget Bill for the Board of Prison
25 Terms criticizing proposed $19 million annual budget and noting huge cost of
additional incarceration resulting from no-parole policy).

26

1  be a factor in murder sentences, the governor was blunt: "No.
2  Zero . . .  They must not have been listening when I was
3  campaigning. . . .  If you take someone else's life, forget it.
4  I just think people dismiss what I said in the campaign as either
5  political hyperbole or something that I would back away from . .
6  . .  We are doing exactly what we said we were going to do."'"
7  29 Cal. 4th at 684.

8      Respondent does not refute the alleged facts.  Instead,
9  respondent argues that, assuming arguendo prisoners in California
10 have an interest in a parole date protected by the due process
11 clause, constitutional requirements are met so long as there is
12 "some evidence" supporting the findings petitioner is unsuitable.
13 See Oppo. at 7:20 (so long as "some evidence" standard is met,
14 "the Board decisions could not have been arbitrary.")  For the
15 reasons explained, this court rejects that claim.  As this court
16 previously has found, there always will be "some evidence" that
17 can be used to explain a denial or rescission under the
18 circumstances.  Federal due process requires more.

19     California's parole scheme gives rise to a protected liberty
20 interest in release on parole.  McQuillion v. Duncan, 306 F.3d
21 895, 902 (2002); Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389,
22 1390 (9th Cir. 1987); Greenholtz v. Inmates of Nebraska Penal &
23 Correctional Complex, 442 U.S. 1 (1979); Biggs v. Terhune, 334
24
25
26

5

1 | F.3d 910, 915 (9th Cir. 2003); In re Rosenkrantz, 29 Cal. 4th 616
2 | (2003).[3]

3    Therefore, petitioner is entitled to the process outlined in
4 | Greenholtz, viz., notice, opportunity to be heard, a statement of
5 | reasons for decision, and limited right to call and cross-examine
6 | witnesses.  The determination that petitioner is unsuitable for
7 | parole must be supported by some evidence bearing some indicia of
8 | reliability.

9    These guarantees do not exhaust petitioner's right to due
10 | process.  The fundamental core of due process is protection
11 | against arbitrary action:

12    The principal and true meaning of the phrase has never
      been more tersely or accurately stated than by Mr.
13    Justice Johnson, in Bank of Columbia v. Okely, 17 U.S.
      235, 4 Wheat. 235-244, 4 L.Ed. 449 [(1819)]: "As to the
14    words from Magna Charta, incorporated into the
      Constitution of Maryland, after volumes spoken and
15    written with a view to their exposition, the good sense
      of mankind has at last settled down to this: that they
16    were intended to secure the individual from the
      arbitrary exercise of the powers of government,
17    unrestrained by the established principles of private
      right and distributive justice."
18
      Hurtado v. California, 110 U.S. 516, 527, (1884).  "The
19
      concessions of Magna Charta were wrung from the king as
20
      guaranties against the oppressions and usurpations of his
21

22

23    [3] That is so because the parole statute, Penal Code § 3041, uses mandatory
      language ("The panel or board shall set a release date unless it determines"
24    further incarceration is necessary in the interest of public safety) which
      "'creates a presumption that parole release will be granted," unless the
25    statutorily defined determinations are made.  Board of Pardons v. Allen, 482 U.S.
      369, 378 (1987) (quoting Greenholtz, 442 U.S. at 12).  As of 1988, by amendment
26    of the state constitution, a parole date given can be withdrawn by the Governor
      under the same factors considered by the Board.

6

1  prerogative."  Id. at 531.  "The touchstone of due process is
2  protection of the individual against arbitrary action of
3  government."  Wolff v. McDonnell, 418 U.S. 539, 558 (1974),
4  citing Dent v. West Virginia, 129 U.S. 114 (1889).

5      A government official's arbitrary and capricious exercise of
6  his authority violates the essence of due process, contrary to
7  centureis of Anglo-American jurisprudence.  See Yick Wo v.
8  Hopkins, 118 U.S. 356, 369 (1886) ("When we consider the nature
9  and the theory of our institutions of government, the principles
10  upon which they are supposed to rest, and review the history of
11  their development, we are constrained to conclude that they do
12  not mean to leave room for the play and action of purely personal
13  and arbitrary power."); United States v. Lee, 106 U.S. 196, 220
14  (1882) ("No man in this country is so high that he is above the
15  law.  No officer of the law may set that law at defiance with
16  impunity.  All the officers of the government from the highest to
17  the lowest, are creatures of the law and are bound to obey it.
18  It is the only supreme power in our system of government, and
19  every man who by accepting office participates in its functions
20  is only the more strongly bound to submit to that supremacy, and
21  to observe the limitations which it imposes upon the exercise of
22  the authority which it gives."); U.S. v. Nixon, 418 U.S. 683,
23  695-96 (1974) (rule of law is "historic commitment"); Accardi v.
24  O'Shaughnessy, 347 U.S. 260, 267-68 (1954) (Attorney General must
25  abide by regulations and cannot dictate immigration board's
26  exercise of discretion in decision on application to suspend

7

1 | deportation; remedy is new hearing where board will exercise it's
2 | discretion free from bias).

3 |     Concomitant to the guarantee against arbitrary and
4 | capricious state action is the right to a fact-finder who has not
5 | predetermined the outcome of a hearing.  See <u>Withrow v. Larkin</u>,
6 | 421 U.S. 35 (1975) (a fair trial in a fair tribunal is a basic
7 | requirement of due process, and this rule applies to
8 | administrative agencies which adjudicate as well as to courts);
9 | <u>Edwards v. Balisok</u>, 520 U.S. 641 (1997) (recognizing due process
10 | claim based on allegations that prison disciplinary hearing
11 | officer was biased and would suppress evidence of innocence);
12 | ·<u>Bakalis v. Golembeski</u>, 35 F.3d 318, 326 (7th Cir. 1994) (a
13 | decision-making body "that has prejudged the outcome cannot
14 | render a decision that comports with due process").

15 |     Courts too numerous to list have recognized that the right
16 | to a disinterested decision-maker, who has not prejudged the
17 | case, is part of the fundamental guarantee against arbitrary and
18 | capricious government conduct ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.
19 | See, <u>e.g.</u>, <u>Rosenkrantz</u>, 29 Cal. 4th at 677 (parole decision "must
20 | reflect an individualized consideration of the specified criteria
21 | and cannot be arbitrary and capricious"); <u>In re Ramirez</u>, 94 Cal.
22 | App. 4th 549, 563 (2001) ("some evidence" standard is "only one
23 | aspect of judicial review for compliance with minimum standards
24 | of due process" (citing <u>Balisok</u>) and Board violates due process
25 | if its decision is "arbitrary and capricious"); <u>In re Minnis</u>, 7
26 | Cal. 3d 639 (1972) (blanket no-parole policy as to certain

8

1  category of prisoners is illegal); <u>In re Morrall</u>, 102 Cal. App.
2  4th 280 (2003) (same).  The guarantee of neutral parole officials
3  in a suitability hearing is just as fundamental as the right to a
4  neutral judge in a court proceeding.  Compare <u>Sellars v.</u>
5  <u>Procunier</u>, 641 F.2d 1295 (9th Cir. 1981) (holding that California
6  parole officials, analogous to judges, are entitled to absolute
7  immunity).

8      The Ninth Circuit previously has acknowledged California
9  inmates' due process right to parole consideration by neutral
10  decision-makers.  See <u>O'Bremski v. Maas</u>, 915 F.2d 418, 422 (9th
11  Cir. 1990).  In that case the appellate court found that a
12  neutral parole panel at a new hearing would reach the same
13  outcome and so denied relief.  The record in this case simply
14  will not permit the same conclusion.  The requirement of an
15  impartial decision-maker transcends concern for diminishing the
16  likelihood of error.  As the Supreme Court clearly held in
17  <u>Balisok</u> a decision made by a fact-finder who has predetermined
18  the outcome is <u>per se</u> invalid -- even where there is ample
19  evidence to support it.  520 U.S. at 648.

20      Petitioner presents a convincing case that a blanket policy
21  against parole for murderers prevented him from obtaining a
22  parole suitability determination made after a fair hearing.
23  Respondent offers nothing to counter petitioner's showing.

24      Accordingly, the court hereby recommends that the petition
25  for habeas corpus be granted unless, within 60 days of the
26  district court's adoption of these recommendations, respondent

9

1 | provides a fair parole suitability hearing, conducted by a board
2 | free of any prejudice stemming from a gubernatorial policy
3 | against parole for murderers.

4 | Pursuant to the provisions of 28 U.S.C. § 636(b)(1), these
5 | findings and recommendations are submitted to the United States
6 | District Judge assigned to this case. Within 20 days after being
7 | served with these findings and recommendations, respondent may
8 | file written objections. The document should be captioned
9 | "Objections to Magistrate Judge's Findings and Recommendations."
10 | The district judge may accept, reject, or modify these findings
11 | and recommendations in whole or in part.

12 | Dated: ___DEC 2 1 2004___ .

14 | Peter A. Nowinski
Magistrate Judge

26 | cole0783.f&r grant

10